*** Filed ***
03:06 PM, 06 Mar, 2026
U.S.D.C., Eastern District of New York

**UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK**

Andrew Quijano, Plaintiff, -against- AMAZON.COM SERVICES LLC, Defendant

Case No.: 1:26-cv-00664

**PLAINTIFF'S OPPOSITION TO REQUEST FOR PRE-MOTION CONFERENCE; REQUEST TO STAY VENUE PROCEEDINGS PENDING DECISION ON REMAND**

Dear Honorable Judge DeArcy Hall,

The Plaintiff Andrew Quijano respectfully requests that the Court stay all briefing regarding Defendant's request for a pre-motion conference and transfer of venue until the pending Motion to Remand is decided, as jurisdictional priority must be established before discretionary venue motions can be considered. Furthermore, the Defendant's reliance on *Atlantic Marine* is misplaced; that precedent applies only to contractually valid clauses, whereas the Release here is void as a matter of law for violating the unwaivable venue and whistleblower protections of NY Labor Law § 740 and the public policy mandates of Judiciary Law § 519. Finally, as detailed in Section II below and the accompanying declaration, the Defendant's Request is built upon a foundation of factually incorrect statements made in its February 26, 2026, Answer to Complaint statements that directly contradict the public record and are currently the subject of a Rule 11 Safe Harbor notice served to them via e-mail on March 5, 2026.

## I: Jurisdictional Priority (The "Steel Co." Rule)

a. Under the Supreme Court's mandate in ***Steel Co. v. Citizens for a Better Environment***, 523 U.S. 83, 94 (1998), the requirement that jurisdiction be established as a threshold matter is **"inflexible and without exception."** Because a court without jurisdiction cannot proceed at all, this Court must resolve the pending Motion to Remand before it can rule upon the Defendant's discretionary request for a venue transfer.

b. Plaintiff's Motion to Remand (ECF No. 9) is **currently pending** and identifies significant procedural defects in the Defendant's removal from Queens County. **It is unusually bold for the Defendant to demand a transfer to the SDNY when the Remand motion hasn't even been ruled on, especially when they weren't upfront in the Motion to Remove that their plan was to litigate this case in SDNY the whole time.** If this case belongs in the Queens Supreme Court, this Court has no power to send it to SDNY. Procedural order must prevail: the "where" (Venue) cannot be determined until the "whether" (Jurisdiction) is established.

1

## II: The Defendant has already made factually inaccurate statements

a. **Reckless Denials of the Court Record:** The Defendant's Answer contains at least eight (8) objective falsehoods, most notably denying the existence or "knowledge" of authenticated emails. First, the Defendant denies knowledge of the Plaintiff's email to Queens County Court (ECF No. 14,  20, 23), but the e-mail was provided in the Motion to Remand (ECF No. 9-5, Exhibit C). Furthermore, the Defendant has made other denials (ECF No. 14,  5, 9, 10, 11, 22) of existing e-mail communications and documents, which are disproven by Exhibits A, B, C, and D. Queens County Court received Exhibits A, C, and D as of February 18, 2025 (ECF No. 9-5, Exhibit C).

b. **Failure of Reasonable Inquiry:** Beyond record denials, the Defendant further denies undisputed facts such as the Plaintiff's tenure and documented jury service history (Exhibit D), both of which are easily verifiable via its own internal HR databases. The Defendant should not be permitted to use a venue transfer to escape the consequences of its lack of candor in this District.

## III: The Agreement is Void as a Matter of Law and Public Policy

a. **Unconscionability and the "Data Lockout" Trap:** The Agreement (ECF 9-5, Exhibit B, § Acknowledgements) requires the Employee to represent that they have disclosed all ethical concerns. Plaintiff filed a comprehensive Ethics Report (Exhibit F) on May 27, 2025, to ensure the factual accuracy of this representation. However, this requirement is procedurally and substantively unconscionable when paired with Defendant's "data lockout" policy (Exhibit E). Defendant forces a whistleblower to certify the completeness of their disclosures while simultaneously stripping them of the access necessary to substantiate those very claims.

b. **Compliance and Regulatory Red Flags:** The suspicious one-day turnaround between Plaintiff's Ethics Report and the presentation of the Release suggests a systemic failure of internal controls. Defendant utilizes Navex EthicsPoint *to satisfy SOX and EU Whistleblower Directive requirements*; however, the documented sequence of an active ethics report followed immediately by a 'General Release' presents a profile of suppression. While the instant matter concerns the violation of Judiciary Law § 519, the Defendant's use of a 'Release' to truncate a live EthicsPoint investigation creates a profile of suppression that would, in the context of a securities or financial report, constitute a per se violation of **SEC Rule 21F-17(a)** and the precedent set in **SEC v. KBR**. The Plaintiff's ability to identify and bypass internal 'lockouts' underscores a systemic risk: if the Release is used to silence a juror, **it leaves the door open for the system to be used to silence potential whistleblowers regarding internal trade compliance or securities law violations.**

c.  **The "License to Battery" Absurdity (Judiciary Law § 519):** Defendant's interpretation of the "common law tort" waiver is fundamentally incompatible with New York public policy. If applied to the facts here and taken to its logical extreme, Defendant's interpretation would permit an employer to commit intentional torts, including physical battery, against a juror for their absence, yet remain shielded from civil liability. Because Judiciary Law § 519 prohibits any "penalty" for jury service, a waiver that purports to authorize intentional torts against a sitting juror is a legal nullity.

d.  **The "Severability suicide Pill" and NY LL § 740**: The Agreement (§ Severability) explicitly prohibits the narrow construction or "blue-penciling" of the "General Release" section. However, the Release purports to waive NY Labor Law § 740, which contains an explicit anti-waiver provision under § 740(7). Because the Defendant has intentionally made the General Release unseverable, the illegality of the § 740 waiver (which is void as a matter of law) effectively collapses the entire agreement. The Court can enforce a contract that violates New York's anti-waiver statute, or strike the NY LL § 740 waiver clause **regardless of lack of severability.** While the Court possesses the equitable discretion to strike individual offending clauses, the Defendant's deliberate inclusion of a 'Non-Severability' mandate effectively precludes the use of the 'Blue Pencil' doctrine to save the remainder; if the core release of claims is inseparable from these void-as-against-public-policy waivers, the Court is invited to invalidate the General Release in its entirety rather than act as a post-hoc scrivener for a sophisticated party.

e.  **Objective Factual Falsity of Representations:** The representation in § Acknowledgements (vii) is objectively false. On February 20, 2025, Plaintiff filed a formal complaint with the New York Attorney General (ECF 9-5, Exhibit D) following the advice of the Queens County Court. Also, § Acknowledgements (iv) is false, as an ethics report was filed within a day of the release (Exhibit F).

f.  **The Sarbanes-Oxley (SOX) Omission:** It is telling that the Agreement explicitly attempts to waive NY LL § 740 but omits any mention of the Sarbanes-Oxley Act (18 U.S.C. § 1514A). **This selective waiver suggests a strategic calculation: the Defendant lacks the 'nerve' to explicitly challenge Federal Whistleblower statutes**, knowing the SEC's stance in *SEC v. KBR*, **yet the Defendant appears to believe it can contract around the fundamental protections of the New York State Judiciary and Whistleblower Law.** Perhaps it is time for New York State to address the same issues that the 'SEC v. KBR Inc.' issue addressed, such as the unwaivability of public duties, such as jury service.

g.  **Systemic Suppression and the "Focus" Program:** This litigation highlights a broader, systemic hostility toward whistleblowers. The "Focus" program (initiated shortly after Plaintiff alerted the Queens Court to his § 519 concerns, as "Focus" is roughly 60 days long) is designed for secrecy, in which managers are explicitly told to avoid telling their direct reports that they are on "Focus". Plaintiff only avoided the "Data Lockout" trap

3

because he was tipped off by a senior manager to begin saving evidence before the Pivot phase (Exhibit E) rendered him "digitally inept."

h. **The Public Interest Factor:** If this Release is enforced, it validates a system where a trillion-dollar corporation uses "data lockouts" (Exhibit E) and unseverable waivers to silence jurors and whistleblowers. The "common law tort" waiver raises a chilling question: **how many other workers, victims of assault and battery, or state law violations, have been successfully silenced by this mechanism?** The public interest in protecting the sanctity of the jury pool and the safety of the workforce outweighs any private interest in a forum-selection clause contained within a void agreement.

i. **Executive-Level Authorization and Systemic Culpability:** The Release (ECF 9-5, Ex. B) was executed on behalf of the Defendant by **Beth Galletti, Senior Vice President of Human Resources**. This signature confirms that the inclusion of illegal anti-whistleblower waivers (NY LL § 740) and the attempted shielding of juror-retaliation (Judiciary Law § 519) is not the result of a "rogue" agent's error. **Rather, it represents an intentional, executive-level strategy to bypass New York law**. By having its highest HR leadership authorize a contract that purports to waive the fundamental right to serve on a jury without penalty, the Defendant has confirmed that its hostility toward judicial service is a top-down corporate mandate.

## IV: Conclusion

a. As a former juror who took his oath to the New York court system seriously (Exhibit D), the Plaintiff is appalled by the Defendant's conduct. This litigation began with a procedurally defective removal, continued with objectively false statements in a federal pleading, and has now culminated in a desperate attempt to flee to the Southern District of New York to avoid this Court's scrutiny.

b. The Defendant's "Agreement" is not a valid contract; it is a top-down corporate attempt to override the public policy of the State of New York. Because the Court hasn't settled jurisdictional priority under *Steel Co.*, and because the underlying contract is void *ab initio*, the Plaintiff respectfully requests that the Court deny the request for a pre-motion conference and stay all venue proceedings until the Motion to Remand is decided first.

Respectfully submitted,

*Andrew Quijano*

Andrew Quijano, Pro Se

4

**Declaration of Andrew Quijano**

I, Andrew Quijano, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

Exhibit A is a true and correct copy of the entire e-mail exchange, from when the warning was issued to the warning being retracted. This e-mail was given to Queens County Court, as an attachment called "Warning and Survival.pdf", shown in Motion to Remand (ECF No. 9-5, Exhibit C) on February 18th, 2025.

Exhibit B is a true and correct copy of the final written warning presented to the Plaintiff on January 6, 2025. The original document is a Microsoft Word file, so the Exhibit also includes a screenshot confirming that the metadata identifies it as an authentic document created by the Defendant's HR department. The Microsoft Word document can be given directly to the Court Clerk to verify my claim of authenticity.

Exhibit C is a true and correct copy of an email exchange between the Plaintiff, the Defendant's counsel, and HR regarding the scheduling of a meeting about the warning.  This e-mail was given to Queens County Court, as an attachment called "Jury_Duty_Delay.pdf", shown in Motion to Remand (ECF No. 9-5, Exhibit C) on February 18th, 2025.

Exhibit D is a true and correct copy of the Plaintiff's jury duty attendance record. The Defendant has a copy of this exact sheet. In Motion to Remand (ECF No. 9-5, Exhibit C), the Plaintiff confirmed that on or before February 18, 2025, the Defendant had a copy of this notice on their HR portal. **This exhibit also objectively confirms that the defamation was in effect throughout the entirety of the Plaintiff's jury service** (Exhibit A).

Exhibit E is a true and correct copy of the third page of the Pivot document, presented to the Plaintiff on May 7, 2025, via e-mail. The Plaintiff highlighted in red the key point that the Defendant implements a data lockout, which he alleges the Defendant uses to prevent any whistleblower from presenting evidence to a regulatory authority. This picture was taken on May 7, 2025, at 11:23 PM.

Exhibit F is a true and correct copy of the Navex Ethics Report hotline Report Key 331330906901 confirming that an Ethics Report was submitted. Given the Defendant's data lockout, the only way the Plaintiff could obtain this evidence was to take a picture of his screen with his iPhone. The picture was taken on May 27, 2025, at 10:11 PM.

Signature was executed on March 6, 2026:

*Andrew Quijano*

Andrew Quijano

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2026, I served a true and correct copy of the Plaintiff's Opposition Request for Pre-Motion Conference; Request to Stay Venue Proceedings Pending Decision on Remand via Email to the following counsel of record:

**Jason D. Burns, Esq. / Shira M. Poliak, Esq.**

**Greenberg Traurig, LLP**

**One Vanderbilt Avenue, New York, NY 10017**

*Andrew Quijano*

Andrew Quijano, Pro Se

# EXHIBIT A

**Quijano, Andrew**

| | |
|---|---|
| **From:** | Stevenson, Glen |
| **Sent:** | Tuesday, February 11, 2025 11:34 AM |
| **To:** | Quijano, Andrew |
| **Cc:** | Ahuja, Priya |
| **Subject:** | RE: Andrew FWW |

Hi Andrew,

After further discussion with HR the FWW is canceled and does not require your signature.


Best Regards,

Glen Stevenson
Security Engineering Manager – AppStar-NAMER
Semper Gumby
PhoneTool

**From:** Quijano, Andrew <andrewfq@amazon.com>
**Sent:** Tuesday, January 7, 2025 2:07 PM
**To:** Stevenson, Glen <stegle@amazon.com>
**Cc:** Ahuja, Priya <ahupriya@amazon.com>
**Subject:** RE: Andrew FWW

Hello Glen,
I want to sign it, I just want to clear things up with HR based on some questions I sent you on Slack yesterday. Ideally, I would like to meet with HR this week just to make sure everything is crystal clear. Also, I figure this extra context hopefully clarifies that these were genuine misunderstandings, I am bringing over the questions from the Slack:

1. For MITLL, there are two academic collaborations
   a. LAVA, it is NOT confirmed yet, but LAVA is part of the PhD program with NYU and my official dissertation topic. We would be committing code to upgrade this code base, would this be a violation if both I and MITLL are actively committing to this code base? LAVA is already open sourced, so technically anyone could submit a Pull Request. Although this repository is technically owned by MITLL.
      1. **Update as of today: There will be NO collaboration with MITLL on LAVA**, it will just be me and my advisor working on the repository for the PhD and publishing papers based on the results, so this question is deprecated

   b. Cyber Risk stuff, so within a PhD, it is important to collaborate (hence why I worked with the FIU Professor, with my advisor's blessing), and my PhD advisor was supportive of this collaboration (He paid for LCN conference and IPCCC conference fee, these papers were not dissertation related). Since this is part of my education, would getting a note my advisor approved of this collaboration/this cyber risk work was something he deemed important for my PhD count for something? I misunderstood this, which is why when I filled out the COI, I filled it out as open-source project, which said no need to fill it out the COI, and I misunderstood the Legal e-mail when it said no need to ask SciPub also meaning no need to report COI/Academic Collaboration for work

1

outside of Amazon. I have a track record reporting COIs, like here and here with my PhD, so while yes, I am more than happy to accept I should have just played safe than sorry, I do hope that this misunderstanding does help clear things up. Also, few more questions I should clear up

1. Am I free to work on this cyber risk project on my spare time (outside of work hours, of course) and just not receive any pay too? I can also terminate the relationship no problem, but I want to know if that is an option.

2. I am technically receiving funding from NYU for the PhD work, if MITLL paid me through NYU (or any other institution for that matter, I figure let's get this cleared up with HR), would that change things somehow?

3. To confirm, HR has no objection to me being paid as a PhD student, as long as my research is done outside of work hours/doesn't impact my Amazon work?

2. Using Amazon stuff
   a. Boru did say as long as doing the research experiment wasn't like burning a lot of money it was fine to use the burner accounts. Technically, I should have gotten it in writing, but now that I am aware this technically should have been HR/Legal question, I'm hoping this wouldn't be held against me here as now I am aware this technically was beyond just a manager's call. But feel free to audit my burner account history, I made sure to be careful with the usage to comply with his request. Plus the last time I used this was like 6+ months ago I think, I forgot. I still have Boru's contact, would it be worth asking for some retroactive thing from Boru? Is there a SIM ticket process to ask when using Amazon stuff could be acceptable (e. g. using Cedric to check grammar for my PhD papers)? Either way, I haven't been using the burners and will be sure to get approvals in writing for any usage like this.

   b. Is there anything else I am in particular being warned about here? At least from my understanding, the issue was when I mentioned to you about using the burner account for the decision tree results.

Sincerely,

**Andrew Quijano**
Security Engineer I
Application Security Team - Team Artists
Amazon | JFK 14 – 7 W 34th Street, New York, NY 10001
Mobile +1 917-224-2122 | Email: andrewfq@amazon.com

---

**From:** Stevenson, Glen <stegle@amazon.com>
**Sent:** Tuesday, January 7, 2025 2:30 PM
**To:** Quijano, Andrew <andrewfq@amazon.com>
**Cc:** Ahuja, Priya <ahupriya@amazon.com>
**Subject:** RE: Andrew FWW

Hi Andrew,

Can you please ensure this is signed by EOD today, 1/7/2025? Thank you!

Best Regards,

Glen Stevenson
Security Engineering Manager – AppStar-NAMER
Semper Gumby
PhoneTool

---

**From:** Stevenson, Glen
**Sent:** Monday, January 6, 2025 12:53 PM
**To:** Quijano, Andrew <andrewfq@amazon.com>
**Subject:** RE: Andrew FWW

Additionally, During the 90 day period after this is delivered any internal transfer would require additional approval.


Best Regards,

Glen Stevenson
Security Engineering Manager – AppStar-NAMER
Semper Gumby
PhoneTool

---

**From:** Stevenson, Glen <stegle@amazon.com>
**Sent:** Monday, January 6, 2025 12:38 PM
**To:** Quijano, Andrew <andrewfq@amazon.com>
**Cc:** Stevenson, Glen <stegle@amazon.com>
**Subject:** Andrew FWW

HI Andrew,

As discussed please review and sign the document. When returned to me signed I will sign it and return it to you.


Best Regards,

Glen Stevenson
Security Engineering Manager – AppStar-NAMER
Semper Gumby
PhoneTool

# EXHIBIT B



To: Andrew Quijano
Department: Amazon Security

Emp ID: 112922834
Location: JFK14

# FINAL WRITTEN WARNING

Amazon expects that all employees follow the established standards of conduct as talked about in the Owner's Manual, the Leadership Principles, and in our guiding policies and principles.  We also expect that you model these principles for the organization. The purpose of this Final Written Warning is to define areas of concern where your actions have not met the established standard based on the aforementioned principles.

Per the terms and conditions of your employment, Amazon is your primary employer. As part of your employment, you are subject to Amazon's Conflict of interest policies. Your current position with MIT Lincoln Labs has come to our attention and conflicts with your role and responsibilities at Amazon. Our priority is to resolve this in a way that aligns with Amazon's policies and your employment agreement. This requires you to terminate your position at Lincoln Labs to maintain your employment with Amazon.

Additionally, you need to ensure you are not using Amazon time and resources to do non-Amazon work. This includes but is not limited to committing code to student research projects during standard working hours and using Amazon resources for testing non-Amazon related research or projects. It has been brought to my attention that you are working on non-Amazon projects during standard working hours and using SDO AWS resources to conduct testing. This is considered a violation of the Owner's Manual: Category 2 - Unauthorized use, misuse, or abuse of equipment, products, material, or property belonging to other associates, belonging to the company, or in the company's custody.

## Areas of Improvement Required:

Amazon has clear guidelines about Conflict of Interest.  Specifically, the Conflict of Interest Policy states:

> All employees of Amazon and its affiliates should avoid conflicts of interest with their job.  A conflict of interest can occur when your interests, or the interests of someone connected to you, overlap or compete with what's best for Amazon. Even the appearance of a conflict of interest can negatively affect Amazon, which is why employees must report potential conflicts of interest via the Conflict of Interest Tool for review by the Legal department.

Legal has determined that your position with Lincoln Labs is a conflict of interest with your position at Amazon.

Additionally, Amazon has clear guidelines about employee conduct.  Specifically, the Owner's Manual and Guide to Employment – US Category 2 states that the following infractions are serious and generally result in corrective action:

> Unauthorized use, misuse, or abuse of equipment, products, material, or property belonging to other associates, belonging to the company, or in the company's custody

The use of Amazon resources to conduct testing is a violation of this policy.

The expectations outlined by leadership on January 6th, 2025 delivered both on a meeting and in email state:

> The failure to terminate your position at Lincoln Labs is a conflict of interest with your position at Amazon. Continued employment at Lincoln Labs could result in further consequences from Amazon. Additionally, any further violation of the Owner's Manual Category 2 in the next 90 days will result in further action from Amazon.

We expect you to follow these guidelines, and escalate to a manager each and every time there is an obstacle that could prevent them from following these guidelines

Going forward, we expect you to meet or exceed the standards in place. If you are unclear of the expectations of you, or are unclear of anything in the Owner's Manual, the standards of conduct, or any of the applicable policies and procedures you should reach out to your manager for clarification.  Failure to comply with these expectations may result in additional disciplinary actions up to and including termination of employment.

amazon

Employee's Signature                                         Date
This information has been reviewed with me.

Preparer's Signature                                        Date

Preparer's Printed Name

CC:  Employee File

# Info

## AndrewFWW

Downloads

 Upload     Share     Copy path     Copy local path     Open file location



### Protect Document

Control what types of changes people can make to this document.

Protect Document ⌄



### Inspect Document

Before publishing this file, be aware that it contains:

- Document properties and author's name
- Headers and footers
- Characters formatted as hidden text

Check for Issues ⌄



### Version History

View and restore previous versions.

Version History



### Manage Document

⟳ There are no unsaved changes.

Manage Document ⌄

### Properties ⌄

| | |
|---|---|
| Size | 48.9KB |
| Pages | 2 |
| Words | 640 |
| Total Editing Time | 6 Minutes |
| Title | Add a title |
| Tags | Add a tag |
| Comments | Add comments |

### Related Dates

| | |
|---|---|
| Last Modified | 1/2/2025 10:57 AM |
| Created | 1/2/2025 10:57 AM |
| Last Printed | |

### Related People

Author

BK  Brown, Kenneth

Add an author

Last Modified By

SG  Stevenson, Glen

### Related Documents

 Open File Location

Show All Properties

# EXHIBIT C

## Quijano, Andrew

| | |
|---|---|
| **From:** | Quijano, Andrew |
| **Sent:** | Friday, January 17, 2025 12:49 PM |
| **To:** | Martin, Elizabeth [C]; meet@chime.aws; pin+3869862085@chime.aws; Dukmen, Sarah |
| **Cc:** | Syso, Rose; Panta, Alicia |
| **Subject:** | RE: Conflict of Interest Policy Questions |

Hello,

I am expected to be in jury duty all of next week. Could we meet on the week of January 27th? Thank you for making the time to meet!

Sincerely,

**Andrew Quijano**
Security Engineer I
Application Security Team - Team Artists
Amazon | JFK 14 – 7 W 34th Street, New York, NY 10001
Mobile +1 917-224-2122 | Email: andrewfq@amazon.com

-----Original Appointment-----
**From:** Martin, Elizabeth [C] <elizamam@amazon.com>
**Sent:** Thursday, January 16, 2025 1:21 PM
**To:** meet@chime.aws; pin+3869862085@chime.aws; Dukmen, Sarah; Quijano, Andrew
**Cc:** Syso, Rose; Panta, Alicia
**Subject:** Conflict of Interest Policy Questions
**When:** Friday, January 24, 2025 12:00 PM-12:30 PM (UTC-06:00) Central Time (US & Canada).
**Where:**

Hi Andrew,

I believe Rose Syso in HR let you know we would be reaching out. I understand from her that you have some questions regarding Amazon's Conflict of Interest Policy in relation to your PhD program.

Setting this call with you, myself (Business Conduct & Ethics), Sarah Dukmen (IP Legal who reviews Academic Collaborations), and HR, so we can address those questions.

Please feel free to suggest a different time.

Best,
Liz

You have been invited to an online meeting, powered by Amazon Chime.

Click to join the meeting: https://chime.aws/3869862085
Meeting ID: 3869 86 2085
A headset is recommended or you may use your computer's microphone and speakers.

Call in using your phone:
United States Toll-Free (1): +1 855-552-4463

1

Meeting ID: 3869 86 2085
One-click Mobile Dial-in (United States (1)): +1 206-462-5569,,,3869862085#
United States (1): +1 206-462-5569
International: https://chime.aws/dialinnumbers/
Dial-in attendees must enter *7 to mute or unmute themselves.

To connect from an in-room video system, use one of the following Amazon Chime bridges:
SIP video system: 3869862085@meet.chime.in or meet.chime.in
H.323 system: 13.248.147.139 or 76.223.18.152
If prompted enter the Meeting PIN: 3869862085#

Download Amazon Chime at https://aws.amazon.com/chime/download
For information about creating an Amazon Chime account, see https://aws.amazon.com/chime/getting-started

# EXHIBIT D



# COMMISSIONER OF JURORS - QUEENS
## 88-11 SUTPHIN BLVD, RM 105
## JAMAICA, N.Y. 11435



**Hon. Audrey I. Pheffer**
*Queens County Clerk*
*Clerk of the Supreme Court &*
*Commissioner of Jurors*

**Raymond M. Weaver**
*First Deputy County Clerk*

**Jason Rivera**
*Jury Supervisor*
*Jamaica/Long Island City*

**Craig Schonfeld**
*Jury Supervisor*
*Kew Gardens*

## THIS IS TO CERTIFY THAT

Andrew Quijano

served as a juror in this Court on the following days:

1/9/25, 1/10/25, 1/13/25, 1/14/25, 1/15/25, 1/16/25,

1/21/25, 1/22/25

**Index Number:** X3163

**Courtroom:** HON. MICHAEL J. HARTOFILIS

**Date:** 1/22/25

Hon. Audrey I. Pheffer
Queens County Commissioner of Jurors

**FOR DETAILS ABOUT SERVICE AND FEES, PLEASE REFER TO SEC. 519 & SEC. 521 OF THE JUDICIARY LAW.**

**IMPORTANT NOTICE PURSUANT TO SECTION 526 OF THE JUDICIARY LAW:**
All jurors who have served in a court of the Unified Court System and are entitled to an allowance and therefore, must present their claims to the Commissioner of Jurors on or before the 31st day of December of the next year succeeding or following the year in which jury service was rendered or performed. Failure to present such claim shall be a forfeiture of the payment for such services.

**EXECUTIVE OFFICE:** 88-11 Sutphin Boulevard, Room 105, Jamaica, New York 11435, (718) 298-060
89-17 Sutphin Boulevard, Room 244, Jamaica, New York 11435, (718) 262-7223
120-55 Queens Boulevard, Room CJ1, Kew Gardens, New York 11415, (718) 298-0621
25-10 Court Square, Room B58, Long Island City, New York 11101, (718)298-0624

Pursuant to Article 16, Section 521 of the Judiciary Law, jurors are entitled to $40.00 per day unless they receive payment from their employer. If such person's daily wages are less than $40.00, he or she shall be entitled to receive an allowance hereunder equal to the difference between $40.00 and the amount of his or her daily wages. The employer is mandated to pay a temporary, night shift, full time, or part time employee the sum of $40.00 a day for the first three days of jury service provided there are more than ten employees. Thereafter, employees whose wages are fully withheld will be paid $40.00 per day by the State. There is no reimbursement for transportation or parking.

If you are entitled to payment from THE STATE OF NEW YORK, a check will be mailed to you approximately 6-8 weeks after you are discharged from jury service. If you have not received a check from the State after ten (10) weeks please call: Queens Division of Jurors at (718) 262-7223.

**Any person who is summoned to serve and who notifies his or her employer to that effect prior to the commencement of a term of service shall not, on account of absence from employment by reason of such jury service, be subject to discharge or penalty. The employer cannot mandate the use of the employee's sick personal, or vacation time. Violation of this shall constitute a criminal contempt of court punishable pursuant to Article 19, Section 750 of this chapter.**

IMPORTANT NOTICE PURSUANT TO SECTION 526 OF THE JUDICIARY LAW: All jurors who have served in a court of the Unified Court System and are entitled to an allowance therefor, must present their claims to the Commissioner of Jurors on or before the 31st day of December of the next year succeeding or following the year in which, jury service was rendered or performed. Failure to present such claim shall be a forfeiture of the payment for such services.

# EXHIBIT E

AndrewPivotEntry.pdf    🖶 Print    ☁ Save to OneDrive

You will maintain a concurrent active review workload of 3-4 reviews. You will complete 2 reviews and deliver independently on all due dates and quality requirements expected of an L4 Security Engineer. All documentation and customer facing artifacts will be submitted for QA prior to task completion. You will maintain a minimum review rate of 1.0 reviews per month.

**Measurement**

- You will create a workback schedule for each review within a week of kick-off, capturing task completion dates based on customer timelines. This schedule will be approved by your manager and reviewed weekly.
- Review tasks will be completed within timelines as determined by the workback schedule.
- If blockers arise, you will communicate them to your manager, address them, and modify the workback schedule as needed with manager approval.
- Work will be completed independently with technical depth expected of a L4 Security Engineer as outlined in process and calibration guidelines.
- Documentation will follow Quality Assurance and Issue Writing standards.
- All risks will be submitted to your manager for review prior to cutting them to ASR/Shepherd.
- A peer reviewer will validate tasks have been completed, issues identified, and artifacts documented properly prior to sharing with customers.
- Rework required from Manager-QA should not exceed more than 10% of artifacts.

**Associated Amazon Leadership Principle(s):**
Insist on the Highest Standards; Earn Trust; Deliver Results

**Expectation 2 - Due Date: June 28, 2025**
Less than 10% of your security findings in each review will be returned to you by your manager for rework.

**Measurement**

- You will peer review all risks with a team Risk Bar Raiser
- You will submit all risks to your manager prior to cutting them in ASR/Shepherd
- All risks will follow the Issue Quality Review Checklist Guidelines

**Associated Amazon Leadership Principle(s):**
Customer Obsession; Dive Deep

---

While your manager is willing to provide assistance, coaching, and support to help you improve your performance, it is important for you to understand that the responsibility for bringing your performance up to an acceptable level rests with you. Your manager will review your progress on a regular basis during 1:1s. Depending on your performance, the length of your plan could be lengthened or shortened. You are encouraged to discuss any concerns or questions you may have regarding this plan with your manager, HR partner, or skip-level manager. As part of the standard Pivot process, Amazon will implement enhanced security measures to protect Amazon's confidential information, which may impact your ability to move data off your laptop.

**EMPLOYEE ACKNOWLEDGEMENT AND AGREEMENT TO TERMS:**
We will place a copy of this plan in your Pivot file. If you do not meet the above-stated expectations, maintain them, and sustain improved performance, you will be subject to further action, up to and including termination of employment. If you choose the Improve option, please sign below and return to your manager.

# EXHIBIT F

# Thank You

Thank you for raising your concerns to the Ethics Line. Please save your report key and password to check on your report or to make a follow-up.

**Please save your follow-up report key**

**Report Key: 331330906901**

Save Report Key

Exit

Copyright © 2000-2025 NAVEX Global, Inc. All Rights Reserved

Privacy Statement  |  Acceptable Use Policy  |  Cookie Statement  |  Contact NAVEX