**UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK**

---

Andrew Quijano, Plaintiff, -against- AMAZON.COM SERVICES LLC, Defendant

Case No.: 1:26-cv-00664

---

# PLAINTIFF'S MOTION TO STRIKE SECOND AFFIRMATIVE DEFENSE IN ANSWER TO AMENDED COMPLAINT AND MEMORANDUM OF LAW

## I. PRELIMINARY STATEMENTS

a. Plaintiff Andrew Quijano ("Plaintiff") moves to strike the Defendant's second affirmative defense pursuant to **FRCP Rule 12(f)**.

b. **Note on Priority of Remand:** While this Motion is filed now to ensure compliance with the 21-day deadline following Defendant's Answer, Plaintiff respectfully requests that the Court prioritize the pending **Motion for Remand**. However, because the "General Release" asserted by Defendant involves substantial questions of Federal Law, specifically **SEC Rule 21F-17**, the **Jury System Integrity Act (JSIA)**, and **USERRA**, the Plaintiff requests that this Court resolve these Federal questions as a matter of law to prevent the "chilling" of these public interests. **Whether this case remains in Federal Court or is remanded, these Federal violations should be addressed to ensure the integrity of the judicial and regulatory systems.**

c. The reason Plaintiff brings this motion now is one of **Urgent Public Policy**. If there is a securities whistleblower, a uniformed service member, or a Federal juror currently bound by a release identical to the one asserted by Defendant**, they should not be forced to wait for the conclusion of this litigation to know if their rights are valid. Such a delay risks the**

**expiration of statutes of limitations on valid claims by individuals who mistakenly believe they have waived their rights.**

d. Although the Pro Se office informed me that motions to strike are often disfavored, the Second Circuit in *GEOMC, Inc. v. Calmare Therapeutics Inc.*, 918 F.3d 92 (2d Cir. 2019) clarified that the "plausibility" standard of *Twombly/Iqbal* applies to affirmative defenses. A defense is legally insufficient if it is "foreclosed by prior controlling decisions." Because Defendant's "General Release" is facially illegal under Federal and New York law and contains a **Non-Severability** clause that voids the entire agreement if any part is found invalid, the defense is legally implausible and should be stricken.

## II. THE AGREEMENT IS VOID AS A MATTER OF PUBLIC POLICY

a. **Unconscionability and the "Data Lockout" Trap:** The Agreement (ECF 9-5, Exhibit B, § Acknowledgements) requires the Employee to represent that they have disclosed all ethical concerns. Plaintiff filed a comprehensive Ethics Report (Exhibit A) on May 27, 2025, to ensure the factual accuracy of this representation. However, this requirement is procedurally and substantively unconscionable when paired with Defendant's "data lockout" policy. Defendant forces a whistleblower to certify the completeness of their disclosures while simultaneously stripping them of the access necessary to substantiate those very claims.

b. **The "Severability Suicide Pill" and NY LL § 740:** The Agreement (§ Severability) explicitly prohibits the narrow construction or "blue-penciling" of the § General Release. However, the Release purports to waive **NY Labor Law § 740**, which contains an explicit anti-waiver provision under **§ 740(7)**. Because the Defendant has intentionally made the General

Release unseverable, the illegality of the § 740 waiver, which is void as a matter of law, effectively collapses the entire agreement. While the Court possesses the equitable discretion to strike individual clauses, the Defendant's deliberate inclusion of a "Non-Severability" mandate precludes the use of the "Blue Pencil" doctrine. The Court is invited to invalidate the General Release in its entirety rather than act as a post-hoc scrivener for a sophisticated party.

c. **The "License to Batter/Detain Jurors" Absurdity (Judiciary Law § 519):** Defendant's interpretation of the "common law tort" waiver is fundamentally incompatible with New York public policy. If applied to its logical extreme, given the fact that the retaliation overlapped with the Plaintiff's jury service, the Defendant's interpretation would permit an employer to commit intentional torts, including physical battery or physical restraint, against a juror during their protected leave, yet remain shielded from civil liability. Because Judiciary Law § 519 prohibits any "penalty" for jury service, a waiver that purports to authorize intentional torts against a sitting juror is a legal nullity.

## III. THE RELEASE IS FACIALLY ILLEGAL AS IT PURPORTS TO WAIVE NON-WAIVABLE FEDERAL STATUTORY RIGHTS

a. **Jury System Integrity Act (JSIA) and 28 U.S.C. § 1875:** In seeking to move this case (ECF No. 17), Defendant stated the Agreement covers *"any theory of retaliation... in any form."* This "can of worms" implies a waiver of **28 U.S.C. § 1875**, the law protecting Federal Jurors from employment retaliation. While the Defendant avoided invoking the explicit waiver in NY LL § 740 in its recent letter, its reliance on a blanket "retaliation" waiver without carve-outs for federal jury service constitutes a prima facie violation of Federal public policy.

b. **Uniformed Services Employment and Reemployment Rights Act (USERRA)** explicitly states at **38 U.S.C. § 4302(b)** that it *"supersedes any... contract [or] agreement... that reduces, limits, or eliminates in any manner any right or benefit provided by this chapter."* The Defendant's General Release, which demands a waiver of "any and all" federal claims, and even **explicitly waives USERRA**. This constitutes a second, independent "unwaivable" violation that, when combined with the Non-Severability clause, renders the entire Release void.

c. **SEC Rule 21F-17(a) and Systemic Suppression:** The representation in § Acknowledgements (vii) is objectively false; Plaintiff filed a formal complaint with the New York Attorney General (ECF 9-5, Ex. D) and an Ethics Report (Ex. A) within 24 hours of the Release. The Defendant's use of a "Release" to truncate a live investigation, combined with the lack of reporting carve-outs, constitutes an action to "chill" whistleblower activity in violation of **SEC Rule 21F-17(a)** and the precedent set in *SEC v. KBR, Inc.*

d. **The Sarbanes-Oxley (SOX) Omission:** It is telling that the Agreement explicitly attempts to waive **NY LL § 740** and **USERRA** but omits any mention of the **Sarbanes-Oxley Act (18 U.S.C. § 1514A)**. This selective waiver suggests a strategic calculation: **the Defendant lacks the 'nerve' to challenge Federal Whistleblower statutes explicitly**, knowing the SEC's stance in *SEC v. KBR*, yet believes it can contract around the fundamental protections of the New York State Judiciary and Whistleblower Law. Perhaps it is time for New York State to address the same issues that *SEC v. KBR Inc.* addressed, such as the unwaivability of public duties like jury service.

## IV. SYSTEMIC CULPABILITY AND THE "FOCUS" PROGRAM

a. **The "Focus" Program and Evidence Suppression**: This litigation highlights a systemic hostility toward whistleblowers. The **"Focus"** program (initiated shortly after Plaintiff alerted the Queens Court to his Judiciary Law § 519 concerns) is designed for secrecy. Managers are explicitly told to avoid telling reports they are on "Focus," ensuring the "Data Lockout" trap (Exhibit B) renders the employee "digitally inept" before they can secure evidence of retaliation or report any violations to a regulator.

b. **Executive-Level Authorization:** The Release (ECF 9-5, Ex. B) was signed by **Beth Galetti, Senior Vice President of Human Resources, who reports directly to the CEO, Andy Jassy**. The signature confirms that the inclusion of illegal anti-whistleblower waivers and the attempted shielding of juror retaliation are not "rogue" errors, but an intentional, executive-level corporate mandate to bypass New York and Federal law.

c. **The Public Interest Factor:** If this Release is enforced, it validates a system where a trillion-dollar corporation uses "data lockouts" (Exhibit B) and unseverable waivers to silence jurors and whistleblowers. The "common law tort" waiver raises a chilling question: **how many other workers, victims of assault and battery, or state/federal law violations, have been successfully silenced by this mechanism?** The public interest in protecting the sanctity of the jury pool and the safety of the workforce outweighs any private interest.

## V. THE DEFENDANT POSSESSED ACTUAL KNOWLEDGE OF THE RELEASE'S ILLEGALITY

a. **The Greenberg Traurig "Red Flag" Report:** In October 2023, the law firm Greenberg Traurig (GT) published a report titled *"Financial Regulatory & Compliance/Labor &*

*Employment,"* authored by Arthur Don, Tracy L. Gerber, Hannah Caplan, and Jack S. Gearan (see **Exhibit C**). This report explicitly warned clients that the SEC had recently imposed millions in penalties against companies for utilizing overly restrictive releases that violated **Rule 21F-17(a)**.

**b. The "Condition Precedent" Trap:** The GT report specifically warned that the SEC fined a company for requiring *"departing employees to sign general releases and agreements affirming that they had not filed any complaints with any governmental agency... in order to receive deferred compensation and other benefits."* This is a direct mirror of the Defendant's **§ Acknowledgements (vii)**, which requires an employee to certify that they have *"not filed any complaints, claims, or actions against Employer or any released person or entity."* (**ECF 9-5, Exhibit B**).

**c. The Failure of Prospective Carve-Outs:** The GT report notes that in the SEC's 2023 enforcement actions, even companies that included "carve-out" language (permitting future reporting) were still penalized. The SEC found that because these carve-outs were merely prospective, they did not remedy the "impeding effect" of requiring a representation regarding *past* reporting. Defendant's **§ Exceptions** clause fails this exact test: it cannot cure the chilling effect of **§ Acknowledgements (vii)**, which forces a whistleblower to choose between a truthful government disclosure and their severance.

**d. Suppression of Financial Incentives:** The SEC has ruled that agreements are illegal if they require employees to *"forego the critically important financial incentives"* intended to encourage communication with the Commission. Defendant's Release, rendered unseverable by **§ Severability**, purports to waive *"any other statutory... regulation of the employment*

*relationship"* and *"any claim for attorneys' fees and costs."* This is a "double-tap" of suppression: it sweeps in **False Claims Act (Qui Tam)** and **SEC Securities** violations, which include significant bounties, while simultaneously stripping the employee of the statutory fee-shifting (e.g., **NY LL § 740** or **28 U.S.C. § 1875**) that makes such whistleblowing financially viable.

**e. Evidence of Systemic Misconduct:** Citing a **$10 million penalty** against a firm with only 400 departing employees, the Plaintiff notes that the Defendant's use of this likely nationwide template suggests a liability profile involving tens of thousands of employees. Furthermore, the SEC cases cited by GT concerned only "overly strict releases"; they did not even address the additional "Data Lockout" mechanisms used by the Defendant to render whistleblowers "digitally inept" during the Pivot phase, even after whistleblowers filed an Ethics Report. (**Exhibits A & B**).

**f. The Procedural Deception and the "Screenshot" Necessity:** The Defendant's conduct during removal underscores a startling lack of transparency, not only with the Court but potentially with its own counsel. The Agreement's **§ State Law** clause explicitly mandates venue in "New York County" (The Defendant clearly wants SDNY), yet the Defendant removed this action to the EDNY without initially mentioning the venue clause or the Release. If the Defendant were acting in good faith, it would have been upfront **upon removal, disclosing the venue conflict immediately and the desire for SDNY**. Instead, the Plaintiff was forced to bypass the Defendant's refusal to allow the Plaintiff to download the Release; he had to use screenshots of the Release (ECF 9-5, Exhibit B) to the Court, just to establish the baseline facts of the Agreement. The Release's difficulty of obtaining suggests a systemic failure of candor: the Defendant likely suppressed the existence of this facially illegal "General Release" even from its

own legal team until the Plaintiff brought it into the light. The fact that GT, a firm that has publicly warned against these exact illegalities, is now forced to defend a document that violates its own published "best practices" suggests that the Defendant's internal suppression mechanisms are so pervasive that they have likely blindsided its own defense.

## VI. CONCLUSION

a. The Plaintiff appears before this Court *pro se* **by necessity**. When consulting with various members of the New York employment bar, the Plaintiff was repeatedly **advised that a private "General Release" is an absolute bar to all claims, and that a Judge would prioritize the sanctity of a corporate contract over the protection of a citizen-juror.** This advice stands in stark contradiction to the Plaintiff's experience in the New York State Court system**, where Judge Hartofilis issued a stern mandate to the jury pool: "Should any of your managers interfere with your jury service, come to me."** It is logically and legally absurd to suggest that a Judge's authority to protect the jury system exists only until an HR department presents a severance agreement. To accept the Defendant's position is to believe that a private contract can authorize an employer to commit intentional torts, including battery, against a sitting juror, and that a Court would switch its allegiance from the Constitution to a private corporation the moment a signature is obtained, is just too absurd for the Plaintiff to believe.

b. For decades, employers have operated under a "cloak of plausible deniability," using these releases to silence jurors and whistleblowers. **This case may be the first instance in American history where a "General Release" is tested directly against the fundamental protections of the jury system**. The public interest demands clarity, not just for the Plaintiff, but for any New York or Federal jurors currently facing retaliation under the shadow of similar, void-as-against-public-policy releases.

c. The sheer overreach of this document is best demonstrated by the Defendant's attempt to require a waiver of the **New York Wage-Hour and Wage Payment Laws and Regulations**. It is a foundational principle of labor law that minimum wage protections are non-waivable public rights. By attempting to contract around the very floor of the New York economy, and simultaneously forbidding the Court from "blue-pencilling" such illegal provisions via an explicit **Non-Severability** mandate, the Defendant has rendered the entire Release a legal nullity.

d. While the Plaintiff focuses here on the egregious violations of **SEC Rule 21F-17**, **USERRA**, and the **Jury System Integrity Act**, it is not the Plaintiff's burden to provide an exhaustive autopsy of this document due to the constraints of litigating *pro se*; the Plaintiff has highlighted only the most critical "system failures." There are likely several other illegal components buried within this Release (ECF 9-5, Exhibit B), the discovery of which the Plaintiff leaves "as an exercise for the interested reader" in the public record.

e. The existence of multiple, facially illegal waivers within an intentionally non-severable instrument provides a clear path for this Court: it should nullify the Release in its entirety rather than commit the judicial labor required to salvage a document drafted with such systemic disregard for public policy.

f. As the Supreme Court held in **West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937)**, "freedom of contract is a qualified, and not an absolute, right," and the government maintains the power to provide "restrictive safeguards" for the health and safety of the people. The Defendant cannot use a private agreement to repeal the laws of the State of New York or the United States. The Plaintiff humbly asks this Court to **finally exorcise the ghosts of *Lochner v. New York* and Milton Friedman's "shareholder primacy theory" from the New York Bar.**

**WHEREFORE**, for the reasons set forth above, Plaintiff Andrew Quijano respectfully requests that this Court:

1. **STRIKE** the Defendant's Second Affirmative Defense (Release) with prejudice.
2. **NOTE** that while this Motion is filed now to ensure compliance with the 21-day deadline following Defendant's Answer, Plaintiff respectfully requests that the Court prioritize the pending Motion for Remand. However, because the "General Release" asserted by Defendant involves substantial questions of Federal Law, including SEC Rule 21F-17, the Jury System Integrity Act (JSIA), and USERRA, Plaintiff requests that this Court resolve these Federal questions as a matter of law to prevent the "chilling" of these public interests, whether in this Court or as a final instruction upon Remand.
3. **GRANT** such other and further relief as the Court deems just and proper.

Dated: March 17, 2026

Respectfully submitted,

*Andrew Quijano*

Andrew Quijano, Plaintiff Pro Se

54-29 69th Lane Maspeth, NY 11378

+1 (917) 224-2122

**Declaration of Andrew Quijano**

I, Andrew Quijano, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

Exhibit A is a true and correct copy of the Navex Ethics Report hotline Report Key 331330906901 confirming that an Ethics Report was submitted. Given the Defendant's data lockout, the only way the Plaintiff could obtain this evidence was to take a picture of his screen with his iPhone. The picture was taken on May 27, 2025, at 10:11 PM.

Exhibit B is a true and correct copy of the third page of the Pivot document, presented to the Plaintiff on May 7, 2025, via e-mail. The Plaintiff highlighted in red the key point that the Defendant implements a data lockout, which he alleges the Defendant uses to prevent any whistleblower from presenting evidence to a regulatory authority. This picture was taken on May 7, 2025, at 11:23 PM.

Exhibit C is a PDF export of Greenberg Traurig's blog post warning employers to update their releases, given that the SEC is actively investigating violations of Rule 21F-17(a). The link to the report is provided here:

https://www.gtlaw.com/en/insights/2023/10/sec-broadens-scrutiny-of-employment-and-separatio n-agreements-under-whistleblower-rule#:~:text=SEC%20Broadens%20Scrutiny%20of%20Empl oyment,October%2010%2C%202023%20GT%20Alert

Exhibit D is a true and correct copy of the Notice of Electronic Filing (NEF) for ECF No. 17, documenting the service list and associated recipients for Defendant's counsel, including cross-agency email associations (e.g., @eeoc.gov) and firm-wide alert triggers.

Signature was executed on March 17, 2026:

*Anfrew Quijano*

Andrew Quijano

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2026, I served a true and correct copy of the Plaintiff's Motion to Strike Second Affirmative Defense and accompanying documents via Electronic Mail to the following counsel of record and associated recipients identified in the Court's Notice of Electronic Filing (ECF No. 17), see Exhibit D:

**Jason D. Burns, Esq. (Jason.Burns@gtlaw.com)**

**Shira M. Poliak, Esq. (shira.poliak@gtlaw.com)**

**Greenberg Traurig, LLP**

**One Vanderbilt Avenue, New York, NY 10017**

**Additional Recipients per ECF Record:**

- robinsonsh@gtlaw.com
- lateesha.vines@eeoc.gov

*Andrew Quijano*

Andrew Quijano, Pro Se