*** Filed *** 03:36 PM, 05 Apr, 2026 U.S.D.C., Eastern District of New York

**UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK**

---

Andrew Quijano, Plaintiff, -against- AMAZON.COM SERVICES LLC, Defendant

Case No.: 1:26-cv-00664

---

# PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT AND REPLY IN FURTHER SUPPORT OF HIS MOTION TO STRIKE

## I. THE DEFENDANT HAS DEFAULTED

a.  On March 20, 2026, Defendant's counsel, Greenberg Traurig (GT), filed a letter requesting an extension to respond to the Plaintiff's **Motion to Strike (ECF No. 20)**. The Plaintiff had explicitly consented to this request via email. However, the Defendant's filing (**ECF No. 21**) conspicuously failed to attach the Plaintiff's written consent.

b.  This omission is unusual, as **Judge DeArcy Hall's Individual Practice I(E)(2)(e)** requires that a party seeking an extension indicate 'whether the adversary consents.' When the Plaintiff moved for a stay (**ECF No. 11, Exhibit A**), he strictly complied with this Practice by attaching written proof of the Defendant's refusal to consent, ensuring the Court had a complete and transparent record. In contrast, the Defendant, a sophisticated global firm, chose to omit the Plaintiff's written approval in **ECF No. 21**, effectively obscuring the Plaintiff's cooperation and likely causing the very procedural confusion

1

that led to the deadline passing without a Court Order. The Defendant now stands in Default of a deadline they themselves requested and that the Plaintiff was hoping to have.

c.  **The Extension of Safe Harbor was a Token of Goodwill to Preserve Judicial Economy:** The Plaintiff further notes that the "Safe Harbor" period for Rule 11 Sanctions (originally detailed in **ECF No. 18, Section II***) has expired*. However, in an effort to maintain a clean and efficient docket, the Plaintiff proactively extended this Safe Harbor period to **April 14, 2026,** in his last e-mail with GT. The Plaintiff's reasoning was twofold:

   i.  **Consolidation of Issues:** Both the *Motion to Strike* (ECF No. 20) and the potential *Rule 11 Sanctions* target the same foundational defect: the Defendant's **Answer** (ECF No. 14), with its reliance on a "General Release" and answers that contradict documented evidence.

   ii.  **Opportunity for Cure:** By extending the deadline, the Plaintiff provided the Defendant, who had been occupied with depositions and travel, a clear window to reconcile their Answer with the actual data and evidence already provided to them (ECF No. 18). This was intended to allow the Defendant to amend their filing *once*, rather than burdening the Court with multiple, overlapping motions to amend a defective Answer.

   iii.  In light of the fact that the **Motion to Strike** (ECF. No. 20) now stands uncontested due to the Defendant's default, the Plaintiff humbly requests that the Court **refrain** from imposing Rule 11 sanctions *sua sponte* at this juncture. The Plaintiff remains open to holding any further Rule 11 filings in abeyance until the Court rules on the Motion to Strike (ECF No. 20). This approach ensures that the

2

factual record regarding the "General Release" is settled before the Court addresses the more serious issue of professional conduct and sanctions.

d. **Admission by Silence:** The court-mandated deadline of March 31, 2026, has passed. Without an Order granting the extension, the Defendant is in **Default**. The Plaintiff moves the Court to treat the well-pleaded facts regarding the "General Release" (ECF No. 9-5, Exhibit B), including its violation of **Judiciary Law § 519**, **NY LL § 740, JSIA, USERRA, and SEC Rule 21F-17(a)**, as undisputed.

## II. DEFENDANT'S RECENT SUPPRESSION OF ACCESS TO EVIDENCE IN THE A2Z PORTAL

a. The Timestamps of Access: The Plaintiff previously secured screenshots of the General Release (ECF No. 9-5, Exhibit B) on August 8, 2025, at approximately 9:00 PM. At that time, the document was readily accessible within the "A2Z" employment application. However, following the filing of the Plaintiff's **Motion to Strike (ECF No. 20)**, the Defendant appears to have altered the accessibility of these records.

b. **Evidence of Strategic Concealment:** Upon re-accessing the A2Z portal on March 29, 2026, during his research on the release's compliance with N.Y. COB. LAW § 5-336, the Plaintiff discovered that both the General Release and the Non-Compete Agreement (Exhibit B) had been removed from the standard user interface. These documents now appear to be sequestered behind a secondary login credential that is inaccessible to "Amazon Alumni" (Exhibit A).

c. **Identification of the Signatory via Signature Cross-Reference:** The General Release (ECF No. 9-5, Exhibit B) contains a signature but **conspicuously omits the printed name or title** of the authorized representative. However, the Plaintiff possesses a **Known Specimen**: his 2022

3

Non-Compete Agreement (Exhibit B), which he secured during his onboarding before the Defendant restricted "Amazon Alumni" access. By performing a cross-reference, the Plaintiff observed that the signature on the 2025 Release is **identical** to the signature on the 2022 Non-Compete (Exhibit B), where the signer is explicitly identified in print as **Beth Galetti, SVP of Human Resources.** The Plaintiff suggests that the omission of the SVP's name from the Release was not an oversight, but a **deliberate structural anomaly** designed to distance executive-level leadership from a document that seeks to waive non-waivable New York Jury Duty protections. The fact that the Defendant subsequently "hid" both documents in the A2Z portal (Exhibit A) confirms a **Conscious Disregard** for the truth.

**d. Offer of Forensic Verification:** The Plaintiff, guided by scientific principles of peer review and a commitment to the objective record, recognizes the severity of alleging a systematic data lockout. Therefore, the Plaintiff welcomes a Judicial Order to Show Cause (OSC) to settle the matter. The Plaintiff is prepared to demonstrate the A2Z application's current concealment of these records in the presence of a Court Officer at the EDNY. **To be clear: if the Plaintiff has somehow misinterpreted the UI of the A2Z interface, he is prepared to issue a formal apology on the public record and immediately concede the point.** However, the Plaintiff is forced to make this offer because the alternative, that a Trillion-dollar Defendant is intentionally maintaining a 'digital shroud' to suppress evidence from a New York Juror, **is so brazen that it demands immediate objective clarity**. The Plaintiff is a bit too shocked by what he saw; he is simply asking the Court to review the screen to confirm he is, in fact, not seeing another data obstruction, and to see whether the screenshots are a red flag (Exhibit A).

## III. UNUSUAL MASSIVE STOCK SELL-OFFS DONE BY AMAZON C-SUITE POTENTIALLY RELATED TO THIS CASE

a.  **Notice of Potential Criminal Contempt and the MNPI Threshold:** On or around September 30, 2025, the **Queens District Attorney's Office** initiated contact with the Defendant regarding a "Final Written Warning" issued to the Plaintiff that directly overlapped with his term of Jury Service (**See Exhibit E**). This inquiry officially placed the Defendant on notice that its internal disciplinary actions were under scrutiny for a potential violation of **New York Judiciary Law § 519**.

    It would be absurd to assume that the Defendant's **General Counsel, Mr. David Zapolsky**, was not made aware of a New York Judiciary Law § 519 inquiry. At that time, the District Attorney's Office exercised its discretion to stop the investigation. However, a *skeptical investor* (e.g., **State Street, Vanguard, BlackRock**) could argue that, just because the State of New York didn't prosecute them then, it doesn't mean it cannot change its mind later upon discovering new evidence or upon a direct referral/order from the Judiciary.

b.  **Knowledge of Risk and Executive Divestment:** Furthermore, Mr. Zapolsky, as an experienced attorney, likely recognized that the existence of this inquiry constituted **Material Non-Public Information (MNPI)**. He understood the risk of a potentially dangerous whistleblower lawsuit based on the documented facts: that a juror was defamed during his service (**ECF No. 18, Exhibit A, B, D**) and that said juror could allege that Amazon terminated him to **cover up a potential Judiciary Law § 519 violation, regardless of whether New York State originally pursued the case.**

5

c. **Timing of Adoption of SEC Form 144 (Post-DA Notice):** Specifically, David Zapolsky adopted his current Rule 10b5-1 trading plan on **November 3, 2025**. This adoption occurred roughly 30 days after the **Queens District Attorney** placed the Defendant **on notice of a potential criminal contempt violation under New York Judiciary Law § 519** (**Exhibit C**). At the time of plan adoption, Mr. Zapolsky was in possession of MNPI regarding a systemic legal vulnerability: the Defendant's "General Release" (ECF No. 9-5) contains a non-severability "Suicide Pill" that could be triggered by the Plaintiff's jury retaliation claims.

d. **The February Divestment Window (Exhibit C):** On or around **February 23-24, 2026**, Mr. Zapolsky executed sales totaling approximately **$2 million** (10,649 shares). This divestment occurred:

   i. Exactly three days before the GT filed its **Answer (ECF No. 14)**. a document the Plaintiff argues constitutes having **eight Rule 11 violations** (ECF No. 18) on denying various facts of the case. It almost seems as if the Defendant's General Counsel had bet that GT would bungle a potentially precedent-setting whistleblower case in EDNY and introduce far more liability.

   ii. By the Remand stage (**ECF No. 9-5**), the Plaintiff had already begun attacking the Release's venue and non-severability clauses via **NY LL § 740(7)**. Any competent lawyer would have to see the absolute danger *that the Plaintiff wasn't a fool to post the Release first* (ECF No. 9-5, Exhibit B), and that he may have recognized fatal vulnerabilities in the Release. This is the equivalent of *Star Wars: A New Hope*, when the Empire noticed Luke Skywalker attacking the thermal exhaust port of the Death Star; **if he succeeded**, the damage could be catastrophic.

6

By proceeding with the sale, the General Counsel may have sought to minimize personal **risk in the event the Plaintiff succeeds in destroying the release** by receiving cash rather than Amazon stock that could tumble in value.

e. The Plaintiff notes that he **believes** he also found similar high-volume divestments were executed by Amazon's CEO, Andy Jassy, and AWS CEO, Matt Garman, during the same February 2026 window. To preserve judicial economy and *try his best to remain within the Court's page limits*, the Plaintiff focuses his forensic analysis on the Defendant's General Counsel, Mr. Zapolsky, whose specific role as an Officer of the Court and overseer of the Defendant's legal 'Safe Harbor' makes his divestment particularly relevant to the 'Scienter' of this case.

f. **The Peizer Correlation (U.S. v. Peizer, 2:23-cr-00089):** The Plaintiff alleges that the Defendant's General Counsel, David Zapolsky, engaged in a pattern of divestment mirroring the criminal conduct in *United States v. Peizer*. In that case, CEO Terren Peizer was convicted for selling equity after adopting a 10b5-1 plan while knowing his company's $90 million contract was at risk, despite certifying he held no Material Non-Public Information (MNPI). Like the defendant in *Peizer*, Mr. Zapolsky utilized the "Cooling-Off Period" as a strategic buffer to liquidate equity before this case became a potentially massive liability, specifically the discrepancies and the § 519 referral reached a point of market realization. The Plaintiff argues this divestment constitutes a hedge against the massive class-action liability inherent in the Defendant's potentially illegal severance structure, and a **small but realistic risk** that New York could restart its § 519 investigation.

g. The Plaintiff would like to note that the Queens DA already had proof that the warning was wrongful via the written retraction  (ECF No. 18, Exhibit A). Especially if the Defendant's GC's office did a preliminary investigation and realized that a potentially toxic general release, even by Greenberg Traurig's own standard (ECF No. 20-1, Exhibit C), is going to be tested against jury service, is a legally dangerous set of facts. It is an **extremely dangerous bet to assume the release would not be subject to blue-penciling or a potential strike, given that judges will prioritize jury service over contracts**.

h. **A Note on the 'Lochner' Calculation and the Plaintiff's Risk Profile:** To be fair to the Defendant's General Counsel, Mr. Zapolsky, he would be justified in arguing to his investors that the risk of a successful challenge to the General Release was statistically negligible. For decades, the Plaintiff's Bar has been haunted by the **'Ghost of *Lochner*,'** leading even elite employment attorneys to skirt around releases rather than challenging their fundamental legality. In a standard risk assessment, betting that no one would dare attack the Release directly is **a sound counterargument that the Plaintiff will concede.** However, this calculation failed to account for the Plaintiff's specific background as a security and forensic professional (**See Plaintiff's CV**). The Defendant possessed the resources to verify that the Plaintiff, despite appearing *pro se*, represents a non-linear threat capable of innovating legal tactics that bypass traditional 'Economic Duress' arguments.

For example, the Plaintiff utilized a **Motion to Remand (ECF No. 9)** to strategically plant exhibits whose existence the Defendant later denied (**ECF No. 14**), potentially constituting a *prima facie* violation of **Rule 11(b)(4)**. Rather than fighting the losing

battle of 'Duress,' the Plaintiff has targeted the **Illegality** of the Release itself (**ECF No. 20**). This tactical shift, attacking the contract's core rather than the circumstances of its signing, **is a risk that any competent legal team should have identified.** That this risk was ignored speaks either to a systemic stagnation within the Bar or a catastrophic failure of the Defendant's internal 'Threat Assessment' regarding this specific high-stakes litigation.

i. **The "Institutional Hedge", JPMorgan's Strategic Short:** On or around March 27, 2026, **JPMorgan Chase** announced a novel mechanism for investors to hedge against the debt of major tech entities, including Amazon, specifically citing a "2008-like crisis" (See: JPMorgan Hedge News). While public speculation attributes this to overzealous AI spending, another plausible analysis suggests a **Regulatory Risk Hedge.**

j. JPMorgan was recently sanctioned by the SEC for violating **Rule 21F-17(a)** regarding the use of restrictive language in release agreements (see SEC Press Release 2024-7).

    i. **The PACER Signal:** As of February 11, 2026, the Defendant's **General Release (ECF No. 9-5, Exhibit B)** became a matter of public record on PACER. Any sophisticated legal team, *especially one recently penalized for the same structural flaw*, SEC 21F-17(a), would immediately **recognize a release that could be subject to SEC scrutiny**. Also, the Defendant's inclusion of a **Non-Severability "Suicide Pill" (ECF No. 20, II(b))** creates a binary risk: If a single provision (such as the waiver of Jury Service rights) is struck, the *entire* historical library of Amazon's releases could be voided, especially after the Plaintiff pointed it out (ECF. No 20).

ii.    **The Inference:** It is not a "leap of faith," but a logical inference of market behavior to suggest that JP Morgan is shorting the Defendant's stability because they have identified a **multi-billion dollar class-action liability** hidden in plain sight within the Defendant's own ECF filings (ECF No. 14-1 Exhibit A) if the release is void (ECF No. 20).

## IV. THE "INSPECTOR CLOUSEAU" PHENOMENON: A SYMPATHETIC VIEW OF DEFENSE COUNSEL

a.    The Plaintiff moves the Court to consider the "Preponderance of the Evidence" regarding the Defendant's erratic procedural behavior. The removal was executed on the 30th day, at 11:45 PM on the final night, suggesting a "Counsel Shopping" crisis caused by the "Radioactive" nature of defending a Judiciary Law § 519 (Jury Retaliation) claim.

b.    **The "Boutique" Rejection and the GT "Panic Hire":** The Plaintiff notes that the matter was initially served on Alpha Law LLC (ECF No. 1, Ex. F). It is highly irregular for a specialized boutique firm to decline a well-funded defense for a Trillion-dollar client **unless the underlying facts, specifically the written retractions** (ECF No. 18, Exhibit A & B) and **poisoned "General Release"** (ECF No. 9-5, Exhibit B), rendered the case legally "toxic" for Officers of the Court.

c.    The Plaintiff infers that the Defendant was forced into a "last-minute" engagement with Greenberg Traurig (GT) to avoid immediate default. This "frantic shopping" likely resulted in GT entering the fray *without a complete or honest briefing from the Defendant's in-house team.*

d. **The "TD Bank" Pattern: When a Client Blinds Its Own Counsel:** The current performance by the Defense, specifically the conspicuous failure to attach the Plaintiff's consent in **ECF No. 21**, mirrors the troubling history in *Coquina Investments v. TD Bank*. In that matter, Honorable Judge Cooke, from the Southern District of Florida, famously noted that GT's litigation failures were not necessarily due to a lack of skill, but were a byproduct of being kept "in the dark" by a dishonest client when she compared GT's performance to *Inspector Clouseau*.

e. As a former **Juror** (ECF No. 18, Exhibit D), tasked to weigh evidence with impartiality and a focus on the truth, the Plaintiff finds it difficult to believe that a firm of GT's stature would intentionally fumble a basic extension request or an answer (ECF No. 14). Rather, the Plaintiff agrees with the logic of the Southern District of Florida Court in the *Courina* case: it is far more likely that the Defendant is withholding critical data from its own counsel, **effectively leading GT toward a Rule 11 cliff.**

f. **Establishing the "Scienter" of In-House Manipulation:** History is already repeating itself in the current record. Documented evidence shows that the Defendant has already misled its own in-house counsel, **Elizabeth Martin, Esq.,** and **Sarah Dukmen, Esq. (ECF No. 18, Exhibit B & C)**, into issuing a fraudulent "Final Written Warning" based on incomplete information.

g. If the Defendant is willing to manipulate its internal legal team to facilitate defamation against a Juror, **it is a logical leap**, **not a stretch**, to conclude that the Defendant is currently providing GT with a sanitized or altogether false version of the facts. The Plaintiff, speaking as a former Officer of the Court (a New York Juror), feels a sense of

11

duty to highlight this "Client-Driven Malpractice" before it further compromises the integrity of these proceedings.

h. **Scienter and the Economic Incentive of the General Counsel:** If the Defendant's General Counsel, Mr. Zapolsky, was aware that specialized employment firms were declining the case due to the "Radioactive" facts of jury retaliation, a potentially high-stakes case with criminal implications, **this also counts as MNPI**. If Mr. Zapolsky played a role in misleading GT, effectively using them as a "meatshield", his decision to liquidate his stock holdings during this period suggests a realization that the Defendant was in extreme legal peril. The Plaintiff argues that the "Clouseau-like" litigation tactics are not the result of GT's incompetence, but rather a coordinated data-suppression effort by **a client desperate to avoid their lack of legal and regulatory compliance.**

i. **The "Triple-Blind" Deception: Did the Defendant Mislead New York State?** The Plaintiff's analysis of the timeline suggests a deeply troubling "Triple-Blind" strategy. If the Defendant was willing to mislead its **In-House Counsel** (**ECF No. 18, Exhibit C**) and likely had effectively misled its **Retained Counsel** (GT), it is a logical and necessary inquiry to ask: **Was the Queens District Attorney also misled?** If the representations made to the DA during the 2025 inquiry diverge from the documented evidence, the Defendant (Amazon) has moved from mere employment litigation into the realm of **Obstruction of Justice**. The Plaintiff alleges that the massive equity liquidations by the Defendant's General Counsel (Exhibit C), occurring in the shadow of this DA inquiry and the subsequent "Rule 11" predicament (**ECF No. 18**), are not merely "scheduled trades." They are the financial signatures of an executive who realized the Defendant's answer (ECF No. 14) was built on a foundation of documented falsehoods. This discrepancy

12

doesn't just increase the legal risk detailed in Section III; it transforms it into a systemic failure of corporate integrity that no "General Release" can legally immunize.

## V. NOTICE TO THE DEFENDANT: FILING OF SEC TCR (#17729-110-716-747) AND UPCOMING EU WHISTLEBLOWER DIRECTIVE NOTIFICATION

a.  The Plaintiff hereby provides notice that an **SEC Tips, Complaints, and Referrals (TCR)** report was formally filed on March 7, 2026. This filing ensures that the Plaintiff's original analysis of the Defendant's "General Release" (ECF No. 20) is protected under the **SEC Whistleblower Program,** especially from another PACER reader attempting to pre-empt the Plaintiff's work. Furthermore, the Plaintiff has engaged the Office of **U.S. Representative Grace Meng** to monitor the SEC's response, with an expedited inquiry currently pending.

b.  The following "Tips" outline the systemic irregularities and **Scienter** identified by the Plaintiff, which the Defendant is now under a strict duty to preserve for regulatory review.

c.  Tip 1: The "Galetti" Execution & Rule 21F-17(a) Vulnerability

    i.  The General Release (ECF No. 9-5, Exhibit B) was exclusively presented, omitting the printed name or title of the signatory. Through cross-referencing of his 2022 onboarding records (Exhibit B), the Plaintiff identified the signer as **Beth Galetti, SVP of Human Resources.**

    ii.  **The Inquiry:** Did the Amazon General Counsel authorize a release that explicitly waives non-waivable laws? Were they aware that firms like **Greenberg Traurig** have publicly warned that such broad releases are vulnerable to **SEC Rule**

**21F-17(a)** (ECF No. 20 Exhibit C)? Who authorized making the release so difficult for former employees to obtain? As Beth Galetti reports to the CEO, Andy Jassy, how aware was he of the illegality and potential fatal flaw of the General Release?

d.  Tip 2: The "Focus" Protocol - Secretive by Design

   i.  The "Focus" performance program is initialized at the sole discretion of HR and Management.

   ii.  **The Inquiry:** Why is Focus explicitly designed to be concealed from the employee? If the program is legitimate, transparency would logically benefit performance. The Defendant's internal policy (which reportedly forbids managers from lying if asked directly about Focus, but managers are told not to tell if an employee is on Focus proactively) implies a "Retaliation Safety Valve", a recognition that the system cannot survive direct scrutiny. The SEC should investigate the "success rate" of HR interventions; if HR never stops a termination, the **system is a rubber stamp for retaliation.**

   iii.  **Corroborating Source about Focus Secrecy**: The Court need not take the Plaintiff's word for it, as Katherine Anne Long stated, "*Amazon instructs managers not to tell office employees that they are on a formal performance-management plan that puts their job in jeopardy unless the employee explicitly asks, according to guidance from an Amazon intranet page for managers*." in her article titled, "Amazon tells bosses to conceal when employees are on a performance management plan" published in the Seattle Times, (See Exhibit D,

https://www.seattletimes.com/business/amazon/amazon-tells-bosses-to-conceal-when-employees-are-on-a-performance-management-plan/)

e.  Tip 3: "Pivot" Data Lockout & The "Invisible Text" PDF of Pivot Document.

  i.  Upon transition to the "Pivot" stage, the Defendant implements an immediate data lockout.

  ii.  **The Inquiry:** The Pivot PDF (ECF No. 19, Exhibit B) contains **"invisible" or "un-copyable" text**, a technical stunt that prevents employees from easily extracting the document's contents for legal review. This "digital shroud" strongly implies **Scienter**; if the document were a standard business record, there would be no forensic reason to disable the "copy-paste" function. Has Pivot successfully silenced whistleblowers before, and does the Defendant know? Why did HR not explicitly mention the data lockout the moment the Pivot e-mail was received **during the meeting, when the Plaintiff was officially on Pivot**? Is the data lockout a normal feature for everyone in Pivot?

  iii.  Finally, it is plausible, and perhaps likely, that the Plaintiff is the first person to formally identify and document the specific **Data Lockout** feature of the Pivot program. While investigative journalists (e.g., *The Seattle Times*, *The Verge*) have reported on the secrecy of the 'Focus' phase, the technical mechanism of the Pivot Lockout appears to have remained a 'dark pattern' hidden from public view. This is likely because the lockout is designed to be absolute: once a Pivot is initiated, the employee is digitally disarmed, losing the ability to access or export the very data needed for their defense. The Plaintiff only succeeded in preserving this evidence by **thinking outside the corporate laptop**, realizing that when a system

15

is designed to be a 'black box,' the only way to capture the truth is through an iPhone camera.

f.  Tip 4: Ethics Reporting & NY LL § 740 (8) Violations

   i.  The Plaintiff's internal Ethics Report (ECF No. 9-20, Exhibit A) regarding his Jury Duty service was ignored, mirroring a potential pattern of **Whistleblower suppression.**

   ii.  **The Inquiry:** Regulators should subpoena **Navex** (the Amazon third-party compliance host) to determine the action rate of ethics reports. If the success rate of reports involving senior management is near 0%, Amazon's "Compliance" is a decorative facade. The failure to publish **NY LL § 740** protections in the JFK-14 facility further highlights a systemic effort to keep employees in a state of legal illiteracy. Have there been any Ethics Reports that reported any securities law violations or criminal activities that were ignored? Have there been other employees like the Plaintiff who submitted an Ethics Report before termination that also have been silenced (ECF No. 19 Exhibit A)?

   iii.  Has any individual named as a subject in an Ethics Report, specifically regarding violations of State or Federal law, been investigated, denied promotion, or conversely, **cleared for promotion** even despite having an Ethics report on their record? Does the Defendant's internal 'Compliance' protocol allow for the promotion of senior management even when they are the primary subjects of unresolved allegations of statutory retaliation?

   iv.  What is the statistical correlation between an employee filing an Ethics Report via Navex and that same employee subsequently being placed on 'Pivot' or

terminated? Specifically, has the Defendant tracked the 'survival rate' of whistleblowers within the organization, or is the Ethics Portal effectively a 'sorting tool' to identify and remove dissenters before they can reach external regulators?

v. The Plaintiff only became aware of the Ethics Report system during initiation into Pivot. This begs some questions, like h**ow often have people filed Ethics Reports during Pivot or PIP**? Has HR mostly or always discarded these ethics reports? If so, then while the Plaintiff isn't doubting that there could be some frivolous claims, pretending there might not ever be any legitimate cases of retaliation **would also be absurd**.

g. Tip 5: The Myth of "Objective" Metrics & The Cost of "Truth"

i. The retraction of a "Final Written Warning" (**ECF No. 19, Exhibit A**) is the "Smoking Gun" of this litigation. It proves that the Defendant's disciplinary system is *not a scientific instrument but a subjective, manipulable tool*.

ii. **The Inquiry:** Management defamed a sitting New York Juror, then attempted to "validate" that defamation by terminating the juror months later. If a trained scientist and former NYU Professor, protected by the shield of the Jury System, only **narrowly exposed this "Near-Perfect" machine**, one must ask: **How many other employees have been coerced into signing wrongful warnings under the guise of "Objectivity"?**

iii. **Rebuking the Facade of Objectivity:** On May 9, 2025, the Plaintiff challenged HR on the merits of the "Pivot" program. HR's primary defense was that

management is "objective" and that HR cannot challenge their findings because they rely on "objective metrics."

iv. However, as a scientist, the Plaintiff must clarify a fundamental rule of data integrity: **Data may be objective, but the conclusions are bought and paid for by the observer.** To illustrate this divergence of perspective:

   1. Approximately 30% of the country views President Donald J. Trump's actions as the most transparent and anti-establishment in modern history.

   2. Conversely, a significant portion of the citizenry argues that those same actions constituted violations of the **Emoluments Clause** and warranted criminal prosecution.

v. **The Defendant, Amazon, clearly understands this "Subjectivity of Fact."** They didn't donate millions of dollars to the Trump administration for "legal and regulatory protection" because they believe in "Objective Truth"; they did so because they know that with enough capital, you can buy the "Official Interpretation" of the law.

vi. In this case, management had every incentive to buy a "Termination" conclusion. Having already entered a dangerous legal gray area by defaming a sitting New York Juror (**ECF No. 18, Exhibit A & B**), an act with potentially criminal implications via Judicary Law §519 , it was in their direct interest to use every internal lever of power to ensure the New York Courts remained unaware of the truth.

vii. **The Logical Conclusion:** If the Defendant's metrics were truly "objective," the initial "Final Written Warning" would have been an indisputable fact. **The very**

**existence of a Retraction proves that the first "objective" conclusion was a fabrication.** It is therefore more reasonable to conclude that **Amazon employees sign warnings out of fear of management's power, rather than the results of a thorough, unbiased investigation.**

h.  Tip 6: Forensic Suppression: The Disabling of .eml Exports and Metadata Integrity

 i.  Prior to the Plaintiff's termination in May 2025, the Defendant implemented a targeted change to the Microsoft Outlook interface. Specifically, the "Save As" feature for .eml files was disabled, forcing employees to rely on metadata-poor PDF printouts. Unlike a PDF, an **.eml file** contains the raw header data necessary for forensic authentication, including server routing and precise internal timestamps.

 ii.  The disabling of this forensic tool, combined with the secrecy of "Focus" and the General Release, necessitates an immediate **Litigation Hold** on all relevant HR platforms. This includes, **but is not limited to: "Promote!", "Forte", "Focus Entry", "Focus Exit", "Shoutouts", "Pivot", "PIP", e-mails (especially those with the Pivot notice and with all written warnings),** and all internal **HR Tickets**.

 iii.  The fact that the Defendant began hiding the General Release after the Plaintiff's Motion to Strike (ECF No. 20) demonstrates **Scienter**; the **Defendant is clearly preparing for a regulatory audit**. Consequently, this notice serves as a formal warning: any data deleted or altered since the filing of the SEC TCR on March 7, 2026, must be scrutinized as a **Spoliation of Evidence.**

## VI.  SDNY JUDGE RAKOFF'S OPINION ON CORPORATE ACCOUNTABILITY

a.  The Defendant expresses an exceptional interest in transferring this matter to the Southern District of New York (**"SDNY"**) (ECF No. 17). However, the Plaintiff suggests this may be a profound strategic miscalculation. As Article III SDNY Judge Jed S. Rakoff noted in his seminal analysis of corporate accountability, the failure to address "intentional fraud", often obscured by corporate "contrivances", is a failure of the justice system itself. *See* Jed S. Rakoff, *Why Have No High-Level Executives Been Prosecuted in Connection with the Financial Crisis?*, CLS Blue Sky Blog (Nov. 15, 2013), https://clsbluesky.law.columbia.edu/2013/11/15/why-have-no-high-level-executives-been -prosecuted-in-connection-with-the-financial-crisis/

b.  The Court, while it may lament the systemic failure to prosecute individual actors during the 2008 financial crisis, stands in an unusually powerful position today. In the present case, the Court has the clear authority to strike the Defendant's Release (ECF No. 9-5, Exhibit B) with prejudice, thereby permanently 'exorcising the ghost of *Lochner v. New York*.'

c.  **The "Willful Blindness" of Corporate Contrivances:** The Defendant's strategy, layering a secretive "Focus" process, an "invisible text" Pivot PDF, and an unseverable General Release that waives non-waivable laws, mirrors the "intentional obscuration" described by Judge Jed S. Rakoff. As Judge Rakoff noted regarding the systemic failures of 2008:

*"Who... were generating the so-called 'suspicious activity' reports... Why, the banks themselves. A top-level banker... might have inquired as to why his bank's mortgage-based securities continued to receive triple-A ratings? And if... the*

20

*executive failed to make such inquiries, might it be because he did not want to know what such inquiries would reveal? This, of course, is what is known in the law as 'willful blindness' or 'conscious disregard.'"*

In the present case, the "Suspicious Activity Report" was the Plaintiff's own internal Ethics Report and his documented pushback against a wrongful Final Written Warning (ECF No. 18, Exhibit A & B). If Amazon's C-Suite and Legal department failed to inquire why a sitting New York Juror was being defamed, it is because they chose a strategy of **"Retaliate First, Ask Questions Later."** Rather than intervene to halt a clear violation of **Judiciary Law § 519**, HR and Management opted to rely on a **near-perfect, automated retaliation system, gambling that it would function as it had tens of thousands of times before to silence dissent.** They bet that the "System" would outlast the "Juror." This is not an exercise of "Business Judgment"; it is a **Conscious Disregard** for the law and the sanctity of the Jury System.

d. **The Failure of Enforcement and the Systemic Under-Reporting Problem:** Perhaps **Judiciary Law § 519** remains under-litigated not because violations are rare, but because few individuals possess the nerve to challenge an employer for the **calculated hostility** surrounding their jury service. As Judge Rakoff concluded:

*"[T]he failure of the government to bring to justice those responsible for such colossal fraud bespeaks weaknesses in our prosecutorial system that need to be addressed."*

It is **statistically absurd to assume the Plaintiff is the first juror in 250 years of American history to be defamed and professionally compromised during their term of servic**e. If we conservatively estimate 100,000 seated jurors annually in the United

21

States, even a 1% rate of **extra-judicial interference** results in nearly **1,000 compromised jurors a year.** The Court must consider the **"Confluence of Harm"**: when an external manager *asserts dominance over a seated juror through defamation and disciplinary "contrivances,"* they aren't just torturing an employee; they may be compromising the **Jury's Impartiality.** Whether it is a criminal defendant's liberty or a corporation's millions in a civil dispute, the integrity of the verdict depends on a juror who is free from the "quiet desperation" of employer-led retaliation.

The Plaintiff suggests a fundamental shift in the Judicial lens: **the question is not merely whether specific misconduct occurred *solely because of jury duty, but whether the structural anomalies surrounding* jury duty created an unacceptable risk to the administration of justice.** To allow a General Release (ECF No. 9-5, Exhibit B) to bury such an inquiry is to allow a corporate "Contrivance" to supersede the Constitution.

e.  **The Request for Judicial Reassertion: Moving Beyond the Narrow "But-For" Mirage:** *If it pleases the Cour*t, in addition to striking the Release, the Plaintiff invites the Court to consider the systemic concerns raised herein and offer options for further clarification. The Plaintiff recognizes that while a Clerk's observation of a potential violation is notable (ECF No. 9-5, Exhibit C), a criminal contempt referral originating from the Article III Judiciary carries a singular, authoritative weight that no administrative officer can provide.

The Court possesses the unique authority to move beyond the passive observation that characterized the corporate scandals of 2008, as described by Honorable Judge Rakoff. The Plaintiff acknowledges that the infliction of a tort, specifically Defamation Per Se

22

(ECF No. 18, Exhibit A & B), upon a sitting juror during their term of service represents an *unorthodox* interpretation of jury retaliation law. However, if the Court finds that defaming a juror, followed by a sequence of irregular disciplinary events leading to termination, constitutes a "contrivance" to interfere with the administration of justice, then there is no higher authority than an Article III Judge to clarify that interpretation.

By doing so, the Court would provide the "Systemic Clarification" necessary to rectify an outdated "But-For" test for jury retaliation. **This current standard has likely been gamed by sophisticated employers to safely retaliate against jurors behind a facade of "objective metrics," effectively insulating themselves from judicial wrath**. The Plaintiff suggests that only a Judicial Reassertion can bridge this gap between corporate "Business Judgment" and the constitutional necessity of an impartial, uncoerced Jury.

## VII. THE CONFLUENCE OF PROBABILITY: WHY THIS COURT IS THE UNIQUE FORUM FOR SYSTEMIC CLARIFICATION

a. The Second Circuit and this District are presented with a unique confluence of events that may not repeat for decades. The probability of a single litigation capturing the following variables is mathematically minuscule.

b. **The Jury Duty Synchronicity:** The Plaintiff was selected as an alternate juror in the State of New York, exactly as a 'final written warning' was issued 3 days before his court appearance, a timing window so narrow it borders on the impossible.

c. **The Forensic Pedigree:** Unlike the average employee, the Plaintiff brought specialized technical-legal training to his defense. Having completed the *Seminar in Anonymity and Privacy* at Columbia University under the training of Professor Steven Bellovin and Alex

Abdo (leading to a 2021 publication in the *Richmond Journal of Law and Technology*), the Plaintiff possessed the ability to challenge a senior HR and corporate counsel **without a lawyer**. This resulted in **a rare, documented admission that his final written warning had no factual basis** (ECF No. 18, Exhibit A). Honorable Judge Levy likely recognizes Alex Abdo's training, as the Plaintiff places heavy emphasis on Exhibits and systemic implications via logical deductions in his motions.

d.  **The Preemptive Audit:** Tipped off to the secretive 'Focus' process, the Plaintiff secured his evidence before the 'Pivot' system could fully sever his access, a stroke of luck, as most victims of retaliation likely didn't know they would be made digitally inept, and have no evidence to present to a court that their termination was in fact retaliation.

e.  **The Bravery Variable:** While elite employment firms, seemingly haunted by the ghost of *Lochner*, advised the Plaintiff that the General Release successfully waived both **New York Jury Duty Protections** and **NYS Whistleblower Law**, the Plaintiff was moved to action by a specific catalyst. A *Grey-eyed Barnard College woman* (ironically sharing the Alma Mater of Ms. Shira Poliak) provided the pivotal moment of clarity. **With a gentle cheek touch, a command mixed with love and sternness, she told him, 'You underestimate yourself too much.'** This personal connection provided the resolve to reject the expert advice to surrender, and the Plaintiff followed the principle of Voir Dire: to seek the truth no matter the cost. That pursuit has now uncovered a general release (ECF No. 9-5 Exhibit B) that could potentially violate USERRA, NYS Whistleblower Law, and SEC 21F-17(a). Furthermore, the pursuit of truth under the New York Whistleblower Law is raising broader questions about how Judiciary Law § 519 is interpreted.

24

f.   Given these points, the Court is unlikely to encounter another Plaintiff with this specific combination of forensic evidence, legal/technical training, and the visceral bravery to resist a Trillion-dollar Defendant. If the Court does not strike this release now, it misses a once-in-a-century opportunity to clarify that New York Jury Duty protections (and SEC Whistleblower Laws, USERRA, etc.) cannot be waived by a release.

## VIII. CONCLUSION

a.   While the Defendant may argue that the validity of the Release should wait for trial, time is a luxury that other Plaintiffs in this District do not have. Specifically, in the newly filed class action, *Won et al. v. Amazon.com Services LLC* **(1:26-cv-00593, Hon. Nicholas G. Garaufis presiding)**, Amazon's systemic use of the General Release to waive **USERRA** rights is likely to be a central conflict.

b.   **The Perez v. Uline Precedent:** The Defendant's reliance on a boilerplate General Release to waive claims rooted in protected service is a legal impossibility. As the California Court of Appeals held when interpreting the federal anti-waiver provisions of USERRA:

"We determine that because USERRA directs that its provisions may not be eliminated by a contract, the release of rights in the severance agreement may not be enforced to the extent it deals with the claims of termination based on plaintiff's membership in the military or his military service." *Perez v. Uline, Inc.*, 157 Cal. App. 4th 953, 959 (2007).

c.   Striking the Release now, based on the invalid USERRA/SEC/Jury Law waivers detailed herein, would provide invaluable clarity to those Plaintiffs in Won et al v. Amazon.com

Services LLC. It would ensure that former service members who may have been retaliated against are no longer silenced by a contrivance that violates Federal and State law. The Court has a unique opportunity to provide critical feedback that protects the integrity of the entire District's docket.

d.  The Plaintiff has shown why he has decided to pursue this matter alone, recognizing the extraordinary circumstances that enabled him to hold his own against both Amazon and Greenberg Traurig. The Plaintiff brought these concerns **because his silence would set a dangerous precedent:** that for **$38,612.18** (ECF No. 9-5 Exhibit B), a corporation can defame a sitting juror **without any fear of the New York Attorney General or the New York State Court.**

e.  Had the Plaintiff not acted, this would have been a decision made behind the back of the **Queens County Court**. Driven by a *bias for action* and the urgent reality of a short **Defamation Per Se** statute of limitations, the Plaintiff chose to act. While objectively the entire legal community may view a *pro se* pursuit as risky, the Plaintiff knows it is a calculated one: he holds a **written retraction** that justifies the risk (ECF No. 18 Exhibit A). Perhaps this case is simply the unscripted *Jury Duty Season 2* that the Defendant required, an ironic reality given that the Defendant's fabrication of 'Cause' in February 2025 perfectly coincided with the public announcement of the show's second season.

f.  The Plaintiff would likely gently remind that it was the EDNY court in Brooklyn that ended the reign of the Wolf of Wall Street (Jordan Belfort), in part charging him with securities law violations. There is no more appropriate court in the Second Circuit to comment on whether the Defendant's Release (ECF No. 9-5, Exhibit B) is, in fact, a violation of SEC Rule 21F-17(a).

**WHEREFORE**, for the reasons set forth above, Plaintiff Andrew Quijano respectfully requests that this Court:

1. **STRIKE** the Defendant's Second Affirmative Defense (Release) with prejudice.

2. **NOTE** that while this Motion is filed now to ensure compliance with the 21-day deadline following Defendant's Answer, Plaintiff respectfully requests that the Court prioritize the pending Motion for Remand. However, because the "General Release" asserted by Defendant involves substantial questions of Federal Law, including SEC Rule 21F-17, the Jury System Integrity Act (JSIA), and USERRA, Plaintiff requests that this Court resolve these Federal questions as a matter of law to prevent the "chilling" of these public interests, whether in this Court or as a final instruction upon Remand.

3. **GRANT** such other and further relief as the Court deems just and proper.

Dated: April 5, 2026

Respectfully submitted,

*Andrew Quijano*

Andrew Quijano, Plaintiff Pro Se

54-29 69th Lane Maspeth, NY 11378

+1 (917) 224-2122

27

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2026, I served a true and correct copy of the Plaintiff's Motion of Entry to Default and Reply In Further Support of his Motion to Strike and accompanying documents via Electronic Mail to the following counsel of record and associated recipients:

**Jason D. Burns, Esq. (Jason.Burns@gtlaw.com)**

**Shira M. Poliak, Esq. (shira.poliak@gtlaw.com)**

**Greenberg Traurig, LLP**

**One Vanderbilt Avenue, New York, NY 10017**

*Andrew Quijano*
_____

Andrew Quijano, Pro Se