*** Filed ***
12:46 PM, 22 Apr, 2026
U.S.D.C., Eastern District of New York

**UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK**

---

Andrew Quijano, Plaintiff, -against- AMAZON.COM SERVICES LLC, Defendant

Case No.: 1:26-cv-00664

---

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE

## I. PRELIMINARY STATEMENT: THE DEFENDANT'S CHALLENGE TO JUDICIAL DISCRETION

While the Defendant correctly notes that motions to strike are generally disfavored, this argument overlooks a critical procedural reality: the Honorable Judge DeArcy Hall maintained the full authority to deny the Plaintiff's Motion to Strike *sua sponte* at its inception. Instead, the Court chose to let the motion proceed. To insinuate that Judge DeArcy Hall would deliberately burden this Court's schedule, and, by extension, expend Federal taxpayer resources, on a truly frivolous matter is a bold reaching of the Defendant's position. Such an argument appears to question the Judiciary's inherent power to identify and manage its own docket efficiently.

1

## II. WAIVING A DEFAMATION CLAIM OF A SITTING JUROR IS VOID AGAINST PUBLIC POLICY

The Defendant argues that common law tort waivers, which defamation is a subset of, are standard and enforceable. If a general waiver of common law torts is held to bar a sitting juror's claims, it creates a dangerous precedent: an employer could, theoretically, commit physical battery against an employee during their jury service and remain shielded from civil liability simply by the existence of a pre-signed release (ECF No. 20 Section II(c)).

The Defendant relies heavily on *WSP USA Corp. v. Marinello*, No. 13-4591, 2013 WL 6704885 (S.D.N.Y. Dec. 19, 2013), where the SDNY Court dismissed a defamation claim based on a general release. But that case is fundamentally distinguishable. *Marinello* involved a former IT Director accused of misappropriating trade secrets in a private commercial dispute between two private parties.

Consider the distinction: In *Marinello*, the Court dealt with a former IT Director in a private commercial dispute over trade secrets. There was no 'Public Interest' at stake beyond the enforcement of a private contract. By contrast, the Plaintiff here was a sitting juror, an officer of the State performing a sovereign function (ECF No. 18 Exhibit D). Allowing a private contract to waive claims arising from the sabotage of a juror's reputation doesn't just harm the individual; it strikes at the heart of the Judiciary itself. To equate a trade-secret dispute with the targeted defamation of a sitting juror is to ignore the unique 'Public Policy' protections that the State of New York affords to the jury system. Also, it was an employee, not an employer, who was protected by a General Release in the *Marinello* case.

2

Indeed, the Defendant's failure to cite a single case in which a **common-law tort waiver was enforced against a sitting juror confirms the Plaintiff's position**. **Had such a precedent existed, the Defendant surely would have highlighted it in bold.** Its absence strongly suggests that this case is a matter of first impression in American jurisprudence.

## III. A REBUTTAL TO WAIVER CLAIMS IN ECF NO. 23 SECTION III

### a. IT DEPENDS ON WHAT THE MEANING OF THE WORD 'IS' IS: THE DEFENDANT'S RELIANCE ON OBSOLETE, CLINTON-ERA PRECEDENT

The Defendant relies heavily on *Warden v. E.R. Squibb & Sons, Inc.*, 840 F. Supp. 203 (E.D.N.Y. 1993) to argue that **NY LL § 740** is waivable. This reliance is misplaced for three reasons: it is chronologically obsolete, logically inconsistent with recent legislative reforms, and fundamentally ignores the fact that today's corporate landscape requires stricter statutory guardrails than those of the early 90s.

**1. The 2021/2022 Legislative Overhaul Rendered *Warden* a Relic:** The *Warden* court operated in a 1993 world, a time before the "Wall Street Bets" era of institutional volatility, and before the systemic deceptions of Enron, WorldCom, and the 2008 financial crisis proved that major corporations are often just "4chan users with Bloomberg terminals and $3,000 suits."

The New York Legislature's 2021 and 2022 amendments to **NY LL § 740** were a direct response to this evolution, completely reimagining the statute to favor the employee. Specifically, § 740(7) now explicitly provides:

> *"Nothing in this section shall be deemed to diminish the rights, privileges, or remedies* of any employee under any other law or regulation or under any collective bargaining agreement or *employment contract."*

3

If the General Release is an employment contract, as Defendant asserts (ECF No. 23, Section I, Paragraph 2) and as the release still enforces the non-compete clauses (ECF No. 22, Exhibit B, ECF No. 9-5 Exhibit B, § Recitals) further implicate, then by the statute's own text, it cannot be used to "diminish" the Plaintiff's rights. The Defendant's attempt to use a 33-year-old case to bypass modern anti-waiver protections is a classic exercise in legal anachronism. It is further absurd that the Defendant themselves explained that, in 2019, New York effectively strengthened the law as an argument that contracts can waive NY LL § 740 (ECF No. 23).

Even if *Warden* survived the 2021 amendments, it addressed whistleblower claims in the context of civil law (NY LL § 215). It did not, and could not, authorize the waiver of claims arising under **Judiciary Law § 519**, which sounds in **criminal contempt**. As confirmed via correspondence with Counsel to the Queens County Clerk (Exhibit B), jury duty protections are not commodities to be traded in a severance package. *If a precedent existed for the waiver of criminal-adjacent whistleblower claims under Judiciary Law § 519, the Defendant surely would have produced it in bold, capitalized text by now.*

**2. Defendant's Tactical Silence on the Explicit Whistleblower Waiver** The Plaintiff notes a significant curiosity in the Defendant's planned Motion for Judgment on the Pleadings (ECF No. 17). While the General Release **explicitly mentions** a waiver of the "New York State Whistleblower Law" (ECF No. 9-5, Exhibit B), the Defendant chose not to lead with this explicit language. Instead, they relied on broader "catch-all" terminology and invoked "common law torts" to neutralize the defamation claim.

This suggests that the Defendant may harbor doubts about whether the NYS Whistleblower Law is indeed waivable under the 2022 standards. If the waiver were a "slam dunk," the Defendant

4

would not be digging up 1993 case law; they would be pointing to the explicit text as they did with the common law tort component. Their hesitation to do so implies recognition that statutory "Anti-Waiver" protections, especially those affecting **Judiciary Law § 519** and criminal law, are not so easily traded away.

**3. Statutes Trump Contracts: The "Wong" Standard:** It is a foundational principle that federal and state mandates supersede private "ink on paper." For example, the Second Circuit has consistently held that the anti-arbitration provisions of the **Sarbanes-Oxley Act (18 U.S.C. § 1514A(e))** render pre-dispute arbitration agreements unenforceable as a matter of law, regardless of what a contract says. *See Wong v. CKX, Inc.*, 890 F. Supp. 2d 411, 421 (S.D.N.Y. 2012) (holding that the SOX anti-arbitration provision "precludes the enforcement of any pre-dispute arbitration agreement").

Just as a contract cannot kill a SOX claim with its explicit anti-contract protections, a "General Release" cannot kill the claims protected by **NY LL § 740**. The Defendant cannot "contract around" the integrity of jury duty protections when they are invoked under the New York Whistleblower Law.

**b. THE DEFENDANT'S SELECTIVE CITATION OF *TOLLE* AND THE DISTINCTION OF THE *CORNELIUS* FOOTNOTE**

The Defendant's reliance on *Tolle v. PocketSonics* and *Cornelius v. United Parcel Serv., Inc.* to argue for the broad waivability of statutory rights is built on a foundation of incomplete procedural histories and a failure to address modern appellate standards.

**1. The "Math" of *Tolle*: A Reversal the Defendant Overlooked:** The Defendant cites a March 2018 decision in *Tolle* as if it were the final word. It was not. In October 2018 (Exhibit E), the

Court denied the enforcement of the release. The earlier March ruling merely allowed limited discovery to determine whether the Plaintiff had received benefits equal to or exceeding those guaranteed by USERRA. Once the Court realized the math didn't check out, the release was discarded, and the USERRA claim was allowed to proceed (Exhibit E). Citing the March "partial dismissal/limited discovery" while ignoring the October final "denial" is, at best, an oversight; at worst, it is a misrepresentation of the case's outcome.

**2. The *Cornelius* "Contentious Issue" and the Lack of Statutory Analysis:** The Defendant's reliance on *Cornelius v. United Parcel Serv., Inc.* (SDNY 2012) is equally problematic. A review of the record reveals that the *Cornelius* court **failed to perform a rigorous analysis of 38 U.S.C. § 4302** (the anti-waiver provision), likely because the parties admitted the military dispute was already a "contentious issue" and the "only issue" prior to the release (See *Cornelius*, Footnote 3).

Because the dispute was already known and "specifically contemplated," the court rushed to a 12(b)(6) dismissal without considering whether the statute itself forbade such a waiver. This is exactly the type of lower-court rush-to-judgment that the California Court of Appeals corrected in ***Perez v. Uline, Inc.***, 157 Cal. App. 4th 953, 68 Cal. Rptr. 3d 872, 2007, where the California Appeals Court emphasized that a release cannot override USERRA's § 4302 mandate. Had *Cornelius* been appealed to the Second Circuit, it is highly probable that the district court's lack of § 4302 analysis would have faced the same fate as the California lower court in *Perez v. Uline*, assuming Cornelius was fully under USERRA's protection, which is difficult for the Plaintiff to fully infer based on Footnote 3.

**3. A Note on Judicial Economy and Professional Candor:** The Defendant's presentation of an overturned March decision (*Tolle*) and a surface-level 2012 SDNY opinion (*Cornelius*), while ignoring superior appellate reasoning in *Perez v. Uline*, appears to brush against the boundaries of **FRCP Rule 11(b)(2)**. While the Plaintiff, as a *pro se* litigant, lacks the resources of a global firm to audit every citation the Defendant provides, the discrepancy here is glaring.

The Plaintiff has better things to do than engage in "gotcha" motion practice over the Defendant's messy research. However, in the interest of judicial economy, the Plaintiff has corrected the record so the Court is not led into error by the Defendant's selective citations. The Plaintiff **waives any formal Rule 11 claim for the Defendant's USERRA analysis**, trusting that the Court will note the Defendant's failure to provide the full procedural context of the cases they cite.

### c. THE JURY SYSTEM IMPROVEMENTS ACT (JSIA): FILLING THE STATUTORY SILENCE TO PROTECT THE SOVEREIGN

The Counsel to the Queens County Clerk has explicitly stated that a General Release cannot bar claims where the facts relate to a juror's service (Exhibit B). If a state administrative official recognizes that jury service protections are non-waivable as a matter of public policy, then it follows a fortiori that an Article III Federal Judge possesses the inherent authority to clarify that **28 U.S.C. § 1875** is similarly insulated from contractual interference.

**1. A Rare Opportunity for Judicial Economy:** Jury retaliation cases are exceedingly rare, and cases involving the "contractual waivability" of such protections are virtually non-existent. While **28 U.S.C. § 1875** is currently silent on waivers, this silence should not be interpreted as a license for corporations to "contract around" the Sixth Amendment. It is in the interest of judicial

economy for this Court to draw a clear line in the Report and Recommendation: the structural integrity of the Federal Jury System cannot be sold in a private severance agreement.

**2. Correcting the Legislative Assumption** Congress likely never anticipated a scenario where a corporation would attempt to use a General Release to immunize itself against the criminal-adjacent act of juror retaliation. Unlike the Sarbanes-Oxley Act (SOX), which was drafted with explicit anti-waiver language in the wake of corporate collapse, the JSIA relies on the Judiciary to safeguard its own provisions.

**3. Preventing the "Fee-Shifting" Loophole** Without a clear judicial determination that U.S.C. 28 § 1875 is non-waivable, the statute's protections, **including its critical fee-shifting provisions**, become illusory. If a Plaintiff's attorney can be "contracted" out of the very fees designed to make the litigation of these rare cases possible, the statute is effectively repealed by private ink. The Plaintiff respectfully submits that the Court should **use this R&R to state clearly: the protections of the American Federal Jury System are not for sale**.

**d. NON-SEVERABILITY AND THE BDO SEDIMAN V. HIRSHBERG BLUE PENCIL** Under the *Erie* Doctrine, this Court is bound to apply the law as interpreted by the New York Court of Appeals. In **BDO Seidman v. Hirshberg, 93 N.Y.2d 382 (1999)**, New York's highest court established a three-prong test for the partial enforcement of restrictive covenants and releases. To be enforceable, a provision must: (1) be no greater than required to protect the employer's legitimate interest; (2) not impose undue hardship on the employee; and **(3) not be injurious to the public.**

**1. The Release is "Injurious to the Public" under Prong 3:** While the Plaintiff defers to the Court's discretion, the General Release (ECF No. 9-5, Exhibit B) fails the third prong of the

8

*BDO Seidman* test as a matter of law. The Release purports to waive rights under "Super-Statutes" designed specifically to protect the public good: **USERRA** (Military Service), **SOX** (Securities Integrity), and **NY LL § 740** (Whistleblower Protections). Based on *Tolle v. Pocketsonics*, the Plaintiff can confirm that roughly $38,000 was roughly only 2.5 months of base pay; **that is it** (RSUs, 401K match, etc. were denied)**.** Should the Won et. al. Plaintiff's attorneys (EDNY, 1:26-cv-00593) subpoena the Ethics Report, they should see proof that the Plaintiff attempted to negotiate better leave conditions but was shut down by the Defendant, so it goes without saying, **it is very likely that veterans represented in the class action bound by the release have not been properly compensated** (ECF No. 20 Exhibit A). Note that, since the Navex Report key is public, the Plaintiff grants any interested party permission to read the Ethics Report; Navex is your only gatekeeper now.

Most critically, the Defendant's attempt to use a private contract to bar claims arising from **Judiciary Law § 519** is an affront to the New York public. If a corporation can retaliate against jurors with impunity by simply buying a "General Release," the very foundation of the jury system is compromised. A whistleblower claim regarding a State crime (Juror Retaliation) is not a mere "private right" to be traded; it is an enforcement mechanism for public safety.

**2. The "Sketchiness" of Explicitly Waiving NY LL § 740:** The Release's explicit mention of **NY LL § 740** (Exhibit B) is telling. It suggests the Defendant was aware that this specific whistleblower protection, which guards against retaliation for reporting illegal conduct, posed a threat to their practices. By attempting to contract away a law that exists to protect the public from corporate malfeasance, the Defendant has demonstrated the "overreaching and coercive exploitation" that *BDO Seidman* expressly forbids.

9

**3. The "Non-Severability" Nuclear Option:** Finally, the Defendant's General Release is uniquely fragile by design. Per the **Severability** provision (ECF No. 9-5, Exhibit B). While most parts of the Agreement can be salvaged if found unlawful, the **General Release clause itself is explicitly non-severable.**

*The provisions of this Agreement are severable, and, if any part of it, **other than the general release clause set forth in the section of this Agreement titled GENERAL RELEASE,** is found to be unlawful or unenforceable, the unlawful or unenforceable provision(s) shall be narrowly construed, and the other provisions of this Agreement shall remain fully valid and enforceable to the maximum extent consistent with applicable law.*

This creates a "Nuclear Option" for the Court. If any single component of that Release is found to be an unlawful attempt to waive unwaivable rights, such as **NY LL § 740** or **28 U.S.C. § 1875**, etc., the *entire* general release section must fall; the remaining provisions could remain, but the entire contract is effectively dead.

The Defendant now asks this Court to perform "Judicial Surgery" to save them from their own drafting. However, it is not the burden of an overworked Federal Judiciary to "blue-pencil" a sophisticated Defendant's contract to make it compliant with the very laws the Defendant attempted to circumvent. If the Release seeks to bar claims that the Law says are un-barrable, the "Non-Severability" trigger is pulled, and the Release collapses in its entirety.

## IV. THE OVERBROAD RELEASE AS A SHIELD FOR CORPORATE IMMUNITY AND THE DEFENDANT'S CONSTITUTIONAL HYPOCRISY REGARDING JURY RIGHTS

The Defendant has recently laid off approximately 16,000 employees and reportedly plans further massive reductions. These layoffs are likely governed by the same overly broad 'General

Release' challenged here, a release the Plaintiff has already flagged in an SEC TCR regarding compliance system failures (ECF No. 20, Section II). *The Plaintiff didn't forget to file a complaint with the EU Whistleblower Directive about the bungled Ethics Report/Pivot (ECF No. 20, Exhibit A, B), and will inform the Defendant in a Court filing when it is done, **it is coming***.

## a. THE GENERAL RELEASE OF CRIMINAL LIABILITY VIA EXHAUSTION AND SYSTEMIC INTERIA

The core issue is the **Asymmetry of Boldness**: an overly broad release shifts the burden to the terminated employee to 'call the Defendant's bluff.' **When even specialized employment counsel advises plaintiffs that such releases protect the Defendant from whistleblower lawsuits over suspected violations of law**, **it raises a disturbing question: How many valid allegations of corporate crime have been successfully suppressed by the potent mix of employee exhaustion and the Plaintiff Bar's risk-aversion?**

There are two systemic failures that facilitate this silence. First, the 'Regulatory Lag': the turnaround time for government officials to respond to whistleblower reports takes months, a timeframe in which the average citizen, l**acking the Plaintiff's resolve, simply surrenders.** Second, as Honorable Judge Rakoff noted (ECF No. 22 Section VI(d)), prosecutors may be deterred by resource constraints or political considerations when the target is a corporation of the Defendant's magnitude, as 2008 had effectively no prosecutions. If a whistleblower claim is deemed waived where the underlying allegation is not a mere civil tort, but a **criminal violation**, it creates a 'Zone of De Facto Immunity.' The Defendant is **effectively incentivized to break the law, knowing that the 'General Release' will act as a contractual gag order that the average employee, and even the average prosecutor, lacks the resources or will to challenge.**

There is a larger point at stake regarding the nature of the Defendant's General Release.' Under **Milton Friedman's Shareholder Primacy Theory, as formalized in *Dodge v. Ford Motor Co., 204 Mich. 459, 170 N.W. 668 (1919)***, a corporation's singular priority is the maximization of shareholder profit. Crucially, *that theory contains no carveouts for the rule of law, national allegiance, responsibility to regulators, public safety, or 'customer obsession.'*

It begs the question: **Should a Court or Government interfere with and harm a corporation's profits**, would it not, via the Friedman Doctrine and the **Dodge v. Ford** precedent, **be the fiduciary responsibility of the C-Suite to cripple, or ideally destroy, said institutions if they get in their way?** This is not a hypothetical concern. The Defendant is currently engaged in active litigation seeking to dismantle the National Labor Relations Board (NLRB), arguing the institution itself is unconstitutional (Amazon.com Servs. LLC v. NLRB, No. 24-60513 (5th Cir. 2024)). When **paired with the Defendant's massive financial expenditures to influence regulatory outcomes (FEC Committee ID: C00360354),** a clear pattern emerges: the Defendant views the 'Rule of Law' as an operational hurdle to be cleared or a target to be destroyed**.**

The Defendant's position regarding the 'General Release' is not only legally repugnant but constitutionally hypocritical. The Court should note the exceptional irony that the Defendant is currently suing the NLRB, **arguing that the NLRB is unconstitutional because its proceedings '***adjudicate private rights... without providing the right to a trial by jury***' in violation of the Seventh Amendment** (*Amazon.com Servs. LLC v. NLRB*, No. 24-50761 (5th Cir. 2024)).

12

It is an affront to the Judiciary for the Defendant to claim an 'irreparable harm' from the deprivation of its own jury trial rights in one circuit, while simultaneously attempting to strip a former New York juror (ECF No. 18, Exhibit D) of his statutory and constitutional protections in this District. The Defendant's supporters, in active litigation where the Defendant is the lead Petitioner, have argued that '***the right to a jury trial ranked sacrosanc****t*' and that '***key among those structural protections was the right to trial by jury. That "most excellent method of decision" had long been hailed as "the glory of the English law."'*** (*U.S. Chamber Amicus Brief, Amazon.com Servs. LLC v. NLRB, No. 24-50761 (5th Cir. 2024)*, *quoting William Blackstone*). The copy of the amicus brief is provided as Exhibit A, written by Steven A. Engel Michael H. McGinley, Justin W. Aimonetti, Brian A. Kulp of DECHERT LLP, Jordan L. Von Bokern, and Maria C. Monaghan representing the U.S. CHAMBER LITIGATION CENTER.

The Defendant cannot invoke the sanctity of the Seventh Amendment as a fundamental safeguard to dismantle the NLRB in Texas, while simultaneously arguing in New York that the Court should treat the Sixth Amendment-protected *function of jury service as a waivable, contractual inconvenience.* To allow the 'General Release' to bar this action would be to permit the Defendant to dismantle the very constitutional rights it claims to revere.

## b. ANOTHER IMPORTANT NOTE ABOUT SPACEX BEING A PLAINTIFF IN THE NLRB CASE AND A MODEST PROPOSAL FOR THE NLRB

While the Plaintiff can likely bet that SpaceX enforces Arbitration under the Federal Arbitration Act (FAA), he specifically saw this document waiving his right to a jury trial when he applied for a role at Tesla around 2025 (Exhibit D). There is a **certain irony in Elon Musk arguing, "*Jury Rights for me, not for thee*"**. **Should the NLRB be ruled unconstitutional, it should be only**

13

**fair that the FAA be ruled unconstitutional as well,** since the Chamber of Commerce believes a right to a jury trial is so sacrosanct, **we should make sure everyone has a right to a jury trial!** The plaintiff, a former juror, flattered by the Chamber of Commerce's reference to the nobility of his jury service, has a *modest proposal* (ECF No. 18 Exhibit D). **If the Defendant and its allies in the Chamber of Commerce seek to dismantle the NLRB on Seventh Amendment grounds, the solution is not the elimination of labor rights via destroying the NLRB, but the integration of labor expertise into the Judiciary**. Converting NLRB Administrative Law Judges into Magistrate judges working within the District Courts would preserve the expertise of the 'enforcers' while finally honoring the 'sacrosanct' right to a jury trial that the Defendant so inconsistently champions. The Plaintiff humbly asks that Honorable Judge Levy comment on this solution, *if possible*, probably as a footnote in the Motion to Strike R&R.

The 'Conspiracy' here is not of the Plaintiff's making; it is the Defendant's stated litigation strategy. **It is a logical absurdity for the Defendant to maintain that the release permits reporting to the Government, while simultaneously executing a fiduciary mandate to obliterate the very regulators to whom the Plaintiff would report to.**

## V. ADDRESSING DENIALS IN ECF NO. 23 SECTION III(c)

To address this, the Defendant can't just rely on blanket denials without either stronger evidence or logical reasoning to counter the Plaintiff. This, **in fact, is the broad use of denials that got a Litigation Star snared in multiple Rule 11(b)(4) violations (ECF No. 18, Section II)** and an admission of contradiction in their answer (ECF No. 23, Paragraph 1, and ECF No. 14, Paragraph 4).

14

To debunk a conspiracy, one does not simply deny; one applies superior logic or verifiable science. For instance, the **NASA moon landing** is authenticated by the silence of the Soviet Union, a rival space-faring power with every incentive to expose a hoax, yet no evidence to do so. Similarly, the **Eratosthenes experiment** proved the Earth's curvature over 2,000 years ago using the shadows of two obelisks; a repeatable scientific fact that renders 'Flat Earth' theories impossible. The Plaintiff provided both a Seattle Times article (ECF No. 22, Exhibit D) about the "Focus" secrecy and a NAVEX Ethics Report Key (ECF No. 20, Exhibit A) proving an Ethics Report was filed less than a day the Release was signed; should the Defendant fail to prove these are lies, then these should be factored in, as **how a corporation handles their ethics reports and events leading to termination should be considered as how the General Release was created** (ECF No. 9-5, Exhibit B). The Defendant has provided no evidence for the rebuttal regarding the Pivot data lockout, but the Plaintiff is excited for discovery to objectively prove, once retrieved, that the May 7th, 2025, e-mail and the Pivot PDF file text can't be copied (ECF No. 20, Exhibit B).

With regard to citing the GT Report (ECF No. 20, Exhibit C), the whole point was that **the Defendant knew that some provisions of the contract were illegal when applying SEC Rule 21F-17(a).** It would now be disrespectful for the Defendant, **caught red-handed in a knowing violation of the rules for writing releases**, to count on the Court's good graces to be saved by the severability clause in the Acknowledgment section, especially **after the Court saved the Defendant from a Default on April 6, 2026 (ECF No. 22).**

As for the Plaintiff's notice of A2Z changes, showing the release is now blocked by another login screen, his offer to demo the application still stands. If the Defendant is fully confident that

15

the Plaintiff is wrong, they should be ecstatic and seize the opportunity to force the Plaintiff to issue a public retraction and do the demo (ECF No. 20, Section II(d)).

Finally, the whole allegation cross referencing SEC records with the Queens DA call (ECF No. 20, Section III), yes, it is a tangent to the motion to strike, but the whole point, **if a whistleblower who was almost had by the Focus/Pivot system just barely made it out reporting an alleged State crime, then** this exercise at least **gives more validity that there might be ignored Securities Laws Ethics Reports from the Defendant on Navex**. Of course, the EDNY has the resources to cross-reference the SEC records and call the Queens DA to confirm these events happened. Whether this counts as MNPI and whether the timing looks weird is for the Court and the Defendant's investors to decide.

To conclude this section, to quote *a First Amendment warrior, Mr. Joseph Foreman, a.k.a. Afroman, the Plaintiff's proof is on the Internet* (Exhibit A-E, ECF No. 9-5, Exhibit B-D; No. 18 Exhibit A-F, No. 20 Exhibit A-D, No. 22 Exhibit A-E). The Defendant has yet to present an exhibit other than the General Release, which the Plaintiff posted first (ECF No. 9-5 Exhibit B) to counter his claims.

# VI. MURRAY V. UBS SECURITIES AND ITS IMPLICATIONS FOR JUDICIARY LAW § 519

## a. A CLOSER LOOK AT  JUDICIARY LAW §  519

In the recent case of ***Murray v. UBS Securities LLC***, 601 U.S. 23, 34-35 (2024), a unanimous Supreme Court ruled that Courts **should not read requirements into a statute that the text does not explicitly state**. Regarding the Sarbanes-Oxley Act (SOX), the Court noted:

16

> **"Section 1514A's text does not reference or include a 'retaliatory intent' requirement.**.. While a whistleblower... must prove that his protected activity was a contributing factor... **he need not also prove that his employer acted with 'retaliatory intent.'"**

If this Court agrees that intent should not be added where it is not explicitly stated, a comparison between New York statutes is illuminating. **NY Penal Code § 215.25** (Tampering with a juror in the first degree) clearly defines the *mens rea* as an **"intent to influence the outcome**." However, **Judiciary Law § 519** contains no such requirement. It states:

> Any person who is summoned to serve as a juror... shall not, on account of absence from employment by reason of such jury service, be subject to discharge or penalty... Violation of this section shall constitute a criminal contempt of court.

The text does **not** state a *mens rea* requirement or a specific intent to harm the Judiciary. Since § 519 does not clearly require a "knowing" or "purposeful" *mens rea*, as does § 215.25, a strict intent requirement should not be grafted onto the text. If an employer negligently or recklessly penalizes a juror, such as by issuing a wrongful "Final Written Warning" that **fully** overlaps with jury duty (**ECF No. 18, Ex. A, B, D**), the statutory violation should be complete.

**b. THE JUROR'S STATE OF MIND AND HIS FEAR OF FEDERAL IMPRISONMENT VIA DEFENDANT'S FINAL WRITTEN WARNING TEXT MATCHING A FEDERAL FELONY**

The Plaintiff is compelled to state, with **some embarrassment, that the fear of this warning caused him to apply for jobs in the jury breakroom** and even interview for positions on or around January 17, 2022, during his jury service (Exhibit C, ECF No. 18 Exhibit D).

This highlights the flaw of the "But-For" test: only an **"Inspector Clouseau-level" employer would be foolish enough to explicitly state they warned/fired someone for jury duty**. The specific language of Amazon's "Final Written Warning," charging the Plaintiff with

17

"**unauthorized use, misuse, or abuse of equipment, products, material, or property**," is facially similar to the elements of the **Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030**.

The Plaintiff genuinely feared that, if he signed the document, he would be signing his own arrest warrant. Having concluded a seminar at Columbia University in December 2021 with **Professor Bellovin**, who specifically **warned of the dangers and breadth of the CFAA in various classes**, the Plaintiff believed his signature would be used as a confession against him by the U.S. Attorney. He feared he was one e-mail reply away from being "*cellmates with Diddy*" at the MDC. **While the Plaintiff uses humor throughout his filings as a coping mechanism, his fear was grounded in his education:** he had no knowledge of the *Van Buren v. United States, 593 U.S. 374 (2021)*, that finally narrowed the CFAA, and had no reason to believe Amazon wouldn't turn him over to Federal authorities. His fear was further justified, as t**he warning was in part written by two in-house counsel**, Sarah Dukman and Elizabeth Martin (ECF No. 18, Exhibit C), *due to the Defendant's HR's faulty information*. If the Defendant wants to argue that the General Release's breadth allows a waiver of whistleblowing on alleged criminal law violations, then it is only fair, **via Judicial Estoppel, that the Plaintiff apply the same broad interpretation when reading the Final Written Warning** (ECF No. 18 Exhibit B).

This raises a haunting rhetorical question for this Court (especially Queens County Court):

> If a juror is sitting in a box, paralyzed by the fear of a potential criminal indictment, the imminent loss of his livelihood, and was mentally preparing for his high-stakes showdown with a trillion-dollar Legal/HR apparatus on January 31, 2025 (ECF No. 18, Exhibit C), **is this the mind that any criminal defendant, or any trial judge for that matter, would ever want deliberating over a human being's life?**

**c. THE POTENTIAL IMPACT ON *PEOPLE v. ORLANDO VALDEZ***

18

Consistent with the Queens Supreme Court's instructional video, "**Jury Service & Fairness**," jurors are cautioned about biases that distort the deliberative process (https://cmi.nycourts.gov/vod/WowzaPlayer/oca/2025-JuryFairness). The Plaintiff would like to note that New York courts routinely excuse prospective jurors for financial hardship, **reflecting judicial recognition that significant economic pressure may impair a juror's ability to serve with thoroughness and impartiality.** In this case, there was a direct conflict between the Plaintiff's civic duty and his economic survival.

Based on the Plaintiff's memory and subsequent investigation, he is **reasonably certain** the case he served in was *The People of New York v. Orlando Valdez* (Ind. No. 72733/2023, 2025-05769). The fact that this case is reportedly under appeal suggests significant issues may have arisen at trial (Exhibit C). **Had the Plaintiff deliberated under the duress of Amazon's threats**, the Appellate Advocates would have a powerful **Sixth Amendment** argument that Mr. Valdez lacked an impartial jury.

**The liability of a mistrial due to jury retaliation falls on the State of New York, not the Defendant**. The Plaintiff brings this case to protect the integrity of the Judiciary. As noted by the **Chamber of Commerce** (Exhbit A), jury service is the "**glory of the English law**, so jurors **must be offered the broadest protections from economic pressure so they can truly live up to their potential as the "conscience of the law."**

## VII. CONCLUSION

### a. UPDATE ON RULE 11 FROM ECF NO. 18

The Defendant has conceded 7 points of factual contention, except for the retraction (ECF No. 18, Section II, Exhibit A). Regarding the factual contention of the 'Final Written Warning' (ECF No. 18, Exhibit A): **The Defendant has conceded the status was changed but maintains it was 'modified' rather than 'retracted.'** Plaintiff possesses forensic, native-format data proving, beyond a reasonable doubt, **that a full retraction occurred on February 11, 2025** (ECF No. 18, Exhibit A).

To ensure the compliance of the record and avoid unnecessary Rule 11 litigation over a verified Answer, Plaintiff respectfully asks the Court for guidance: **Should the Defendant be required to amend its Answer to reflect the 100% factual reality of the retraction, or does the Court find the current 'modification' admission sufficient for the purposes of moving to the merits?**

Further, Plaintiff requests leave to submit the native-format evidence of said retraction to Chambers via email, as its forensic nature cannot be captured in a standard PDF, and seeks instructions on how to properly docket a redacted version for PACER to preserve the integrity of the data. **This information would help inform the decision of which fix for the answer would be most appropriate.**

### b. REALITY IS STRANGER THAN FICTION: JURY DUTY EDITION

The Plaintiff, at times, wonders why this case feels like a far grimmer, higher-stakes version of *Jury Duty* (Season 1). He currently faces a Defendant who could theoretically argue 'ineffective

20

counsel' due to the Rule 11 violations a *pro se* Plaintiff identified, though, **unfortunately for the Defendant, a corporation cannot go *pro se* like in the show.** For the record, Plaintiff stands firmly by his 'Inspector Clouseau' speculation regarding the Defendant's performance (ECF No. 20, Section IV).

Much like the protagonist, Ronald Gladden, who rejected $2,000 based on 'made-up rules' that didn't exist, the Plaintiff here refused to believe a $38,612.18 severance package tethered to a potentially fabricated and illegal 'General Release' would work. **The Plaintiff did not want the role of defending Mr. Valdez's right to an impartial juror; it is an objectively unpleasant experience to spend months battling the massive institutional inertia** of the Plaintiff Bar, the Queens DA, the Labor Bureau, and legislative offices. While these institutions and practitioners may privately validate the merits of this case, they appear tethered by a collective risk-aversion, waiting for a 'test case' victory before committing their resources. **To be fair to the Queens DA and the Labor Bureau, they are tasked with the enforcement of established law; however, only the Judiciary possesses the sovereign power to interpret whether Judiciary Law § 519 encompasses the reckless or negligent chilling of a juror's mind.** The Plaintiff has effectively accepted the role of the *sacrificial lamb* in this District, enduring the grueling task of documenting evidence and rehearsing arguments against a tide of legal inertia. But given how fate has aligned (ECF No. 20, Section VII), the Plaintiff realized that **if he is the only person positioned to fight for the sanctity of the Sixth Amendment, then so be it.** Failure, and the silence it would cement, is no longer an option

That resolve was forged on or around the night of August 8, 2025. As the Plaintiff captured screenshots of the General Release at 9:01 PM (ECF No. 9-5, Exhibit B), his media bar was playing 'Atlas' by Coldplay. The lyrics, *"I'll carry your world and all your hurt"*, resonated not

21

as mere entertainment but as **an acceptance of the burden to come**. It was in that moment, recalling a lover's command to stop underestimating himself, that the Plaintiff committed to seeing this through to the bitter end. The oath sworn to the People of New York at the conclusion of *Voir Dire* was not a temporary gesture; it was a mandate that must be fulfilled.

As the Chamber of Commerce correctly reminds this Court, **'the Framers recognized that structural protections against abuse of power [are] critical to preserving liberty'** (citing *Bowsher v. Synar*, 478 U.S. 714, 730 (1986)), (Exhibit A). The Plaintiff appreciates the compliment from the Chamber of Commerce that he, as a juror, through all this extra work, is in fact keeping the flame of liberty alive. Yet it is ironic that a private corporation now asks this Court to 'carve out' the very jury rights the Chamber of Commerce labels as a **'crucial bulwark against governmental abuses of power'** (Exhibit A). In fulfilling his mandate to New York, the Plaintiff is finally living up to the expectations that Alexander Hamilton had for the American citizen, acting as the 'palladium of liberty' when the established institutions were too risk-averse to stand (Exhibit A).

The PACER lurkers, the NY Appellate Court, the NY Court of Appeals, the Appellate Advocates, and Queens County Court, shall hold their breath to see if the Sixth Amendment right to an impartial juror that Mr. Orlando Valdez had, which was entrusted to me to uphold, shall get a carveout to protect the Defendant from Judiciary Law § 519 or not.

**WHEREFORE**, for the reasons set forth above, Plaintiff Andrew Quijano respectfully requests that this Court:

1. **STRIKE** the Defendant's Second Affirmative Defense (Release) with prejudice.

2.  **NOTE** that while this Motion is filed now to ensure compliance with the 21-day deadline following Defendant's Answer, Plaintiff respectfully requests that the Court prioritize the pending Motion for Remand. However, because the "General Release" asserted by Defendant involves substantial questions of Federal Law, including SEC Rule 21F-17, the Jury System Integrity Act (JSIA), and USERRA, Plaintiff requests that this Court resolve these Federal questions as a matter of law to prevent the "chilling" of these public interests, whether in this Court or as a final instruction upon Remand.

3.  **GRANT** Plaintiff leave to contact the Court's Chambers via email regarding the submission of sensitive, non-PDF data proving the retraction on February 11, 2025, "Final Written Warning," and provide instructions on the Defendant's amended answer.

4.  **GRANT** such other and further relief as the Court deems just and proper.

Dated: April 22, 2026

Respectfully submitted,

*Andrew Quijano*

Andrew Quijano, Plaintiff Pro Se

54-29 69th Lane Maspeth, NY 11378

+1 (917) 224-2122

23

**Declaration of Andrew Quijano**

I, Andrew Quijano, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

Exhibit A is a true and correct copy of the Amicus Brief from the Chamber of Commerce, where they state that the NLRB is denying Amazon's right to a jury trial

https://www.uschamber.com/assets/documents/U.S.-Chamber-Amicus-Brief-Amazon.com-Services-LLC-v.-NLRB-5th-Cir.pdf

Exhibit B is a true and correct copy of an e-mail communication with Karen Charrington,

Counsel to the Queens County Clerk, clarifying whether jury duty can bypass a General Release.

Exhibit C contains two components with regard to the impartial jury clause of the Sixth

Amendment problem this case brings up

- The proof that Orlando Valdez is currently in the NY appellate court system:

  https://www.nycourts.gov/courts/ad2/Handdowns/2025/Motions/M305679.pdf

- The proof that the Plaintiff was job hunting during his jury duty (ECF No. 18 Exhibit D):

  he interviewed around 7 PM-ish when he got home from the court and applied for jobs in

  the break room, as he had no idea when Judge Hartofilis would call the jury. The

  unredacted e-mail can be given to the Court Chambers; the employer information is

  redacted, as they likely don't want to be accidentally spotlighted as the accidental proof

  of a Sixth Amendment impartial jury violation for another corporation.

Exhibit D is a PDF copy of the Arbitration agreement between Tesla and the Plaintiff when he

applied, which, by applying, means waiving the right to a jury trial. This exhibit is so that the

court does not need to take the word of the Plaintiff on calling out SpaceX's hypocrisy on the

NLRB case.

Exhibit E provides the fuller context of the Tolle v. Pocketsonics case omitted by the Defendant. The Plaintiff provides both a LexisNexis printout and a link to the document via Justia. The Plaintiff circled some paragraphs in red that contradict the Defendant's view on Tolle's March decision.

https://www.studicata.com/summaries/united-states-district-court-western-district-of-virginia/tolle-v-pocketsonics-inc-2018-ayfqip/

https://law.justia.com/cases/federal/district-courts/virginia/vawdce/3:2017cv00074/109145/61/

Signature was executed on April 22, 2026:

*Andrew Quijano*

Andrew Quijano

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2026, I served a true and correct copy of the Plaintiff's Memorandum of Law in Support of Motion to Strike and accompanying documents via Electronic Mail to the following counsel of record and associated recipients:

**Jason D. Burns, Esq. (Jason.Burns@gtlaw.com)**

**Shira M. Poliak, Esq. (shira.poliak@gtlaw.com)**

**Greenberg Traurig, LLP**

**One Vanderbilt Avenue, New York, NY 10017**

*Andrew Quijano*

Andrew Quijano, Pro Se

# EXHIBIT A

**No. 24-50761**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

AMAZON.COM SERVICES LLC,
*Plaintiff-Appellant*,

vs.

NATIONAL LABOR RELATIONS BOARD, a federal administrative agency; JENNIFER ABRUZZO, in her official capacity as the General Counsel of the National Labor Relations Board; LAUREN MCFERRAN, in her official capacity as the Chairman of the National Labor Relations Board; MARVIN E. KAPLAN, GWYNNE A. WILCOX, and DAVID M. PROUTY, in their official capacities as Board Members of the National Labor Relations Board; MERRICK GARLAND, *Defendants-Appellees*.

On Appeal from the United States District Court for the Western District of Texas, No. 5:24-cv-01000, Hon. Xavier Rodriguez

## BRIEF OF *AMICUS CURIAE*
## THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF PLAINTIFF-APPELLANT

BRIAN A. KULP
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

JORDAN L. VON BOKERN
MARIA C. MONAGHAN
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, NW
Washington, DC 20062

STEVEN A. ENGEL
  *Counsel of Record*
MICHAEL H. MCGINLEY
JUSTIN W. AIMONETTI
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel for the Chamber of Commerce of the United States of America*

## SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

### *No. 24-50761, Amazon.com v. NLRB*

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Rule 28.2.1 also have an interest

in the outcome of this case. These representations are made in order that the Judges

of this Court may evaluate possible disqualification or recusal.

1.   **The Chamber of Commerce of the United States of America**

("Chamber"), *Amicus Curiae*, represented by:

> **Steven A. Engel**
> **Michael H. McGinley**
> **Justin W. Aimonetti**
> **Brian A. Kulp**
> **DECHERT LLP**
>
> **Jordan L. Von Bokern**
> **Maria C. Monaghan**
> **U.S. CHAMBER LITIGATION CENTER**

2.   The Chamber has no parent corporation, and no publicly held company

has 10% or greater ownership in the Chamber.


Dated: October 16, 2024          */s/ Steven A. Engel*
                                 Steven A. Engel
                                 DECHERT LLP
                                 1900 K Street, NW
                                 Washington, DC 20006
                                 (202) 261-3369
                                 steven.engel@dechert.com


i

## TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE*.................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................3

ARGUMENT ....................................................................................6

I.    Compelled Adjudication in the NLRB's Juryless Administrative
Tribunals Violates the Seventh Amendment...................................6

      A.    The Right to a Civil Jury at Common Law Has Long Served as
an Essential Check on Government Overreach...................................6

      B.    *Jarkesy* Confirmed the Seventh Amendment's Reach.........................9

      C.    The Seventh Amendment Prohibits the NLRB from Conducting
this Proceeding in a Juryless Administrative Tribunal. ......................11

            1.    The Remedy Sought by the NLRB Is "All But
Dispositive" of Amazon's Right to a Jury Trial. ....................12

            2.    The Nature of the Cause of Action Only Confirms that
the Seventh Amendment Applies. ...........................................15

II.    The NLRB Cannot Rely on the Public Rights Exception Where
Amazon's Private Rights Are at Stake. ..........................................17

III.    The District Court Has Jurisdiction to Address Amazon's Seventh
Amendment Claim...........................................................................21

IV.    The Deprivation of Seventh Amendment Rights Constitutes
Irreparable Harm.............................................................................24

CONCLUSION.................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3484, Inc.*,
    373 NLRB No. 28 (Mar. 7, 2024) ......................................................................23

*Adamas Bldg. Servs.*,
    373 NLRB No. 119 (Sept. 27, 2024) .................................................................22

*Airgas USA, LLC*,
    373 NLRB No. 102 (Sept. 18, 2024) .................................................................22

*Ark Fabricators, Inc.*,
    373 NLRB No. 103 (Sept. 26, 2024) .................................................................22

*Atl. Veal & Lamb, LLC*,
    373 NLRB No. 19 (Feb. 22, 2024) ....................................................................23

*Atomic Fire Protection, LLC*,
    373 NLRB No. 109 (Sept. 30, 2024) .................................................................22

*Atwell Hospitality, LLC*,
    373 NLRB No. 127 (Sept. 30, 2024) .................................................................22

*Axon Enter., Inc. v. FTC*,
    598 U.S. 175 (2023).................................................................................*passim*

*Bowsher v. Synar*,
    478 U.S. 714 (1986).............................................................................................3

*Cal. Truck Driving Acad., LLC*,
    373 NLRB No. 95 (Sept. 4, 2024) ....................................................................22

*Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*,
    98 F.4th 220 (5th Cir. 2024) .............................................................................24

*Carr v. Saul*,
    593 U.S. 83 (2021)............................................................................................23

*Cemex Constr. Materials Pac., LLC*,
    372 NLRB No. 157 (Nov. 13, 2023) ..................................................................23

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
    526 U.S. 687 (1999)...............................................................................13, 14, 15

*Cochran v. SEC*,
    20 F.4th 194 (5th Cir. 2021) .........................................................................22

*Compañia Cervecera de P.R., Inc.*,
    373 NLRB No. 47 (Apr. 30, 2024)..................................................................22

*Curtis v. Loether*,
    415 U.S. 189 (1974)...........................................................................................16

*Dairy Queen, Inc. v. Wood*,
    369 U.S. 469 (1962)...........................................................................................24

*Dimick v. Schiedt*,
    293 U.S. 474 (1935)..............................................................................................6

*Dist. Hosp. Partners, L.P.*,
    373 NLRB No. 55 (May 8, 2024)....................................................................22

*East Freight Logistics, LLC*,
    373 NLRB No. 7 (Dec. 22, 2023)....................................................................23

*Erlinger v. United States*,
    144 S. Ct. 1840 (2024)................................................................................3, 7, 8

*Falcon Trucking LLC*,
    373 NLRB No. 124 (Sept. 30, 2024) ..............................................................22

*Feltner v. Columbia Pictures Television, Inc.*,
    523 U.S. 340 (1998).....................................................................................13, 15

*Flatline Constr., LLC*,
    373 NLRB No. 35 (Mar. 13, 2024) ................................................................23

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989)......................................................................................11, 17

*Harvard Maintenance, Inc.*,
373 NLRB No. 117 (Sept. 30, 2024) ....................................................................22

*Home Depot USA, Inc.*,
373 NLRB No. 25 (Feb. 21, 2024) ......................................................................23

*Hothead Grabba LLC*,
373 NLRB No. 118 (Sept. 27, 2024) ....................................................................22

*HSA Cleaning Inc.*,
373 NLRB No. 46 (Apr. 19, 2024) ......................................................................22

*IAG Constr. Inc.*,
373 NLRB No. 116 (Sept. 27, 2024) ....................................................................22

*Instituto de Educacion Popular del Sur de Cal.*,
372 NLRB No. 146 (Sept. 28, 2023) ....................................................................23

*Int'l Longshoremen's Ass'n, Local 1294 (Fed. Marine Terminals, Inc.)*, 372 NLRB No. 160 (Dec. 6, 2023) ............................................................23

*Int'l Longshoremen's Ass'n, Local 1413 (Ports Am. Terminals, Inc.)*,
373 NLRB No. 79 (July 24, 2024) ......................................................................22

*Int'l Longshoremen's Ass'n, Local 1526 (Fla. Int'l Terminal, LLC)*, 373 NLRB No. 22 (Feb. 14, 2024) ........................................23

*Int'l Union, United Auto., Aircraft & Agric. Implement Workers of Am. (UAW-CIO) v. Russell*,
356 U.S. 634 (1958) ...........................................................................................25

*Integrity Def. Servs., Inc.*,
372 NLRB No. 151 (Sept. 30, 2023) ....................................................................23

*Intertape Polymer Corp.*,
373 NLRB No. 68 (June 17, 2024) ......................................................................22

*Jarkesy v. SEC*,
34 F.4th 446 (5th Cir. 2022) ........................................................................10, 14

*In re Jefferson Parish*,
81 F.4th 403 (5th Cir. 2023) ...............................................................................25

*JMC Elec. Contractor, LLC*,
   373 NLRB No. 113 (Sept. 25, 2024) ........................................................22

*Lebow v. Am. Trans Air, Inc.*,
   86 F.3d 661 (7th Cir. 1996) ....................................................................16

*Lion Elastomers, L.L.C. v. NLRB*,
   108 F.4th 252 (5th Cir. 2024) .................................................................20

*Lion Elastomers LLC*,
   372 NLRB No. 83 (May 1, 2023)............................................................20

*Longmont United Hosp. & Centura Health*,
   373 NLRB No. 97 (Sept. 18, 2024) .........................................................22

*Maverick Fulfillment, LLC*,
   373 NLRB No. 57 (June 20, 2024)..........................................................22

*Maywood SNF Operations LLC*,
   372 NLRB No. 152 (Oct. 13, 2023) ........................................................23

*McLaren Macomb*,
   372 NLRB No. 58 (Feb. 21, 2023) ..........................................................20

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993).................................................................4, 12, 13, 14

*Metrohealth, Inc.*,
   372 NLRB No. 149 (Sept. 30, 2023) .......................................................23

*MPStar Pros., LLC*,
   373 NLRB No. 42 (Apr. 2, 2024).............................................................23

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
   59 U.S. (18 How.) 272 (1855) ..............................................................5, 18

*NLRB v. Jones & Laughlin Steel Corp.*,
   301 U.S. 1 (1937)................................................................................18, 19

*NLRB v. McLaren Macomb*,
   2024 WL 4240545 (6th Cir. Sept. 19, 2024) ...........................................20

*North Mtn. Foothills Apts., LLC*,
    373 NLRB No. 26 (Feb. 21, 2024) .................................................................23

*NP Red Rock LLC*,
    373 NLRB No. 67 (June 17, 2024) .................................................................23

*Parsons v. Bedford*,
    28 U.S. (3 Pet.) 433 (1830) ...................................................................4, 9, 11

*PG Pub. Co.*,
    373 NLRB No. 93 (Sept. 20, 2024) .................................................................22

*Phillips 66 Co.*,
    373 NLRB No. 1 (Dec. 6, 2023).....................................................................23

*Radnet Mgmt. Inc.*,
    373 NLRB No. 58 (May 10, 2024)...................................................................22

*Regional Ready Mix, LLC*,
    373 NLRB No. 56 (May 14, 2024)...................................................................22

*RFO808, LLC*,
    373 NLRB No. 60 (May 16, 2024)...................................................................22

*Ross v. Bernhard*,
    396 U.S. 531 (1970).......................................................................................14

*SEC v. Jarkesy*,
    144 S. Ct. 2117 (2024)...........................................................................*passim*

*Solution One Indus., Inc.*,
    372 NLRB No. 141 (Sept. 22, 2023) ...............................................................23

*South Nassau Cmtys. Hosp.*,
    373 NLRB No. 91 (Sept. 6, 2024) ...................................................................22

*Spike Enter., Inc.*,
    373 NLRB No. 41 (Apr. 10, 2024)...................................................................22

*Starbucks Corp.*,
    373 NLRB No. 83 (Aug. 14, 2024) ..................................................................22

*Stericycle, Inc.*,
    372 NLRB No. 113 (Aug. 2, 2023) ...................................................................20

*Success Village Apts, Inc.*,
    372 NLRB No. 140 (Sept. 19, 2023) ..............................................................23

*Tecnocap LLC*,
    372 NLRB No. 136 (Aug. 26, 2023) ...............................................................23

*Thryv, Inc.*,
    372 NLRB No. 22 (Dec. 13, 2022).............................................................*passim*

*Thryv, Inc. v. NLRB*,
    102 F.4th 727 (5th Cir. 2024) .......................................................................12

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994)........................................................................................21

*Trader Joe's*,
    373 NLRB No. 73 (July 9, 2024) ...................................................................23

*Tull v. United States*,
    481 U.S. 412 (1987)...........................................................................10, 11, 15

*Twinbrook OpCo, LLC*,
    373 NLRB No. 6 (Dec. 28, 2023).................................................................23

*United Parcel Serv., Inc.*,
    372 NLRB No. 158 (Nov. 21, 2023) .............................................................23

*United States v. ERR, LLC*,
    35 F.4th 405 (5th Cir. 2022) ...................................................................14, 16

*Valmar Masonry LLC*,
    373 NLRB No. 112 (Sept. 25, 2024)..............................................................22

*Vesta VFO, LLC*,
    373 NLRB No. 10 (Jan. 10, 2024)..................................................................23

*Wendt Corp.*,
    372 NLRB No. 135 (Aug. 26, 2023) ..............................................................23

**Constitutional Provisions**

U.S. Const. amend. VII ............................................................................4, 9

U.S. Const. art. III, § 2, cl. 3 ...................................................................8

**Statutes**

29 U.S.C. § 157 ......................................................................................16

29 U.S.C. § 158(a)(1)..............................................................................16

29 U.S.C. § 160(c) ..................................................................................16

33 U.S.C. § 2702(a) ................................................................................16

**Other Authorities**

3 William Blackstone, *Commentaries on the Laws of England* (1768) ..........3, 7, 10

*Cincinnatus II: To James Wilson, Esquire* (Nov. 8, 1787),
  bit.ly/3Glv74b .....................................................................................9

*The Declaration of Independence* (U.S. 1776)...........................................8

*A Democratic Federalist*, Pennsylvania Herald, Oct. 17, 1787,
  bit.ly/46idnBc......................................................................................9

*Essays by a Farmer, No. 4* (Mar. 21, 1788), reprinted in 5 *The
  Complete Anti-Federalist* (Herbert J. Storing ed., 1981) ......................9

The Federalist No. 83 (Alexander Hamilton) (Clinton Rossiter ed.,
  1961) ...................................................................................................8

Philip Hamburger, *Is Administrative Law Unlawful?* (2014).............................7, 18

11 William Holdsworth, *A History of English Law* (1938)......................................7

1 *Journals of the Continental Congress 1774–1789* ...................................8

2 *Journals of the Continental Congress 1774–1789* ...................................8

*Letter from John Adams to Ebenezer Thayer* (Sept. 24, 1765),
  bit.ly/3zl0Ezn .....................................................................................7

*Letter from the Federal Farmer, No. 4* (Oct. 12, 1787), bit.ly/40rtjP0 ..................... 9

Luther Martin, *Genuine Information* (1787), reprinted in 3 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ............................................................................................... 8, 9

James Oldham, *Trial by Jury: The Seventh Amendment and Anglo-American Special Juries* (2006) .......................................................... 6

1 John Phillip Reid, *Constitutional History of the American Revolution: The Authority of Rights* (1986) ..................................................... 7

*Resolutions of the Stamp Act Congress* (Oct. 19, 1765), bit.ly/3YdhAFo ........................................................................................ 8

U.S. Chamber of Commerce, *The Biden Administration's "Whole of Government" Approach to Promoting Labor Unions* (2023), bit.ly/4d3RuZK .................................................................................. 19

Carl Ubbelohde, *The Vice-Admiralty Courts and the American Revolution* (1960) ............................................................................... 7

## INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber's members are frequent respondents in administrative enforcement actions brought by the National Labor Relations Board ("NLRB" or the "Board").  The Chamber thus has a significant interest in ensuring that those proceedings respect the Constitution's structural limitations and submits this brief to explain why compelled adjudication in the NLRB's juryless tribunals violates the Seventh Amendment and would cause irreparable harm.

The Chamber has recently submitted numerous *amicus* briefs on matters at issue in this appeal.  It submitted a brief explaining the original understanding of the

---

[1]  No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.  Counsel for all parties have consented to the filing of this brief.

Seventh Amendment and its application to administrative proceedings in *Jarkesy v. SEC*. *See Amici Curiae* Br. of Chamber of Com. of U.S. et al., No. 22-859 (U.S. Oct. 18, 2023), bit.ly/4d02CXE. It has submitted multiple briefs challenging the NLRB's overreach in making compensatory damages a standard remedy in unfair-labor-practice proceedings. *See Amici Curiae* Br. of Chamber of Com. of U.S. et al., *NLRB v. Starbucks Corp.*, Nos. 23-1953, 23-2241 (3d Cir. Dec. 8, 2023), bit.ly/4daEOQM ("Chamber *Starbucks* Br."); *Amicus Curiae* Br. of Chamber of Com. of U.S., *Thryv, Inc.*, Nos. 20-CA-250250, 20-CA-251105 (NLRB Jan. 10, 2022), bit.ly/3YcJeT4. And it has recently filed a brief in this Court challenging the NLRB's attempt to avoid the Seventh Amendment's protections. *See Amicus Curiae* Br. of Chamber of Com. of U.S., No. 24-40315, *Space Expl. Techs., Corp. v. NLRB* (5th Cir. July 24, 2024), bit.ly/487qg3h.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This appeal presents yet another case of an administrative agency exceeding constitutional limits.  The Framers recognized that "structural protections against abuse of power [are] critical to preserving liberty."  *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).  And key among those structural protections was the right to trial by jury.  That "most excellent method of decision" had long been hailed as "the glory of the English law."  3 William Blackstone, *Commentaries on the Laws of England* *391 (1768).  And, as the Supreme Court emphasized this past Term, the jury trial right "was prized by the American colonists" in both criminal and civil cases alike. *SEC v. Jarkesy*, 144 S. Ct. 2117, 2128 (2024).

The Seventh Amendment arose out of the English effort to "siphon[]" civil cases that had traditionally been tried before juries to "juryless admiralty" tribunals. *Id.*  "[A]s tensions grew between the British Empire and its American Colonies, imperial authorities responded by stripping away that ancient right" on this side of the Atlantic.  *Erlinger v. United States*, 144 S. Ct. 1840, 1848 (2024).  In particular, the Crown expanded admiralty jurisdiction in the 1760s to enforce unpopular Acts of Parliament without the involvement of juries.  And those juryless tribunals fueled the fires of revolution.  The Declaration of Independence identified the deprivation of the jury right among its grievances against the Crown, and the Constitution secured that right in criminal cases.  But the American people demanded more.  They

were well-aware of British abuses of the common law right and so refused to tolerate the risk that the new federal government might similarly enforce its laws before juryless tribunals.

The founding generation thus quickly adopted the Seventh Amendment to "preserve[]" the civil jury trial right in "Suits at common law." U.S. Const. amend. VII. The people understood this language to "embrace[] all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume." *Jarkesy*, 144 S. Ct. at 2128 (quoting *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 447 (1830)). And, for centuries, the Seventh Amendment was lauded as a crucial bulwark against governmental abuses of power.

The growth of the administrative state has eroded that fundamental safeguard. And the recent practice of the NLRB provides a particularly egregious case in point. Without congressional authorization, and without juries to check its overreach, the NLRB has seized for itself the authority to issue "[m]ake-whole relief" that "compensates affected employees for all direct or foreseeable pecuniary harms that result" from allegedly unfair labor practices. *Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951, at *14 (Dec. 13, 2022).

That contortion of the National Labor Relations Act ("NLRA") has constitutional consequences. The "compensatory damages" the NLRB seeks through in-house adjudication are "the classic form of *legal* relief." *Mertens v.*

*Hewitt Assocs.*, 508 U.S. 248, 255 (1993) (some emphasis omitted); *see Jarkesy*, 144 S. Ct. at 2129.  And its pursuit of such legal relief against Amazon is "all but dispositive" in finding a violation of the company's Seventh Amendment right here. *Jarkesy*, 144 S. Ct. at 2129.  The "close relationship" between the claim in this case and traditional common law tort actions "confirms that conclusion." *Id.* at 2130.

At the same time, the Board cannot justify its constitutional deprivation by proclaiming that it is vindicating "public rights."  As *Jarkesy* made clear, the "public rights" exception to the Seventh Amendment is narrow and inapplicable absent a specific showing that "'withdraw[al] from judicial cognizance'" has firm roots in "background legal principles." *Id.* at 2134 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1855)).  The Board cannot point to any historical understanding that would support removing this garden-variety legal claim from the Article III courts—and the jury review that the Constitution requires.

Nor can the Board seriously argue that the district court lacks jurisdiction to hear Amazon's Seventh Amendment claim.  Amazon will suffer a here-and-now injury if forced to endure an adjudication before a constitutionally illegitimate decisionmaker.  The Seventh Amendment issue is wholly collateral to the subject of the NLRB's proceedings.  And the Board has no special expertise in deciding this

5

constitutional question. Review is therefore warranted, and a preliminary injunction is necessary to prevent irreparable harm.

Accordingly, this Court should enjoin the NLRB's administrative proceeding against Amazon.

## ARGUMENT

**I.     Compelled Adjudication in the NLRB's Juryless Administrative Tribunals Violates the Seventh Amendment.**

"The right to trial by jury is 'of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right' has always been and 'should be scrutinized with the utmost care.'" *Jarkesy*, 144 S. Ct. at 2128 (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935)). The NLRB's attempt to subject Amazon to a juryless, in-house adjudication is foreclosed by that history and precedent, and this Court should reject it.

### A.     The Right to a Civil Jury at Common Law Has Long Served as an Essential Check on Government Overreach.

The "modern model of trial by jury" developed in the English common law courts by the sixteenth century, where it was widely recognized as a crucial check against government abuses. James Oldham, *Trial by Jury: The Seventh Amendment and Anglo-American Special Juries* 3 (2006). As William Blackstone explained, the right to a jury trial ranked sacrosanct because a person's rights and property hinged

6

on "the unanimous consent of twelve of his neighbours and equals," not just the will of bureaucratic functionaries. 3 Blackstone, *Commentaries* at *379.

Like their British brethren, the American colonists viewed civil juries as essential to safeguard their fundamental rights. *See Jarkesy*, 144 S. at 2128. But as the Thirteen Colonies approached independence, Parliament responded to adverse verdicts by expanding the jurisdiction of the juryless admiralty courts to a range of cases traditionally tried in common law courts. *See* Carl Ubbelohde, *The Vice-Admiralty Courts and the American Revolution* 12–13, 63, 145–46, 206–08 (1960). Most notably, the Stamp Act of 1765 authorized the Crown to prosecute violations in juryless admiralty tribunals. *See* Philip Hamburger, *Is Administrative Law Unlawful?* 150 (2014). And, "[j]ust as authorities hoped, the tactic proved 'most effective' at securing the verdicts they wished." *Erlinger*, 144 S. Ct. at 1848 (citation omitted); *see* 11 William Holdsworth, *A History of English Law* 110 (1938).

In response, the voters of Boston ranked "the Jurisdiction of the Admiralty"— along with taxation without representation—as their "greatest Grievance." 1 John Phillip Reid, *Constitutional History of the American Revolution: The Authority of Rights* 177 (1986) (citation omitted); *see also Letter from John Adams to Ebenezer Thayer* (Sept. 24, 1765), bit.ly/3zl0Ezn. The Stamp Act Congress of 1765 similarly protested that, "by extending the jurisdiction of the courts of Admiralty beyond its ancient limits," the Stamp Act and similar acts "ha[d] a manifest tendency to subvert

7

the rights and liberties of the colonists." *Resolutions of the Stamp Act Congress* (Oct. 19, 1765), bit.ly/3YdhAFo. Both the First and Second Continental Congresses continued those protests, most famously in the Declaration of Independence, which identified "depriving [the colonists] in many cases, of the benefits of Trial by Jury," among its list of grievances against the King. *The Declaration of Independence* para. 20 (U.S. 1776); *see* 1 *Journals of the Continental Congress 1774–1789*, at 69 (Oct. 14, 1774); 2 *Journals of the Continental Congress 1774–1789*, at 145 (July 6, 1775).

"After securing their independence, the founding generation sought to ensure what happened before would not happen again." *Erlinger*, 144 S. Ct. at 1848. They quickly enshrined the jury trial right in criminal cases. *See* U.S. Const. art. III, § 2, cl. 3. But the Constitution's omission of the civil jury right proved a stumbling block for ratification. As Alexander Hamilton admitted, "[t]he objection to the plan of the convention" that was "met with [the] most success" was "that relative to the want of a constitutional provision for the trial by jury in civil cases." The Federalist No. 83, at 494 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (emphasis omitted).[2]

---

[2] Concern over the lack of civil jury protections rang loud in the Anti-Federalist charge. For instance, Luther Martin explained that jury trials had "long been considered the surest barrier against arbitrary power, and the palladium of liberty." Luther Martin, *Genuine Information* (1787), reprinted in 3 *The Records of the Federal Convention of 1787*, at 172, 221 (Max Farrand ed., 1911) (italics omitted). He thus faulted the proposed Constitution for stripping the citizenry of that right in cases "arising under the laws of the United States, or the execution of those laws," which were the "very cases, where, of all others, [the jury trial] is most essential for

To quell those concerns, the Framers "promptly adopted the Seventh Amendment" to secure the civil jury right for future generations "against the passing demands of expediency or convenience." *Jarkesy*, 144 S. Ct. at 2128 (quotation marks omitted). The Amendment prescribes that, "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII. And since its ratification, "every encroachment upon [the civil jury right] has been watched with great jealousy." *Jarkesy*, 144 S. Ct. at 2128 (quoting *Parsons*, 28 U.S. (3 Pet.) at 446).

### B. *Jarkesy* Confirmed the Seventh Amendment's Reach.

Consistent with the Constitution's text and longstanding history, the Supreme Court and this Court recently reaffirmed the limits that the Seventh Amendment places on juryless administrative tribunals. In *Jarkesy v. SEC*, "[t]he SEC brought an enforcement action within the agency against [Jarkesy and his firm] for securities

---

[the people's] liberty." *Id.* at 222 (italics omitted); *see also Cincinnatus II: To James Wilson, Esquire* (Nov. 8, 1787), bit.ly/3Glv74b (lamenting that "the trial by jury" had ostensibly been "taken away in civil cases"); *Essays by a Farmer, No. 4* (Mar. 21, 1788), reprinted in 5 *The Complete Anti-Federalist* 36, 38 (Herbert J. Storing ed., 1981) (describing "trial by jury" as "the democratic branch of the judiciary power—more necessary than representatives in the legislature" (emphasis omitted)); *A Democratic Federalist*, Pennsylvania Herald, Oct. 17, 1787, bit.ly/46idnBc (recognizing that the jury trial helped "shelter [the people] from the iron hand of arbitrary power"); *Letter from the Federal Farmer, No. 4* (Oct. 12, 1787), bit.ly/40rtjP0 (explaining that trial by jury helped ensure "that common people should have a part and share of influence, in the judicial as well as in the legislative department").

fraud" and ordered them to "pay a civil penalty of $300,000." 34 F.4th 446, 449–50 (5th Cir. 2022). The petitioners argued that this in-house proceeding deprived them of their civil jury rights, and this Court agreed. *See id.* at 449.

After recounting the history that led to the Seventh Amendment's ratification, this Court emphasized that the phrase "Suits at common law" "include[s] all actions akin to those brought at common law," as those actions were understood at the time of the Founding. *Id.* at 452. That is, the civil jury right extends to "suits brought under a statute as long as the suit seeks common-law-like legal remedies." *Id.*

This Court thus held that "[t]he Seventh Amendment guarantee[d] Petitioners a jury trial because the SEC's enforcement action [was] akin to traditional actions at law to which the jury-trial right attaches." *Id.* at 451. After all, "[f]raud prosecutions were regularly brought in English courts at common law." *Id.* at 453 (citing 3 Blackstone, *Commentaries* at *42). And, even more importantly, "actions seeking civil penalties are akin to special types of actions in debt from early in our nation's history which were distinctly legal claims." *Id.* at 454 (citing *Tull v. United States*, 481 U.S. 412, 418–19 (1987)). Together, these historical considerations demonstrated that the petitioners "had the right for a jury to adjudicate the facts underlying any potential fraud liability that justifies penalties." *Id.* at 457.

The Supreme Court affirmed, holding that the Seventh Amendment "embrace[s] all suits which are not of equity or admiralty jurisdiction, whatever may

10

be the peculiar form which they may assume." *Jarkesy*, 144 S. Ct. at 2128 (alteration in original) (quoting *Parsons*, 28 U.S. (3 Pet.) at 447). The Court stressed that "whether [a] claim is statutory is immaterial" to the Seventh Amendment analysis. *Id.* Rather, "[t]he Seventh Amendment extends to a particular statutory claim if the claim is 'legal in nature.'" *Id.* (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989)). That squarely encompassed the SEC's securities fraud claim for civil penalties, and so the petitioners' Seventh Amendment rights barred the SEC's in-house adjudication. *See id.* at 2129–31.

**C.    The Seventh Amendment Prohibits the NLRB from Conducting this Proceeding in a Juryless Administrative Tribunal.**

Just as the Seventh Amendment prohibited the SEC from imposing civil penalties on George Jarkesy and his firm in a juryless administrative tribunal, it prohibits the NLRB from ordering Amazon to pay compensatory damages in its in-house proceeding. That claim, too, is distinctly "legal in nature." *Jarkesy*, 144 S. Ct. at 2131 (citation omitted).

In determining whether a claim is legal in nature, courts must consider (1) the nature of the cause of action and (2) the nature of the remedy. *See id.* at 2129; *Granfinanciera*, 492 U.S. at 42; *Tull*, 481 U.S. at 417–418. Of these two, "the remedy [is] the 'more important' consideration." *Jarkesy*, 144 S. Ct. at 2129 (citation omitted). And, in this case, both factors point decidedly in favor of a jury trial right.

## 1. The Remedy Sought by the NLRB Is "All But Dispositive" of Amazon's Right to a Jury Trial.

As in *Jarkesy*, "the remedy is all but dispositive" of the Seventh Amendment inquiry here. 144 S. Ct. at 2129. As Amazon observes, the NLRB "seeks a broad array of compensatory damages." ECF 11-1 at 3. And such damages constitute the most "classic form of *legal* relief." *Mertens*, 508 U.S. at 255.

Indeed, the Board announced in *Thryv* that it will seek full compensatory damages "in all cases in which [its] standard remedy would include an order for make-whole relief." 2022 WL 17974951, at * 9. That is, the Board "shall expressly order that the respondent *compensate* affected employees for *all direct or foreseeable pecuniary harms* suffered as a result of the respondent's unfair labor practice." *Id.* at *21 (emphasis added). The Board further specified that it was "standardizing this remedy in *all* cases . . . to provide meaningful, make-whole relief for losses incurred" from an employer's unlawful conduct and "to more fully effectuate the make-whole purposes of the [NLRA]." *Id.* at *10 (emphasis added; quotation marks omitted). The NLRB's complaint seeks precisely that sort of relief here again. *See* ECF 11-2 at 95–96.[3]

---

[3] The Board disclaims any "policy or practice of awarding consequential damages," *Thryv*, 2022 WL 17974951, at *14, but the compensatory damages it has made part of its standard remedy are indistinguishable in substance from consequential damages, *see Thryv, Inc. v. NLRB*, 102 F.4th 727, 737 (5th Cir. 2024) (noting that

12

As the Court noted in *Jarkesy*, however, such "money damages are the prototypical common law remedy." 144 S. Ct. at 2129. The Supreme Court has long "recognized the general rule that monetary relief is legal, and an award of statutory damages may serve purposes traditionally associated with legal relief, such as compensation." *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352 (1998) (internal citation and quotation marks omitted).

For instance, in *Mertens*, a group of retirees sought lost pension benefits because the retirement plan's actuary had botched the calculations necessary for the plan's maintenance. *See* 508 U.S. at 250. The Court rejected the group's claim that the recovery of lost pension benefits was an equitable remedy, because "what petitioners in fact [sought was] nothing other than compensatory damages— monetary relief for all losses their plan sustained as a result of [an] alleged breach." *Id.* at 255 (emphasis omitted).

Similarly, in *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, the Court explained that "[j]ust compensation . . . differs from equitable restitution and other monetary remedies available in equity, for in determining just compensation, 'the question is what has the *owner lost*, not what has the taker gained.'" 526 U.S. 687, 710 (1999) (emphasis added) (citation omitted). Thus, when a developer sought

---

the Board ordered "a novel, consequential-damages-like labor law remedy"); *see also* Chamber *Starbucks* Br., *supra*, at 23–30.

compensation for a regulatory taking, the Court reasoned that "just compensation is, like ordinary money damages, a compensatory remedy." *Id.* "The Court has recognized that compensation is a purpose traditionally associated with legal relief," which made clear that the suit "was an action at law" that required a jury. *Id.* at 710–11 (quotation marks omitted).

The Board's effort to award compensation for "losses," which were a "consequence of a respondent's unfair labor practice," thus clearly sounds in the common law. *Thryv*, 2022 WL 17974951, at *11. That policy of ordering compensation for losses incurred goes well beyond requiring "a defendant to return unjustly obtained funds," as might be available in equity. *Jarkesy*, 144 S. Ct. at 2129. It amounts to "[m]oney damages," which "are, of course, the classic form of *legal* relief." *Mertens*, 508 U.S. at 250.[4] Amazon is thus entitled to a jury trial for that claim.

---

[4] For this reason, the NLRB would be quite mistaken to suggest that it seeks to impose damages only that merely "restore the status quo." *See* NLRB Br. at 50, *Space Expl. Techs. Corp. v. NLRB*, No. 24-40315 (5th Cir. Sept. 16, 2024) (quoting *Jarkesy*, 144 S. Ct. at 2129). The NLRB seeks here an order that goes well beyond the return of property wrongfully withheld, and instead seeks to make employees "whole" for any and all losses, *i.e.*, compensatory damages. ECF 11-2 at 95. Moreover, to the extent the NLRB seeks additional, equitable remedies beyond compensatory damages, that does not deprive Amazon of its right to a jury trial with respect to facts relevant to the claims against it for legal relief. *See Ross v. Bernhard*, 396 U.S. 531, 537–38 (1970). "[A] jury trial is required on the overlapping issues to preserve the Seventh Amendment right." *United States v. ERR, LLC*, 35 F.4th 405, 414 (5th Cir. 2022); *see Jarkesy*, 34 F.4th at 454–55.

14

### 2. The Nature of the Cause of Action Only Confirms that the Seventh Amendment Applies.

Although in this case, like *Jarkesy*, the Board's pursuit of a common law remedy is "all but dispositive," the "relationship between the causes of action in this case and common law [actions]" further supports the applicability of the Seventh Amendment, as "[b]oth target the same basic conduct." 144 S. Ct. at 2129–30. The Seventh Amendment "applies not only to common-law causes of action but also to statutory causes of action '*analogous* to common-law causes of action.'" *City of Monterey*, 526 U.S. at 708–09 (emphasis added) (quoting *Feltner*, 523 U.S. at 348); *see Tull*, 481 U.S. at 421.

Here, the NLRB's unfair labor practice claim is akin to a traditional tort cause of action. In *City of Monterey*, the claim at issue was a § 1983 action for just compensation following a regulatory taking. *See* 526 U.S. at 709–10. The Court explained that, "[j]ust as common-law tort actions provide redress for interference with protected personal or property interests, § 1983 provides relief for invasions of rights protected under federal law." *Id.* at 710; *see also id.* at 727 (Scalia, J., concurring in part) ("Like other tort causes of action, [§ 1983] is designed to provide compensation for injuries arising from the violation of legal duties, and thereby, of course, to deter future violations." (internal citation omitted)). That "compel[led] the conclusion that a suit for legal relief brought under the statute [was] an action at law." *Id.* at 710 (majority op.).

15

So too here.  The NLRA creates an analogous scheme: "the statute merely defines a new legal duty, and," in the Board's view, authorizes the adjudicator "to compensate a plaintiff for the injury caused by the defendant's wrongful breach." *Curtis v. Loether*, 415 U.S. 189, 195 (1974).  Specifically, the NLRA creates a duty for employers to refrain from interfering with or coercing employees exercising rights related to self-organizing, collective bargaining, or other concerted activities for mutual aid or protection.  *See* 29 U.S.C. §§ 157, 158(a)(1).  The Board may then order relief when the employer breaches that duty.  *See id.* § 160(c).  As such, "[a] damages action under the statute sounds basically in tort."  *Curtis*, 415 U.S. at 195.

Applying this analysis, this Court recently held that the jury trial right attached to a statutory framework that provided a cause of action to recoup costs for pollution cleanup from the entity causing the pollution.  *See* 33 U.S.C. § 2702(a).  The Court determined that the government's action for recoupment was, "at its foundation, one for tort," because "[t]he statute first creates a legal duty and then provides a right of action to compensate the injured party for a breach of that duty."  *United States v. ERR, LLC*, 35 F.4th 405, 411–12 (5th Cir. 2022).  "And historically, tort claimants had two routes to sue a tortfeasor for monetary compensation"—through either a writ of trespass or quasi-contract.  *Id.*  "Both involved actions at law that were triable to juries."  *Id.* at 411; *see also, e.g.*, *Lebow v. Am. Trans Air, Inc.*, 86 F.3d 661, 669 (7th Cir. 1996) (applying this analysis in the labor-relations context).

16

As a result, the "close relationship between" the NLRB's claim and traditional common law tort actions "confirms that this action is 'legal in nature.'" *Jarkesy*, 144 S. Ct. at 2131 (citation omitted). It follows that the Seventh Amendment applies.

## II. The NLRB Cannot Rely on the Public Rights Exception Where Amazon's Private Rights Are at Stake.

The Board also attempts to avoid the Seventh Amendment by invoking the "public rights" exception, arguing that it "acts in the public interest" when it brings a statutory enforcement action. ECF 25 at 15 (citation omitted). Such reliance on the public rights exception is sorely misplaced.

*Jarkesy* once again removes any doubt. There, the Court held that the government "cannot 'conjure away the Seventh Amendment by mandating that traditional legal claims be . . . taken to an administrative tribunal.'" *Jarkesy*, 144 S. Ct. at 2136 (alteration in original) (quoting *Granfinanciera*, 492 U.S. at 52). And that is true "[e]ven when an action 'originates in a newly fashioned regulatory scheme.'" *Id.* at 2135 (citation and brackets omitted). What matters "is the substance of the suit, not where it is brought, who brings it, or how it is labeled." *Id.* at 2136. Indeed, "[i]f a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory." *Id.* at 2132. The government can rebut that presumption only by pointing to firmly rooted "background legal principles" that justify a departure from the text of Article III and the Seventh Amendment. *Id.* at 2134; *see also id.* at 2147

17

(Gorsuch, J., concurring) ("[T]raditionally recognized public rights have at least one feature in common: a serious and unbroken historical pedigree.").

The NLRB can point to no such history on its side. This case does not involve traditionally recognized public rights, such as the collection and disbursement of tax revenues from a customs agent, the granting of land patents, or immigration matters. *See id.* at 2132–33 (majority op.); *Murray's Lessee*, 59 U.S. (18 How.) at 281–85. Rather, the NLRB seeks to force Amazon to pay compensatory damages to other private parties. That "implicate[s] the core private right to property." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 204 (2023) (Thomas, J., concurring). And allowing the NLRB to adjudicate that classically private right in-house would be akin to reviving "the prerogative exercise of judicial power—the imposition of binding adjudication outside the courts"—which the Constitution's ratifying public viewed as a great affront to fundamental liberties. *See* Hamburger, *supra*, at 228. Amazon need not suffer the sort of juryless inquisitions of government bureaucrats that our forebearers fought a revolution to abolish. It instead "has the right to be tried by a jury of [its] peers before a neutral adjudicator" in federal court. *Jarkesy*, 144 S. Ct. at 2139.

The Board's reliance on *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937), does not help it either. *See* ECF 25 at 15. For one thing, *Jones & Laughlin* held that an NLRB action was "not a suit at common law or in the nature of such a suit" simply because it was "a statutory proceeding." 301 U.S. at 48. The Supreme

18

Court has since "clarified," however, "that the Seventh Amendment *does* apply to novel statutory regimes, so long as the claims are akin to common law claims." *Jarkesy*, 144 S. Ct. at 2139 (emphasis added). As explained above, that is precisely the case here.

Moreover, the Board in *Jones & Laughlin* sought the limited remedies of reinstatement and associated backpay. *See* 301 U.S. at 47–48. But that is not what the Board is doing here. Under *Thryv*, the Board's "updated" approach imposes broader "[m]ake-whole relief" that "consistently compensates affected employees for all direct or foreseeable pecuniary harms that result from a respondent's unfair labor practice." 2022 WL 17974951, at \*14. As the *Thryv* dissenters recognized, by "stray[ing] into [these] areas more akin to tort remedies," the majority ran "headlong into the Seventh Amendment's guarantee of the right to have such claims tried before a jury." *Id.* at \*25, 27 (Kaplan and Ring, concurring in part and dissenting in part).

The Board's decision to adopt this novel remedy and impose it on employers in administrative proceedings, without the protections of an Article III court and an impartial jury, is especially concerning given the novel and aggressive positions it has taken in many recent adjudications. *See, e.g.*, U.S. Chamber of Commerce, *The Biden Administration's "Whole of Government" Approach to Promoting Labor Unions* 27–30 (2023), bit.ly/4d3RuZK. For example, the Board recently held that

19

facially neutral rules that an employee "could" reasonably interpret to restrict union activity—even if the rules do not restrict such activity—are "presumptively unlawful." *Stericycle, Inc.*, 372 NLRB No. 113, 2023 WL 4947792, at *15 (Aug. 2, 2023).  In another case, the Board overruled precedent to broadly assert that offering routine confidentiality and non-disparagement provisions in a voluntary severance agreement inherently interferes with rights protected by the NLRA.  *See McLaren Macomb*, 372 NLRB No. 58, 2023 WL 2158775, at *1 (Feb. 21, 2023); *cf. NLRB v. McLaren Macomb*, 2024 WL 4240545, at *7 (6th Cir. Sept. 19, 2024) (per curiam) (enforcing Board's finding as supported by substantial evidence even under prior precedent's view of the NLRA, without addressing Board's broader legal position).  And in yet another case, the Board "exceeded the scope of [this Court's] remand" and "violated . . . due-process rights" by reaching out to overrule precedent that had better protected employers' rights to maintain harassment-free workplaces—without even "providing the company an opportunity to be heard on the issue."  *Lion Elastomers, L.L.C. v. NLRB*, 108 F.4th 252, 260 (5th Cir. 2024); *see Lion Elastomers LLC*, 372 NLRB No. 83, 2023 WL 3173759, at *1, 11 (May 1, 2023).  The Board's playbook of asserting new and unlawful interpretations of the NLRA in in-house adjudications, followed by an order requiring the employer to pay the employee compensatory damages for a violation, should be met with close constitutional scrutiny.  The Seventh Amendment entitles Amazon to a jury trial in this case.

### III. The District Court Has Jurisdiction to Address Amazon's Seventh Amendment Claim.

In an effort to avoid this Court's review of a patent constitutional violation, the Board argues that the district court lacks jurisdiction to address Amazon's Seventh Amendment claim prior to imposing damages. ECF 25 at 12. But Amazon's claim is clearly proper in the district court because the Board has determined to seek compensatory damages at the juryless hearing, and the Seventh Amendment claim is not "of the type Congress intended to be reviewed" first by the agency. *Axon*, 598 U.S. at 186 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)). Indeed, this case easily satisfies all "three *Thunder Basin* factors," which collectively demonstrate the propriety of immediate judicial review. *Id.* at 195.

*First*, there is no "meaningful judicial review" on the back end after the NLRB proceedings have concluded. *Id.* at 186 (citation omitted). After all, Amazon "protest[s] the 'here-and-now' injury of subjection to an unconstitutionally structured decisionmaking process." *Id.* at 192. That injury exists "irrespective of [the] outcome" in the NLRB's juryless tribunal. *Id.*

*Second*, Amazon's "constitutional challenge [is] 'collateral' to the subject of [the NLRB's] proceeding." *Id.* at 188. The Board contends otherwise, submitting that it is unknown whether it actually "will order the make-whole remedy requested" in its in-house proceeding. ECF 25 at 12. But even if that were true, it is irrelevant.

21

The second *Thunder Basin* factor is satisfied because nothing in the NLRB's review scheme "is intended to provide the sort of relief sought by the plaintiff" here—to receive a jury trial and avoid the Board's unconstitutionally structured proceeding. *Cochran v. SEC*, 20 F.4th 194, 207 (5th Cir. 2021) (en banc), *aff'd sub nom. Axon*, 598 U.S. 175.

At any rate, the Board's feigned agnosticism over damages is beside the point because the Board has committed itself to imposing make-whole relief in "all" cases. *Thryv*, 2022 WL 17974951, at * 9. And it has remained true to its word, consistently imposing *Thryv*-like compensatory damages in the cases before it.[5] It has also

---

[5] *See, e.g.*, *Atwell Hospitality, LLC*, 373 NLRB No. 127 (Sept. 30, 2024); *Harvard Maintenance, Inc.*, 373 NLRB No. 117 (Sept. 30, 2024); *Atomic Fire Protection, LLC*, 373 NLRB No. 109 (Sept. 30, 2024); *Falcon Trucking LLC*, 373 NLRB No. 124 (Sept. 30, 2024); *IAG Constr. Inc.*, 373 NLRB No. 116 (Sept. 27, 2024); *Adamas Bldg. Servs.*, 373 NLRB No. 119 (Sept. 27, 2024); *Hothead Grabba LLC*, 373 NLRB No. 118 (Sept. 27, 2024); *Ark Fabricators, Inc.*, 373 NLRB No. 103 (Sept. 26, 2024); *Valmar Masonry LLC*, 373 NLRB No. 112 (Sept. 25, 2024); *JMC Elec. Contractor, LLC*, 373 NLRB No. 113 (Sept. 25, 2024); *PG Pub. Co.*, 373 NLRB No. 93 (Sept. 20, 2024); *Airgas USA, LLC*, 373 NLRB No. 102 (Sept. 18, 2024); *Longmont United Hosp. & Centura Health*, 373 NLRB No. 97 (Sept. 18, 2024); *South Nassau Cmtys. Hosp.*, 373 NLRB No. 91 (Sept. 6, 2024); *Cal. Truck Driving Acad., LLC*, 373 NLRB No. 95 (Sept. 4, 2024); *Starbucks Corp.*, 373 NLRB No. 83 (Aug. 14, 2024); *Int'l Longshoremen's Ass'n, Local 1413 (Ports Am. Terminals, Inc.)*, 373 NLRB No. 79 (July 24, 2024); *Maverick Fulfillment, LLC*, 373 NLRB No. 57 (June 20, 2024); *Intertape Polymer Corp.*, 373 NLRB No. 68 (June 17, 2024); *RFO808, LLC*, 373 NLRB No. 60 (May 16, 2024); *Regional Ready Mix, LLC*, 373 NLRB No. 56 (May 14, 2024); *Radnet Mgmt. Inc.*, 373 NLRB No. 58 (May 10, 2024); *Dist. Hosp. Partners, L.P.*, 373 NLRB No. 55 (May 8, 2024); *Compañia Cervecera de P.R., Inc.*, 373 NLRB No. 47 (Apr. 30, 2024); *HSA Cleaning Inc.*, 373 NLRB No. 46 (Apr. 19, 2024); *Spike Enter., Inc.*, 373 NLRB No.

repeatedly overruled ALJ decisions to the extent that they failed to do the same. *See, e.g.*, *Trader Joe's*, 373 NLRB No. 73, 2024 WL 3358073, at *1 n.2 (July 9, 2024); *NP Red Rock LLC*, 373 NLRB No. 67, 2024 WL 3063775, at *11 (June 17, 2024). The Board therefore invariably seeks legal relief.

*Finally*, Amazon's Seventh Amendment claim "fall[s] outside the [NLRB's] sphere of expertise." *Axon*, 598 U.S. at 196. The Supreme Court has repeatedly observed that agencies "are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise." *Carr v. Saul*, 593 U.S. 83, 92 (2021). And this case is no exception. Amazon's

---

41 (Apr. 10, 2024); *MPStar Pros., LLC*, 373 NLRB No. 42 (Apr. 2, 2024); *Flatline Constr., LLC*, 373 NLRB No. 35 (Mar. 13, 2024); *3484, Inc.*, 373 NLRB No. 28 (Mar. 7, 2024); *Atl. Veal & Lamb, LLC*, 373 NLRB No. 19 (Feb. 22, 2024); *North Mtn. Foothills Apts., LLC*, 373 NLRB No. 26 (Feb. 21, 2024); *Home Depot USA, Inc.*, 373 NLRB No. 25 (Feb. 21, 2024); *Int'l Longshoremen's Ass'n, Local 1526 (Fla. Int'l Terminal, LLC)*, 373 NLRB No. 22 (Feb. 14, 2024); *Vesta VFO, LLC*, 373 NLRB No. 10 (Jan. 10, 2024); *Twinbrook OpCo, LLC*, 373 NLRB No. 6 (Dec. 28, 2023); *East Freight Logistics, LLC*, 373 NLRB No. 7 (Dec. 22, 2023); *Phillips 66 Co.*, 373 NLRB No. 1 (Dec. 6, 2023); *Int'l Longshoremen's Ass'n, Local 1294 (Fed. Marine Terminals, Inc.)*, 372 NLRB No. 160 (Dec. 6, 2023); *United Parcel Serv., Inc.*, 372 NLRB No. 158 (Nov. 21, 2023); *Cemex Constr. Materials Pac., LLC*, 372 NLRB No. 157 (Nov. 13, 2023); *Maywood SNF Operations LLC*, 372 NLRB No. 152 (Oct. 13, 2023); *Integrity Def. Servs., Inc.*, 372 NLRB No. 151 (Sept. 30, 2023); *Metrohealth, Inc.*, 372 NLRB No. 149 (Sept. 30, 2023); *Instituto de Educacion Popular del Sur de Cal.*, 372 NLRB No. 146 (Sept. 28, 2023); *Solution One Indus., Inc.*, 372 NLRB No. 141 (Sept. 22, 2023); *Success Village Apts, Inc.*, 372 NLRB No. 140 (Sept. 19, 2023); *Wendt Corp.*, 372 NLRB No. 135 (Aug. 26, 2023); *Tecnocap LLC*, 372 NLRB No. 136 (Aug. 26, 2023).

23

claim raises questions of "constitutional law" that are "detached from considerations of agency policy." *Axon*, 598 U.S. at 194 (quotation marks omitted).

"All three *Thunder Basin* factors thus point in the same direction—toward allowing district court review" of Amazon's claim that the NLRB's juryless adjudication "violates the Constitution." *Id.* at 195.

## IV. The Deprivation of Seventh Amendment Rights Constitutes Irreparable Harm.

The district court also concluded that there was no "substantial threat of irreparable harm" because Amazon could challenge the Board's imposition of legal relief in the court of appeals. Dist. Ct. Dkt. 34 at 13. But the irreparable harm at issue here is not the imposition of legal relief; it is the imposition of legal relief *without a jury*. In other words, Amazon challenges its subjection to an unconstitutional adjudication in the first instance. This Court has made clear that "subjecting [a party] to costly and dubiously authorized administrative adjudications amounts to irreparable harm." *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 238 (5th Cir. 2024). And that is because such an injury "is impossible to remedy once the proceeding is over, which is when appellate review kicks in." *Axon*, 598 U.S. at 191.

That is particularly true for Seventh Amendment violations. Indeed, courts have a "responsibility" to grant the drastic remedy of "mandamus where necessary to protect the constitutional right to trial by jury." *Dairy Queen, Inc. v. Wood*, 369

24

U.S. 469, 472 (1962). And, to issue such a writ, "there must be no other adequate means to obtain the relief desired." *In re Jefferson Parish*, 81 F.4th 403, 416 (5th Cir. 2023). In that way, the "mandamus analysis" is "similar to an irreparable-injury analysis." *Id.* This confirms that the deprivation of a jury trial right constitutes irreparable harm. And there is no basis in equity to require Amazon to proceed through a juryless administrative tribunal before affording it a chance to vindicate its Seventh Amendment rights. Regardless of the result, a juryless "proceeding that has already happened cannot be undone." *Axon*, 598 U.S. at 191. Nor is there any mechanism to compensate Amazon for having to endure such an unconstitutional process after it concludes. An injunction is therefore necessary to provide Amazon meaningful relief.

## CONCLUSION

"Congress did not establish a general scheme authorizing the Board to award full compensatory damages for injuries caused by wrongful conduct." *Int'l Union, United Auto., Aircraft & Agric. Implement Workers of Am. (UAW-CIO) v. Russell*, 356 U.S. 634, 643 (1958). *See generally* Chamber *Starbucks* Br., *supra*. Yet by trying to expand its statutory authority to impose such relief, the Board has ventured straight into a constitutional trap. Amazon has a Seventh Amendment right to a jury trial, and this Court should enjoin the NLRB's unconstitutional in-house proceeding.

25

Respectfully Submitted,

*/s/ Steven A. Engel*

BRIAN A. KULP
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

JORDAN L. VON BOKERN
MARIA C. MONAGHAN
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, NW
Washington, DC 20062

STEVEN A. ENGEL
 *Counsel of Record*
MICHAEL H. MCGINLEY
JUSTIN W. AIMONETTI
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel for the Chamber of Commerce of the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2024, I caused the foregoing *amicus curiae* brief to be filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit. The Court's CM/ECF system was used to file the brief, and service will therefore be accomplished by the CM/ECF system on all CM/ECF-registered counsel.

Dated: October 16, 2024

*/s/ Steven A. Engel*
Steven A. Engel
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel of Record for the*
*Chamber of Commerce of the*
*United States of America*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,417 words, excluding those portions of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-pt font.

Dated: October 16, 2024

*/s/ Steven A. Engel*
Steven A. Engel
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel of Record for the*
*Chamber of Commerce of the*
*United States of America*

# EXHIBIT B



**Andrew Quijano <afq2003@nyu.edu>**

## Clarification on Jury Duty Retaliation Protections
2 messages

**Andrew Quijano** <afq2003@nyu.edu>                                    Tue, Aug 26, 2025 at 1:06 PM
To: KCharrin@nycourts.gov

Hello Karen,
Thank you again for your time and insight during our previous conversation. I truly appreciate your willingness to speak with me. I had a brief follow-up question I wanted to raise separately, just as a general clarification.

If an employer asks an employee to sign a general release or severance agreement following jury service and that release does not specifically reference jury duty, is it your understanding that a retaliation claim related to jury service could still potentially be raised?

From my understanding, jury duty is considered a matter of public obligation and the associated protections are generally viewed as non-waivable. I ask only because, in trying to better understand my situation, I've found that no employment attorney has been willing to consider the matter due to the existence of the release. I'm trying to get a broader sense of how this issue is generally viewed in the context of juror protections and public policy.

Of course, I fully understand you're not offering legal advice, I'm simply hoping for any general insight you might be able to share.

--

Sincerely,

Andrew Quijano
NYU Tandon School of Engineering | PhD '28
NYU Email Address
917-224-2122

**Karen H. Charrington** <KCharrin@nycourts.gov>                        Wed, Aug 27, 2025 at 9:26 AM
To: Andrew Quijano <afq2003@nyu.edu>

Good morning Andrew,


The facts you describe below all would be taken in context.  If there was specific facts or evidence relating the release and termination with your jury service, a claim could be raised.


Best Regards,

Karen H. Charrington, Esq.

*Counsel to the County Clerk*

Office of the Queens County Clerk

88-11 Sutphin Blvd.

Jamaica, N.Y. 11435

Office: (718) 298-0640

Case 1:26-cv-00664-LDH-RML　　Document 24　　Filed 04/22/26　　Page 69 of 95 PageID #: 376

*County Clerk's Web Address*

http://www.nycourts.gov/QUEENSCLERK

*E-Courts*

https://iapps.courts.state.ny.us/webcivil/FCASMain

*View records online* here.

*Access the NYSCEF System using these links*: E-File  &  EDDS

 

[Quoted text hidden]

Please be CAREFUL when clicking links or opening attachments from external senders.

# EXHIBIT C

Case 1:26-cv-00664-LDH-RML    Document 24    Filed 04/22/26    Page 71 of 95 PageID #: 378

    Andrew Quijano <afq2003@nyu.edu>

████████████████████████

4 messages

████████████████    Fri, Jan 10, 2025 at 6:46 PM

To: "afq2003@nyu.edu" <afq2003@nyu.edu>

Hi Andrew Quijano,

████████████████████████████████████

Product Security Engineer

So that we can set up your interview, please provide your availability for a 1 hour 30 mins Video Conference Screening Interview.

Our interview hours are typically weekdays from 10 AM - 4 PM, and we ask you to provide at least 5 dates of availability to expedite scheduling.

Once we schedule your interview, please look out for a confirmation email with interview details.

████████████████████████████████████
████████████████████████████████

If you have any questions, please feel free to reach out. We're looking forward to meeting you!

Best,

████████

**Provide Availability**



████████████████    Fri, Jan 10, 2025 at 7:14 PM

To: "afq2003@nyu.edu" <afq2003@nyu.edu>

Hi Andrew,

Thanks for taking the time to chat with me about the Product Security Engineer position. I've attached our prep guides for your initial interview. There are two 45-minute interviews – a coding interview and a technical security interview. The security questions will only focus on web security, per the guide.

Also, please note that the security interview guide is a little bit out of date - it's now a **45-minute interview** and there is **no coding section on that interview.** Please let me know if you have any additional questions.

███

███████

---

**From:** ████████████████████████

**Sent:** Friday, January 10, 2025 3:46 PM

**To:** afq2003@nyu.edu <afq2003@nyu.edu>

**Subject:** ████████████████

[Quoted text hidden]

---

**2 attachments**

 **Security Coding Prep.pdf**
48K

**Product Security Interview Prep-Screen 1 (1) (2) (2).pdf**
264K

---

████████████████████                                          Fri, Jan 17, 2025 at 4:42 PM

To: "afq2003@nyu.edu" <afq2003@nyu.edu>

Hi Andrew,

Thanks for taking the time to speak with me about our Security Engineer position and for participating in our interview process. I heard back from your interviewers, and at this time we unfortunately won't be continuing with your application for this position. It's been a pleasure to represent you, and I do wish you the best of luck in your search and moving forward in your career.

███

███████

---

**From:** ████████████████████████

**Sent:** Friday, January 10, 2025 4:14 PM

**To:** afq2003@nyu.edu <afq2003@nyu.edu>

████████████████████

[Quoted text hidden]

---

**Andrew Quijano** <afq2003@nyu.edu>                          Sat, Jan 18, 2025 at 8:14 PM

████████████████████

████████

Thank you for the fast turnaround time and your assistance during the interview process.

I'm eager to stay connected and informed about future job openings. When would be the next time that I could apply

New York University Mail - ██████████████████████████████████████████████████████████████ https://mail.google.com/mail/u/0/?ik=a3c0ed27b7&view=pt&search=a...

█████████████████ if there is an opening in the Product Security team?

Once again, thank you for your time, and I look forward to staying in touch.

[Quoted text hidden]
--
Thanks,

Andrew Quijano

# Supreme Court of the State of New York
## Appellate Division: Second Judicial Department

M305679
AFA/

HECTOR D. LASALLE, P.J.
MARK C. DILLON
COLLEEN D. DUFFY
BETSY BARROS
FRANCESCA E. CONNOLLY, JJ.

———————————————————

2025-05769

The People, etc., respondent,                              DECISION & ORDER ON MOTION
v Orlando Valdez, appellant.                                     Assignment of Counsel

(Ind. No. 72733/2023)

———————————————————

       Appeal by Orlando Valedez from a judgment of the Supreme Court, Queens County, rendered May 5, 2025, following a trial. Pursuant to Criminal Procedure Law § 380.55(2) and upon the affirmation of Lori Golombek, dated May 5, 2025, it is

       ORDERED that pursuant to County Law § 722 the following named attorney is assigned as counsel to prosecute the appeal:

Patricia Pazner
Appellate Advocates
111 John Street - 9th Floor
New York, New York 10038

and it is further,

       ORDERED that the appeal will be heard on the original papers (including a certified transcript of the proceedings, if any) and on the appellant's and the respondent's briefs; the appellant and the respondent are directed to upload, through the digital portal on this Court's website, digital copies of their respective briefs, with proof of service of one hard copy on each other, or, if the appellant is self-represented and unable to upload a digital copy, to file one original copy with the Clerk of this Court, with proof of service of one hard copy on the respondent (22 NYCRR 670.9[a]); additionally, the appellant is directed to file proof of service of a subpoena upon the clerk of the court of original instance requiring all documents constituting the record on appeal to be filed with the Clerk of this Court (22 NYCRR 1250.9[a][4][i]); and it is further,

       ORDERED that the stenographer of the trial court is directed promptly to make, certify, and file two transcripts of the proceedings of any pretrial hearings, of the plea of guilty or of the trial, and of the imposition of sentence in this action, except for those minutes previously transcribed and certified (*see* 22 NYCRR 671.9); and it is further,

June 6, 2025                                                                                   Page 1.
PEOPLE v VALDEZ, ORLANDO

ORDERED that in the event that the case was tried to a conclusion before a jury, the stenographer shall also make, certify, and file two transcripts of the minutes of proceedings during jury selection; and it is further,

ORDERED that the Clerk of the trial court shall furnish one certified transcript of each of the proceedings set forth above to the appellant's counsel, without charge (*see* CPL 460.70); assigned counsel is directed to turn over those transcripts to the respondent when counsel serves the appellant's brief on the respondent; and it is further,

ORDERED that in the event the stenographer has already prepared a copy of any of the minutes for a codefendant, then the Clerk of the trial court is directed to reproduce a copy thereof for assigned counsel; and it is further,

ORDERED that upon service of a copy of this decision and order on motion upon it, the Department of Probation is hereby authorized and directed to provide assigned counsel with a copy of the presentence report prepared in connection with the appellant's sentencing, including the recommendation sheet and any prior reports on the appellant which are incorporated in or referred to in the report, and to provide additional copies to this Court upon demand; and it is further,

ORDERED that in the event an issue as to the legality, propriety, or excessiveness of the sentence is raised on appeal, or if assigned counsel cites or relies upon the probation report in a brief or motion in any other way, counsel shall provide a complete copy of such report and any attachments to the Court and the District Attorney's office prior to the filing of such brief or motion; and it is further,

ORDERED that the appellant's time to perfect the appeal is extended; assigned counsel shall prosecute the appeal expeditiously in accordance with this Court's rules (*see* 22 NYCRR 1250.9) and written directions; and it is further,

ORDERED that in the event the file has been sealed, it is hereby unsealed for the limited purpose of allowing assigned counsel or his or her representative access to the record for the purpose of preparing the appeal; such access shall include permission to copy the papers insofar as they pertain to the appellant; and it is further,

ORDERED that assigned counsel is directed to serve a copy of this decision and order on motion upon the clerk of the court from which the appeal is taken.

LASALLE, P.J., DILLON, DUFFY, BARROS and CONNOLLY, JJ., concur.

ENTER:

Darrell M. Joseph
Clerk of the Court

*Appellant's address*:
Please make inquiry to the State Inmate Locator
New York State Department of Correctional Services
Telephone: (518) 457-0043

June 6, 2025                                                                                                  Page 2.

PEOPLE v VALDEZ, ORLANDO

# EXHIBIT D



### Arbitration Agreement

By applying for employment with Tesla, Inc., and participating in the pre-employment process, Tesla and I agree to arbitration as the exclusive method for economically and efficiently resolving potential disputes or claims between us as set forth in this Arbitration Agreement ("Agreement"). Tesla, Inc. (together with any parents, subsidiaries, successors, affiliates, and assigns, the "Company") and I (together the "Parties") hereby agree to final, binding and private arbitration conducted by JAMS, under its Employment Arbitration Rules & Procedures, which can be found at https://www.jamsadr.com/rules-employment-arbitration, or by requesting a copy of from Tesla Human Resources.

In arbitration, each side in the dispute presents its case to a neutral third party called an arbitrator, rather than to a judge or jury. Tesla and I may be represented by our own legal counsel in the arbitration. The arbitrator shall have the authority to compel adequate discovery. After reviewing the evidence and considering the arguments of the Parties, the arbitrator will issue a written decision, which will include the reasons for the award. There will be no trial by a judge or jury, and no appeal of the arbitrator's decision, except as provided by law. The Parties are entitled to all rights and remedies that we would be entitled to pursue in a court of law. This Agreement does not apply to any claim or claims that cannot be arbitrated under applicable law. It further expressly excludes claims subject to small claims court jurisdiction, and excludes claims for injunctive relief to preserve the status quo prior to, and/or in aid of, arbitration hereunder.

Tesla and I also agree that each may pursue in arbitration claims against the other only in our individual capacities (if applicable, including any individual claim for California Labor Code violations I allege to have personally suffered under the Private Attorneys General Act), and may not file claims as a plaintiff, nor participate as a class member, in any class, group, or collective proceeding against the other. Tesla and I further agree that each may not file claims against the other as a plaintiff, nor participate as a representative, in any representative action against the other, except to the extent unenforceable by applicable law. The arbitrator's authority is limited to disputes between the Parties or, as applicable, against the Company's officers, directors, employees, agents, representatives, or shareholders. Claims may not be joined or consolidated in arbitration unless agreed to in writing by the Parties.

The Federal Arbitration Act ("FAA") and all of its sections, including its Section 3, govern the interpretation, enforcement, and arbitrability of this Agreement, and the Parties waive any rights to a court trial before a judge or jury with respect to any claims covered by this Agreement. The arbitrator shall apply applicable law to determine issues of liability and damages regarding all arbitrated claims. The arbitrator is authorized to award any remedy or relief that would have been available to the Parties, had the matter been heard in court. The arbitrator shall have the authority to award attorneys' fees and costs to the prevailing party, if such award is authorized by applicable law.

Either Tesla or I may initiate arbitration by making a written request to arbitrate to the other Party that lists the claim(s) to be arbitrated and by submitting a Demand for Arbitration directly with JAMS per instructions on JAMS' website, with a copy of the Demand for Arbitration to be served on Tesla's registered agent for service of process CT Corporation within the statute of limitations under applicable state and/or federal law for the particular claim(s) asserted.

The arbitration shall take place in the county in which the position for which you applied or are applying for employment is located, and subject to the FAA, the substantive law of the State of that county shall otherwise be the governing law, unless the Parties agree otherwise. If I initiate arbitration, then I will pay the initial JAMS filing fee, provided such fee does not exceed the initial filing fees charged by a court of applicable jurisdiction; the Company will pay the arbitrator's fees and any additional administrative fees unique to arbitration; and the Parties will pay for their own fees and costs to the extent they would be required to in a court of law.

# EXHIBIT E

Case 1:26-cv-00664-LDH-RML    Document 24    Filed 04/22/26    Page 79 of 95 PageID #: 386



Search by case name...                                    Search          ≡



Search     ≡

# TOLLE v. POCKETSONICS, INC.

United States District Court, Western District of Virginia (2018)

Labor, Employment & Benefits › USERRA — Reemployment & Discrimination

## Facts

- The plaintiff, James Tolle, filed a complaint against multiple defendants, including PocketSonics, Inc. and Analogic Corporation, alleging discrimination based on his veteran status under the Uniformed Services Employment and Reemployment Rights Act (USERRA).

- Tolle, a veteran of the United States Navy Reserve, began working for PocketSonics in February 2011 and was recommended for non-hire by CEO Jeff Pompeo when the company was acquired by Analogic in 2013.

- While all other PocketSonics employees were offered permanent positions at Analogic, Tolle was only given a temporary contract, which he declined.

- Subsequently, he signed a Severance Agreement that released PocketSonics from all claims in exchange for severance payments.

- The defendants moved to dismiss Tolle's complaint, arguing that the Severance Agreement barred his USERRA claims.

- The court held a hearing on the motion in February 2018, and the case was ripe for decision thereafter.

## Issue

- The issue was whether the Severance Agreement signed by Tolle effectively waived his rights under USERRA and whether he could pursue



Search

## Holding — Conrad, S.J.

- The U.S. District Court for the Western District of Virginia held that the defendants' motion to dismiss was granted in part and denied in part, allowing for limited discovery regarding the comparison of benefits received by Tolle and his coworkers.

## Rule

- A waiver of rights under USERRA must be clear and unequivocal, and the benefits received must be compared against the rights waived to determine validity.

## Reasoning

- The U.S. District Court reasoned that while a veteran could waive rights under USERRA, the waiver must be clear and unequivocal.

- The court found that the Severance Agreement contained unambiguous language waiving Tolle's rights but noted that it was unclear whether the benefits he received were greater than those he might have gained absent the alleged discrimination.

- Therefore, the court determined that discovery was needed to assess whether the Severance Agreement provided Tolle with more favorable terms compared to what he lost.

- The court also declined to resolve the issue of individual liability against some defendants at this stage, recognizing that the determination of the waiver's validity was critical to the case.

## Deep Dive: How the Court Reached Its Decision



Search ☰

The U.S. District Court for the Western District of Virginia reasoned that while veterans have the ability to waive their rights under the Uniformed Services Employment and Reemployment Rights Act (USERRA), such waivers must be clear and unequivocal. The court noted that the Severance Agreement signed by Tolle included explicit language that appeared to relinquish any claims related to his employment and termination with PocketSonics. However, the court raised concerns regarding whether the benefits Tolle received through the agreement were more favorable than those he would have otherwise received had he not faced discrimination based on his veteran status. This highlighted a critical aspect of evaluating the validity of the waiver: the necessity to compare the rights waived against the benefits received. The court emphasized that the record was insufficiently developed to ascertain this comparison, prompting the need for limited discovery. The court's analysis relied on precedents that indicated broad waivers in similar agreements could effectively release USERRA claims, provided they were made with clear intent. Additionally, the court recognized that the determination of whether the Severance Agreement fully released Tolle's USERRA claims was pivotal, as it would significantly influence the outcome of the case. Consequently, the court decided against resolving the issue of individual liability for some defendants at that stage, since the waiver's validity was still under investigation. Overall, the court's reasoning underscored the importance of clarity in waivers and the necessity for a factual basis to evaluate the implications of such agreements on veterans' rights under USERRA.

## Waiver Requirements Under USERRA

The court explained that waivers of rights under USERRA must not only be clear but also convincing, specific, and unequivocal, ensuring that veterans are not deprived of their rights under duress or misrepresentation. The statutory framework of USERRA allows for the possibility of waiver, but the legislative



Search    ☰

rights of veterans cannot be diminished by any agreements or contracts that do not offer equivalent or greater benefits. This provision reinforces the requirement that any waiver must be scrutinized to ensure that the veteran did not forfeit more than they gained. By establishing these guidelines, the court aimed to protect the rights of veterans while recognizing the enforceability of contractual agreements like severance packages. The court acknowledged the balancing act between honoring the contractual nature of severance agreements and upholding the protective intent of USERRA legislation. This legal framework ultimately guided the court's decision to allow for further exploration of the facts surrounding Tolle's claims and the Severance Agreement's provisions.

## Discovery and Future Proceedings

In its ruling, the court determined that limited discovery was necessary to compare the benefits received by Tolle against the rights he potentially waived through the Severance Agreement. This discovery would involve examining the terms of the severance packages offered to Tolle and his coworkers, particularly those who were not veterans, to ascertain whether the benefits Tolle received were indeed better or worse. The court's decision to permit this phase of discovery reflected its commitment to thoroughly understanding the implications of the waiver before making a conclusive ruling on the matter. The court also indicated that the outcome of this discovery would be crucial in determining whether Tolle's claims could proceed. Additionally, the court made it clear that the resolution of individual liability claims against some defendants would be deferred until the waiver's validity was conclusively established. By framing the discovery process as essential to resolving the case, the court emphasized the need for a comprehensive factual basis before ruling on the substantive issues raised by Tolle's complaint. This approach underscored the court's recognition of the complex interplay between employment law, veterans'



Search

# Explore More Case Summaries

## CITY OF MONROE v. WYRICK (1981)

**Supreme Court of Louisiana:** An accused in a criminal prosecution must be provided with clear advisement of their right to counsel and must make a knowing and intelligent waiver of that right before they can be sentenced to imprisonment.

## DODSON v. SAUL (2020)

**United States District Court, Eastern District of California:** An ALJ must provide clear and convincing reasons for rejecting a claimant's subjective complaints and must properly evaluate the opinions of treating and examining physicians.

## WRIGHT v. ASTRUE (2008)

**United States District Court, Northern District of California:** An ALJ must provide clear and convincing reasons for rejecting the opinions of treating and examining physicians when determining the onset date for disability benefits.

## UNITED STATES v. HUNTER (1954)

**United States Court of Appeals, Fifth Circuit:** A civil rights violation under 18 U.S.C.A. § 242 requires a clear legal duty for state officials to take action in preventing the deprivation of rights.

## SMITH v. COLVIN (2015)

**United States District Court, Northern District of California:** An ALJ must provide clear and convincing reasons when rejecting a claimant's credibility and must properly evaluate the opinions of treating and examining physicians in disability cases.

## The top 100 legal cases everyone should know.

The decisions that shaped your rights, freedoms, and everyday life—explained in plain English.

**See the top 100**



Search



4 million+ case summaries. Clear, fast, and free.

## Explore

All Case Summaries

Browse Cases by Topic

Most Popular Cases

Search

## Legal & Support

Terms of Use

Privacy Policy

Disclaimer

Contact

Removal Requests

# Browse cases by category

## Foundations

Business Law & Regulation

Constitutional Law

Contract Law

Evidence

Property Law

Torts

## Litigation & Criminal

Civil Procedure & Dispute Resolution

Criminal Law & Constitutional Protections of the Accused

Environmental Contamination & Toxic Torts

Products Liability



Search

☰

Immigration & Nationality

Data Breach & Response Litigation

Labor, Employment & Benefits

FinTech & Digital Assets

Legal Ethics & Attorney Discipline

Healthcare Fraud & Abuse

Taxation

Intellectual Property, Media & Technology

Wills, Trusts & Estates

© 2026 Blackacre Lab Works LLC

Tolle v. PocketSonics, Inc. 🔗

Select Language ⌄  Powered by Google Translate  ↻    Disclaimer

# Ⓐ Tolle v. PocketSonics, Inc., 342 F. Supp. 3d 695

📚 Export Citation

**United States District Court for the Western District of Virginia, Charlottesville Division**

**October 30, 2018, Decided; October 30, 2018, Filed**

**Civil Action No. 3:17CV00074**

**Reporter**
**342 F. Supp. 3d 695** * | 2018 U.S. Dist. LEXIS 185834 ** | 212 L.R.R.M. 3207 | 2018 WL 5619364

JAMES TOLLE, Plaintiff, v. POCKETSONICS, INC., et al., Defendants.

**Prior History:** Tolle v. PocketSonics, Inc., 2018 U.S. Dist. LEXIS 35922 (W.D. Va., Mar. 5, 2018)

## Core Terms

rights, release agreement, employees, beneficial, veteran, benefits, bonus, summary judgment, defendants', waive, signing, Bonuses, merger, bonus payment, non-veteran, positions, district court, allegations, termination, regular, individual liability, motion to dismiss, severance package, severance payment, unambiguous, contingent, discovery, renewed, terms, memorandum opinion

**Counsel:** [**1] For James Tolle, Plaintiff: Kevin James Shehan ⌄, LEAD ATTORNEY, Tully Rinckey PLLC ⌄, New York, NY.

For Pocketsonics, Inc., Analogic Corporation, doing business as Analogic Untrasound Virignia Corporation, Analogic Limited, Jeff Pompeo, Travis Blalock, Ronald Rios, Farley Peechatka, Defendants: Hayley M. Cotter ⌄, Kenneth M. Bello ⌄, LEAD ATTORNEYS, PRO HAC VICE, Bello Welsh LLP ⌄, Boston, MA; Michael Curtis Gartner ⌄, LEAD ATTORNEY, Whiteford, Taylor & Preston, LLP ⌄, Falls Church, VA.

**Judges:** Hon. Glen E. Conrad ⌄, Senior United States District Judge.

**Opinion by:** Glen E. Conrad ⌄

## Opinion

[*696] **MEMORANDUM OPINION**

Plaintiff James Tolle filed this employment discrimination action under the Uniform Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301-4335, against PocketSonics, Inc. ("PocketSonics"), Analogic Corporation, Analogic Limited (collectively, "Analogic"), Jeff Pompeo, Travis Blalock, Farley Peechatka, and Ronald Rios. The defendants previously moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that Tolle's claims are barred by a Bonus & General Release Agreement ("Release Agreement") that Tolle signed in consideration for certain bonus and severance payments, and that Tolle had not sufficiently stated a claim against Blalock, [**2] Peechatka, or Rios. In response, Tolle conceded that Blalock and Peechatka are not subject to individual liability under USERRA. However, he opposed the defendants' motion in all other respects.

On March 5, 2018, the court issued a memorandum opinion and order granting in part and denying in part the defendants' motion to dismiss. Although the court found the Release Agreement to be clear and unambiguous, the court did not believe that the record had been sufficiently developed to determine whether the Release Agreement provided benefits that were greater than those that Tolle





employees received severance agreements, [was] necessary." Hrof 5, 2018 Hem. Op. 5, Dkt. No. 24. Because a ruling on the enforceability of the Release Agreement could be dispositive of Tolle's claims, the court declined to decide whether Tolle stated a plausible claim against Rios.

The parties have completed the limited discovery permitted by the court. The defendants have since filed a renewed motion to dismiss the complaint or, in the [**3] alternative, **[*697]** for summary judgment. The court held a hearing on the motion via teleconference on August 28, 2018. The motion has been fully briefed and is now ripe for review.

## Background

Tolle is a veteran of the United States Navy Reserve. Compl. ¶ 15, Dkt. No. 1. He completed his last active duty assignment in July of 2009. Id. ¶ 17. Tolle was honorably discharged from the Navy Reserve in September of 2011. Id. ¶ 19.

In February of 2011, Tolle began working as a senior engineer for PocketSonics, a technology company that developed a handheld ultrasound device known as the "Sonic Window." Id. ¶ 18; see also Decl. of Jeffrey Pompeo ("Pompeo Decl.") ¶ 10, Dkt. No. 47. Tolle remained with PocketSonics until September 19, 2013, the day before the company merged with Analogic, another technology company. Compl. ¶¶ 77-78. Prior to the merger, PocketSonics employed eight individuals, including Tolle. Defs.' Resp. to Pl.'s 1st Set of Interrogs. 2, Dkt. No. 46-1. The other employees were Chief Executive Officer Jeff Pompeo, Travis Blalock, Drake Guenther, Michael Fuller, Jermaine Headley, Karen Morgan, and Jacob Wegman. Id. Tolle alleges that Pompeo failed to appreciate Tolle's military experience, [**4] exhibited bias toward Tolle for that service, and gave preferential treatment to the other employees of PocketSonics, all of whom were non-veterans. Compl. ¶¶ 21-41.

In August of 2013, two of Analogic's executive officers, Ronald Rios and Farley Peechatka, met with all of the PocketSonics employees to discuss Analogic's pending acquisition of PocketSonics. Id. ¶ 51. Tolle alleges that "Rios and Peechatka promised that all PocketSonics employees, including Tolle, would retain their positions and receive permanent positions with Analogic after the merger with PocketSonics." Id. ¶ 52. During the meetings, Tolle advised Rios and Peechatka of his military background and requested that they "consider giving him opportunities to use his extensive leadership and management skills from being a senior Navy Officer." Id. ¶ 53.

On September 4, 2013, PocketSonics' Board of Directors ("Board") held a meeting to discuss matters related to the pending merger with Analogic. Board Meeting Minutes 1, Dkt. No. 51-1. The Board also discussed the proposed payment of bonuses to certain employees. The minutes from the meeting indicate that the Board approved the payment of "Transaction Bonuses" to four employees, [**5] including Tolle, which would be contingent upon the successful completion of the merger with Analogic and the execution of a release agreement by the recipient. Id. 7. The Board also approved the payment of "FDA Bonuses" to the same four employees, which would be contingent upon the submission of the Sonic Window to the Food and Drug Administration ("FDA"). Id. The Board proposed to pay Tolle a Transaction Bonus in the amount of $13,500 and an FDA Bonus in the same amount. Id. The bonuses proposed for the other three employees ranged from $19,125 to $54,000 each. Id.

The Board also approved the payment of "Special Pre-Closing Bonuses" to all eight PocketSonics employees. Id. 8. The Board proposed to pay Tolle and four other employees a Special Pre-Closing Bonus of $2,000. The remaining bonuses ranged from $15,000 to $30,000. Id. The Board agreed that the Special Pre-Closing Bonuses would be paid immediately prior to the effectiveness of the proposed merger. Id.

Analogic ultimately declined to offer Tolle a permanent position with the company following the merger. According to the complaint, this decision was made by Rios, upon the recommendation of Pompeo **[*698]** and Blalock. See, e.g., Comp. ¶ 87 (describing [**6] a written statement from Rios in which he noted that "both Pompeo and Blalock affected his decision not to hire or retain Tolle as a regular employee after Analogic's acquisition of PocketSonics was final"). Instead, Analogic offered Tolle a three-month consulting arrangement, which Tolle rejected. Decl. of Patricia Dumas ("Dumas Decl.") ¶ 3, Dkt. No. 46. The proposed consulting agreement was contingent upon the company's acquisition of PocketSonics by September 13, 2013. Consulting Agreement ¶ 1, Dkt. No. 46-2. Under the terms of the proposed consulting agreement, Tolle would have been paid a maximum amount of $6,000 per week during the three-month period specified in the agreement. Id. ¶ 6.

All of the other PocketSonics employees were offered and accepted regular employment with



Analogic, including their respective compensation packages, have been filed under seal with the court. See Sealed Exs. to Dumas Decl., Dkt. No. 50. Four of the individuals who accepted full-time engineering positions with [**7] Analogic were offered annual base salaries that exceeded $100,000. Id. They were also given the opportunity to participate in Analogic's annual bonus program and its standard benefit program that included medical, dental, and life insurance, disability protection, and the company's 401(k) plan. Id. Two of the individuals who accepted full-time engineering positions also received Analogic stock units as a sign-on equity award, as well as the opportunity to receive an additional equity award as part of Analogic's long-term incentive program. Id.

On September 13, 2013, Tolle executed a Bonus & General Release Agreement ("Release Agreement"), under which Tolle agreed that his employment would terminate on the business day prior to the closing of PocketSonics' merger with Analogic, and that he desired to "resolve certain matters including those related to the provision of certain bonus opportunities to [Tolle] from PocketSonics, the release of claims by [Tolle] against PocketSonics, and the termination of [his] employment." Release Agreement 1, Dkt. No. 47-3. By signing the Release Agreement, Tolle acknowledged that he had been given at least 21 days to consider the agreement, and that he [**8] had been advised to consult with an attorney about the agreement's terms. Id. ¶ 8. Under the terms of the Release Agreement, Tolle received a "Transaction Bonus Payment" of $13,500, a "Severance Payment" of $13,500, and a "Special Bonus Payment" of $2,000, all in "valuable consideration" for his general release of claims against PocketSonics. Id. ¶¶ 1, 3. The release provision of the agreement states as follows:

> I hereby fully and forever generally release and discharge PocketSonics, its current, former and future parents, subsidiaries, affiliated companies, related entities, employee benefit plans, and their fiduciaries, predecessors, successors, officers, directors, stockholders, agents, employees and assigns (collectively, the "Company") from any and all claims, causes of action, and liabilities up through the date of my execution of this Release. The claims subject to this release include, but are not limited to, those relating to my employment with PocketSonics and/or any predecessor to PocketSonics and the termination of such employment which will be effective as of the Termination Date. In understanding the terms of this Release and my rights, I have been advised to consult with [**9] an attorney of my choice prior to executing this Release. I understand **[*699]** that nothing in this Release shall prohibit me from exercising legal rights that are, as a matter of law, not subject to **waiver**. . . .

Id. ¶ 2. In a separate paragraph, Tolle also agreed as follows: "I understand and agree that by entering into this Release I am waiving any and all rights or claims I might have under the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act, and that I have received compensation beyond that to which I was previously entitled." Id. ¶ 8. Tolle further acknowledged that he had seven days after signing the Release Agreement in which to revoke it, and that the agreement would not be enforceable until after the revocation period expired. Id.

On September 20, 2013, the date on which the merger became effective, three of the PocketSonics employees who accepted engineering positions with Analogic entered into a "Side Letter Agreement" concerning the payment of a bonus contingent on the submission of the Sonic Window to the FDA for "510(k) clearance" ("FDA Bonus"). Side Letter Agreement, Dkt. No. 50-8. The amounts of the FDA Bonuses ranged from $19,125 [**10] to $54,000. Id. at 2. An earlier version of Tolle's Release Agreement included a contingent FDA Bonus in the amount of $13,500. See Pompeo Decl. Ex. D., Dkt No. 47-4. That bonus was ultimately replaced with the Severance Payment in the same amount. The parties dispute whether Tolle negotiated this particular change. See 2nd Tolle Decl. ¶ 2, Dkt. No. 59-1.

All seven of the other PocketSonics employees received the "Special Bonus Payment" approved by the Board. Pompeo Decl. ¶ 12. Four of the other employees received a Special Bonus Payment in the amount of $2,000, the same amount paid to Tolle. Board Meeting Minutes 5. However, one of the employees who accepted an engineering position with Analogic received a Special Bonus Payment in the amount of $25,000. Id. Additionally, five of the other PocketSonics employees received a "Transaction Bonus Payment." Pompeo Decl. IR 12. The Transaction Bonus Payments made to three of the employees who accepted full-time engineering positions with Analogic ranged from $19,125 to $54,000. Board Meeting Minutes 5.

Tolle has filed declarations in response to the pending motion. In the first declaration, Tolle states that he signed the Release Agreement "in order to obtain the [**11] only employee benefits [he] received in connection with the PocketSonics-Analogic merger," and that his "subjective aim . . . was not to obtain benefits superior to those under USERRA." 1st Tolle Decl. ¶ 1. Tolle further avers that at







emphasizes that he did not become aware of all the amounts paid to other employees until after the instant action was filed, and that he did not "believe that USERRA and/or [his] 'veteran'-related rights were at issue in signing the [Release] Agreement." Id. ¶¶ 2, 5. Although Tolle was advised to consult with an attorney, he did not retain legal counsel to assist him in deciding whether to sign the agreement. Id. ¶ 6. Instead, he spoke to a "former employer. . . whom [he] trusted to give [him] advice on contract issues." Id.

In response to Tolle's first declaration, the defendants submitted an email indicating that Tolle learned of the Side Letter Agreement regarding FDA Bonus Payments by no later than September 20, 2013, which was within the time period in which he could [**12] have revoked the Release Agreement. In a second declaration submitted in response, Tolle avers that he [*700] inadvertently learned about the Side Letter Agreement on September 19, 2013, but that "as of the afternoon of September 20, 2013, the last day of the revocation period for the . . . Release Agreement, [he] still did not have knowledge of the specific payments made to other employees." 2d Tolle Decl. ¶ 1. Likewise, Tolle states that he had "no knowledge of the particular Transaction Bonuses, Special Bonuses and stock payment amounts" made to other PocketSonics employees. Id.

## Standards of Review

PocketSonics, Analogic, Pompeo, and Rios (collectively, "the defendants") have filed a renewed motion to dismiss the complaint or, in the alternative, for summary judgment, arguing that Tolle's USERRA claims are barred by the Release Agreement. The defendants have also renewed their previous argument that the complaint does not state a plausible claim for individual liability against Rios.

Because both sides have presented matters outside the pleadings to support their respective positions on the issue of whether Tolle's USERRA claims are barred by the Release Agreement, the court will treat the [**13] defendants' motion as a motion for summary judgment with respect to that issue. See Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether to grant a motion for summary judgment, the court must "view[] the facts and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Woollard v. Gallagher, 712 F.3d 865, 873 (4th Cir. 2013).

In light of the court's ruling on the first issue, it must also consider whether the complaint states a plausible claim for individual liability against Rios. Because the defendants solely challenge the sufficiency of the allegations against Rios, and do not rely on any matters outside the pleadings to support their position, the court will review this portion of the defendants' motion under Federal Rule of Civil Procedure 12(b)(6). "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint." Edwards v. City of Goldsboro, 178 F.3d 231, 234 (4th Cir. 1999). To survive dismissal under this rule, "a complaint must contain sufficient factual matter, [**14] accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2000)). When ruling on a motion to dismiss, the court "must assume all [well-pled facts] to be true" and "draw all reasonable inferences in favor of the plaintiff." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009) (alteration in original) (internal quotation marks omitted).

## Discussion

"USERRA was enacted, in part, 'to prohibit discrimination against persons because of their service in the uniformed services." Hill v. Michelin N. Am., Inc., 252 F.3d 307, 311 (4th Cir. 2001) (quoting 38 U.S.C. § 4301(a)(3)). Accordingly, USERRA provides that any person who is a member of a uniformed service, or has performed service in a uniformed service, "shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership [*701] . . . [or] performance of service . . . ."  38 U.S.C. § 4311(a). USERRA further provides that "[a]n employer shall be deemed to have engaged in actions prohibited . . . under subsection (a), if the person's membership [or] . . . service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove



By bringing a claim in federal district court by the person aggrieved." Hace v. Willis, 259 F. Supp. 3d 1007, 1015 (D.S.D. 2017) (citing 38 U.S.C. § 4323(a)(3)). "Remedies available for violations of USERRA include: (1) injunctive relief, (2) lost wages or benefits suffered as a result of a USERRA violation, and (3) liquidated damages in an amount equal to the amount of lost wages or benefits if the employer's violation was willful." Id. (citing 38 U.S.C. § 4323(d)(1)).

In the instant case, Tolle claims that PocketSonics, Analogic, Pompeo, and Rios violated his rights under USERRA by, inter alia, providing him with "lower awards, bonuses, stock options, and compensation compared to similarly situated non-veteran employees," and by "ultimately [**16] failing to retain and/or hire [him] in a position with Analogic," all because of his prior military service. Compl. ¶ 97. In the pending motion, the defendants argue that Tolle's USERRA claims are barred by the Release Agreement that Tolle executed on September 13, 2013, and that the complaint fails to state a claim for individual liability against Rios. The court will address each of the defendants' arguments in turn.

## I. The Enforceability of the Release Agreement

Courts have recognized that the text and legislative history of USERRA indicate that a veteran may waive his rights under the statute. See, e.g., Wysocki v. Int'l Bus. Mach. Corp., 607 F.3d 1102, 1108 (6th Cir. 2010). To be enforceable, however, a **waiver** must be "clear and unambiguous," and it must pass muster under **38 U.S.C. § 4302**. Id. at 1107-08. **Section 4302**, which addresses USERRA's relation to other laws, plans, and agreements, provides as follows:

> (a) Nothing in this chapter shall supersede, nullify or diminish any Federal or State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that establishes a right or benefit that is more beneficial to, or is in addition to, a right or benefit provided for such person in this chapter.

> (b) This chapter supersedes any State law (including [**17] any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by this chapter, including the establishment of any additional prerequisites to the exercise of any such right or the receipt of any such benefit.

**38 U.S.C. § 4302**.

Only a few courts have had the opportunity to consider whether a contractual **[*702] waiver** of rights is enforceable under this "unique" statutory provision. Vahey v. Gen. Motors Co., No. 1:11-cv-00661, 2012 U.S. Dist. LEXIS 189423, at *13 (D.D.C. Mar. 1, 2012); see also Wysocki, 607 F.3d at 1109 (Martin ▾, J., concurring) (noting that **§ 4302** "is an exceedingly strange statute" and that he could not "recall ever having encountered anything remotely similar in [his] more than thirty years on the bench"). Those that have been tasked with applying **§ 4302** in the context of contractual **waivers** have recognized that the "critical inquiry" is whether the rights or benefits the veteran received by signing the **waiver** were more beneficial than the rights or benefits he agreed to give up. Wysocki, 607 F.3d at 1107; see also Washington v. Shell Oil Co., No. 2:17-cv-08825, 2018 U.S. Dist. LEXIS 97971, at *5 (E.D. La. June 12, 2018) (quoting Wysocki, supra); Vahey, 2012 U.S. Dist. LEXIS 189423, at *13 (characterizing **§ 4302** as "permitting a **waiver** of rights only for a more beneficial agreement"). This reading is consistent with the [**18] regulations implementing **§ 4302**, which explain that "USERRA establishes a floor, not a ceiling, for the employment and reemployment rights and benefits of those it protects." 20 C.F.R. § 1002.7. "In other words, an employer may provide greater rights and benefits than USERRA requires, but no employer can refuse to provide any right or benefit guaranteed by USERRA." Id. This reading is also consistent with the recognition that "USERRA's provisions are to be liberally construed in favor of veterans." Wysocki, 607 F.3d at 1108; see also Hill, 252 F.3d at 313 ("Because USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries.").

The United States Court of Appeals for the Sixth Circuit's opinion in Wysocki appears to be the only appellate decision squarely addressing whether a release executed by an employee passed muster under **§ 4302**. In that case, the plaintiff alleged that International Business Machines ("IBM") terminated his employment upon his return from military service, in violation of USERRA. Wysocki, 607 F.3d at 1103. On the same day that his employment was terminated, the plaintiff signed a release as part of a separation plan that he negotiated with IBM. Id. at 1104. Under the terms [**19] of the release, the plaintiff agreed to waive all claims that he might have against IBM of any kind, "including, but not limited to [claims of] discrimination based on . . . veteran status. . .

payment of $6,023.03 in exchange for signing the release. Id. The release specifically instructed the plaintiff to consult with an attorney prior to signing it. Id. The plaintiff accepted the severance payment and did not exercise his right to revoke his acceptance. Id. Thereafter, he filed suit against IBM for violating his rights under USERRA. Id. at 1103.

On appeal from the district court's decision granting summary judgment to IBM, the Sixth Circuit held that the release was valid and enforceable under **§ 4302**. Id. at 1108-09. Prior to reaching its decision, the Court noted that USERRA's "legislative history clearly envisioned that veterans would be able to waive their individual USERRA rights by clear and unambiguous action." Id. at 1008. The Court reasoned that "the ability to waive their USERRA rights without unnecessary court interference, [**20] if they believe that the consideration they will receive for waiving those rights is more beneficial than pursuing **[*703]** their rights through the courts, is both valuable and beneficial to veterans." Id. The Court then turned to the record in the case before it, observing that the release at issue used "clear and unambiguous language and involved a valuable amount of consideration." Id. The Court emphasized that the release informed the plaintiff that it "covered claims based on 'veteran status." Id. The Court determined that "[t]his clear and unambiguous language informed Wysocki that he was waiving his USERRA rights and, in exchange for signing the Release, Wysocki received over $6,000.00." Id. Under the circumstances presented, the Sixth Court found that "it appear[ed] from the record that Wysocki understood that the Release eliminated his USERRA rights, that he signed the Release because he believed that the rights provided in the Release were more beneficial than his USERRA rights and, therefore, that the Release [was] exempted from the operation of **§ 4302(b)** by **§ 4302(a)**." Id. Notably, the Court emphasized that "Wysocki [had] not presented any argument or evidence to the contrary," and that it could [**21] not "find any such evidence in the record." Id. The Court went on to note that there was no evidence of incapacity, fraud, misrepresentation, or duress, and that Wysocki was encouraged to consult with an attorney. Id. Based on the record before it, the Court held that "**§ 4302** [did] not invalidate the Release." Id.

In a concurring opinion, Judge Boyce Martin ▾ emphasized that Wysocki relied strictly on an unsuccessful legal argument in response to IBM's motion, "instead of coming forward with evidence to dispute whether the Release resulted in a situation more beneficial than his USERRA rights." Id. at 1109 (Martin ▾, J., concurring). Accordingly, Judge Martin ▾ noted that the case before it was "not the right vehicle for broad statements about the application of **section 4302**," and that he "applaud[ed] the majority's exercise of restraint in deciding [the] case narrowly instead of permitting these bad facts to result in bad law." Id. In concurring in the majority's decision, Judge Martin ▾ once again emphasized that Wysocki "did not present any evidence that would suggest that the money that he received for signing the Release was less beneficial than his USERRA rights, and thus inadequate under **section 4302(a)**." Id. at 1110. Judge Martin ▾ noted that "[a]n [**22] affidavit likely would have sufficed to create a question of fact" on this issue. Id. "Because Wysocki presented no such evidence," Judge Martin ▾ agreed with the majority that "the proper conclusion on this record is that the Release resulted in a situation more beneficial to Wysocki than his USERRA rights and was thus enforceable under **section 4302(b)**." Id.

Based on certain language in Wysocki, some district courts have interpreted this provision of USERRA "to require a subjective belief that the consideration provided by the **waiver** agreement was more beneficial than the rights provided by USERRA." Washington, 2018 U.S. Dist. LEXIS 97971, at *5 (citing Wysocki, 607 F.3d at 1108 ("Clearly, the ability to waive their USERRA rights without unnecessary court interference, if they believe that the consideration they will receive for waiving those rights is more beneficial than pursuing their rights through the courts, is both valuable and beneficial to veterans.")). In Washington, which was before the court on a motion to dismiss, the complaint expressly alleged that the plaintiff "could not determine whether the rights provided in the Release were more beneficial than the rights provided by USERRA," and that the plaintiff "signed the Release 'not because he believed that [**23] the rights provided in the Agreement were more beneficial than his USERRA rights, but rather because of the severe financial distress and emotional duress **[*704]** he continued to suffer' as a result of the Defendants' actions." 2018 U.S. Dist. LEXIS 97971, at *5-6. In light of such allegations, the district court concluded that the defendant's affirmative defense of **waiver** did not appear from the face of the complaint and therefore was not a valid ground for dismissal under Rule 12(b)(6). Id.

Similarly, in Vahey, the United States District Court for the District of Columbia contrasted the facts presented in the case before it from those in Wysocki, and determined that it could not "confidently conclude that plaintiff unambiguously believed the severance package [that he accepted] was more beneficial than his right to bring a claim under USERRA." 2012 U.S. Dist. LEXIS 189423, at *15. The district court explained as follows:



months' salary was better than nothing, as the plant was closing and hence his job no longer existed. But as plaintiff contends, [**24] he was arguably entitled to the opportunity to transfer, either because that opportunity was offered to other employees not deployed for military service or by virtue of USERRA's 'escalator' principle. Because he was not offered a transfer, it is unclear that plaintiff would have chosen the severance package over a transfer opportunity.

Id. (additional citations omitted). Accordingly, "[u]nlike in Wysocki," the district court was unable to "conclude that plaintiff weighed the benefits of his USERRA rights against the severance package and chose the more beneficial arrangement." Id. The district court therefore denied the defendant's motion to dismiss, once again noting that it could not be said from the existing record that "plaintiff consciously waived his USERRA rights in the belief that what he was receiving under the Release was more beneficial than his statutory rights." Id.

Against this backdrop, Tolle and the defendants disagree as to what standard of proof should be employed in determining whether a contractual **waiver** of rights is enforceable under **§ 4302**. Consistent with Washington and Vahey, Tolle argues that the defendants' motion must be denied because they have "failed to show, [**25] as a matter of law and/or based on undisputed material facts, that [he] subjectively believed that the benefits of the [Release Agreement] were more beneficial than his USERRA rights." Pl.'s Br. in Opp'n 3, Dkt. No. 52. The defendants, on the other hand, maintain that "a 'subjective belief' standard is not required in assessing the validity of a USERRA **waiver**," and that the record conclusively establishes that "the benefits plaintiff received were more beneficial, or in addition to, his USERRA rights." Defs.' Reply Br. 2, 5, Dkt. No. 54.

Both sides have advanced strong arguments in favor of their respective positions on whether a "subjective belief" standard should be applied. In the court's view, a veteran's subjective understanding or motivation is one of several factors that may bear on the determination of whether a release agreement resulted in a situation more beneficial to a veteran than his USERRA rights. The court believes that other potentially relevant factors include the particular terms of the agreement, the extent to which the veteran was involved in negotiating the agreement, whether the veteran obtained the advice of counsel, and a comparison of how the employer treated [**26] similarly-situated non-veteran employees. Ultimately, however, the resolution of the **[*705]** instant motion does not turn on whether Tolle subjectively believed that the rights provided in the Release Agreement were more beneficial than his USERRA rights. Even assuming that Tolle's subjective state of mind is immaterial or irrelevant to the analysis under **§ 4302**, the court concludes, for the following reasons, that the defendants are not entitled to summary judgment based on the Release Agreement.

First, the terms of the Release Agreement, when viewed in Tolle's favor, do not compel the conclusion that the agreement provided rights that were more beneficial to Tolle than his USERRA rights. Under USERRA, Tolle had the right not to be denied "employment" or "any benefit of employment" on the basis of his military service. 38 U.S.C. § 4311(a). By executing the Release Agreement, Tolle agreed to receive payments totaling $29,000, in exchange for releasing the defendants from "any and all claims . . . up through the date of [his] execution," including claims relating to his employment with PocketSonics and the termination of such employment. Release Agreement ¶ 2. The court previously found such broad language to be sufficiently [**27] clear to waive Tolle's USERRA rights. However, neither this language, nor the language describing Tolle's payments as "valuable consideration," conclusively establishes that the Release Agreement passes muster under **§ 4302**. Id. ¶ 1. As Judge Martin ⌄ observed in Wysocki, "[j]ust because (1) a **waiver** clearly declares an intent to waive USERRA rights and (2) the veteran received substantial consideration does not permit the inference that the consideration was more beneficial to the veteran than his USERRA rights." Wysocki, 607 F.3d at 1110 (Martin ⌄, J., concurring). "Stated differently, the face of the Release does not allow for a conclusion of enforceability," and, at most, "satisfied [the defendants'] initial burden of production in asserting the Release." Id. For this very reason, the court found that limited discovery was necessary in the instant case.

Second, unlike Wysocki, the record in this case includes additional evidence that would suggest that the money Tolle received for signing the Release Agreement was less beneficial than his USERRA rights, namely the evidence of how Tolle was treated in comparison to his non-veteran coworkers. It is undisputed that Tolle was the only PocketSonics employee who was not [**28] offered regular employment with Analogic, and that all of his non-veteran coworkers received compensation packages that included a sizeable base salary, bonus opportunities, paid vacation time, and other employee benefits. Likewise, the evidence produced during discovery, when viewed in Tolle's favor, indicates that his bonus/severance payments were significantly lower than the bonus payments made





Go to ∨      All terms ∨            🔍            ∧ ∨                      ← 31 of 52 Results →

in Supp. 11-12, Dkt. No. 43, an employee cannot be denied employment or employment benefits on the basis of his military service. See 38 U.S.C. § 4311(a). That is precisely what is alleged here. See Compl. ¶ 97. Based on the current record, the court is unable to conclude that Tolle's Release Agreement resulted in a situation more beneficial to Tolle than his rights under USERRA.

Third, it is not enough that Tolle received benefits that were "different" from those offered to other PocketSonics employees. Defs.' Br. in Supp. 3. For instance, in their brief in support of the pending motion, the defendants emphasize [**29] that "[n]o other PocketSonics employee was offered 'severance' in connection with the merger with Analogic," and that certain **[*706]** other employees instead received an FDA bonus that was contingent on the submission of the Sonic Window to the FDA for clearance. Id. at 2-3. The defendants' arguments in this regard do not carry the day on summary judgment. As emphasized above, Tolle received thousands of dollars less than non-veteran coworkers at PocketSonics and no offer of full-time regular employment from Analogic. Thus, while Tolle's severance package was clearly "different," the court cannot say, as a matter of law, that it was more beneficial to Tolle than his USERRA rights.

Finally, the court is unable to conclude that Tolle's "receipt of $29,000 was, by definition, . . . 'in addition to' his USERRA rights," thereby rendering the Release Agreement enforceable under **§ 4302(a)**. Defs.' Br. in Supp. 2. This is not a case in which a policy or agreement plainly offered additional rights beyond those provided under USERRA. See, e.g., 20 C.F.R. § 1002.7(c) ("For example, although USERRA does not require an employer to pay an employee for time away from work performing service, an employer policy, plan, or practice that provides such [**30] benefit is permissible under USERRA."). Instead, the defendants maintain that Tolle waived his USERRA rights in exchange for the payments provided under the Release Agreement. The defendants have failed to explain how the severance package could be viewed as being "in addition to" Tolle's USERRA rights, if those rights were eliminated or otherwise rendered unenforceable by the Release Agreement.

For all of these reasons, the defendants are not entitled to summary judgment based on the Release Agreement. At this stage of the proceedings, the court must construe the evidence and draw all reasonable inferences in favor of Tolle. When the record is viewed in that manner, it cannot be said that there is no genuine dispute as to any material fact and that the defendants are entitled to judgment as a matter of law on the issue of whether the Release Agreement resulted in a situation more beneficial to Tolle than his USERRA rights. Accordingly, the enforceability of the Release Agreement under **§ 4302** cannot be decided in the defendants' favor on summary judgment.

## II. The Sufficiency of the Allegations against Rios

The defendants have also renewed their motion to dismiss the claim for individual liability [**31] against Rios on the basis that he is not an "employer" for purposes of USERRA. USERRA defines an "employer" as "any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities, including . . . a person, institution, organization, or other entity to whom the employer has delegated the performance of employment-related responsibilities." 38 U.S.C. § 4303(4)(A). USERRA's accompanying regulations likewise state that an employer includes "any person . . . that has control over employment opportunities . . . ." 20 C.F.R. § 1002.5(d)(1). Based on this language, courts have held that individuals who have control over hiring and firing are "employers" under USERRA. Croft v. Vill. of Newark, 35 F. Supp. 3d 359, 368 (W.D.N.Y. 2014) (collecting cases).

Upon review of the complaint, the court concludes that it states a plausible claim for individual liability against Rios. The complaint includes multiple allegations indicating that Rios had the power to hire Tolle to work for Analogic and that he ultimately decided not to offer Tolle a regular position with the company. See, e.g., Compl. ¶ 86 (quoting from a May 9, 2014 statement from Analogic indicating that "Mr. Rios decided to accept the earlier **[*707]** recommendations of Mr. [**32] Pompeo and Dr. Blalock and not to offer Mr. Tolle a regular position with Analogic"); Id. ¶ 87 (referencing an October 22, 2014 written statement from Rios in which he explained what "affected his decision not to hire or retain Tolle as a regular employee after Analogic's acquisition of PocketSonics") (emphasis added). Such allegations, accepted as true, allow the court to draw the reasonable inference that Rios had control over employment opportunities with Analogic and therefore was as an "employer" for purposes of USERRA. See Iqbal, 556 U.S. at 678. Accordingly, the defendants' motion to dismiss on this ground will be denied.

## Conclusion

Case 1:26-cv-00664-LDH-RML    Document 24    Filed 04/22/26    Page 95 of 95 PageID #: 402

merits of the plaintiff's claims of discrimination in violation of USERRA.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 30th day of October, 2018.

/s/ Glen E. Conrad ▾

Glen E. Conrad ▾

Senior United States District Judge

**ORDER**

By: Hon. Glen E. Conrad ▾

Senior United States District Judge

For the reasons stated in the [**33] accompanying memorandum opinion, it is hereby

**ORDERED**

that the defendants' renewed motion to dismiss the complaint or, in the alternative, for summary judgment is **DENIED**. The parties shall proceed with discovery on the merits of the plaintiff's claims of discrimination in violation of USERRA.

The Clerk is directed to send copies of this order and the accompanying memorandum opinion to all counsel of record.

DATED: This 30th day of October, 2018.

/s/ Glen E. Conrad ▾

Senior United States District Judge

**Footnotes**

* ⏚ USERRA defines the term "benefit" or "benefit of employment" as

> any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental and unemployment benefits, vacations, and the opportunity to select work hours or location of employment.

38 U.S.C. § 4303(2).



About LexisNexis®    Processing Notice
Privacy Policy    Terms & Conditions
Trust Center    Sign In | Register
Cookie Policy



Copyright © 2026 LexisNexis.

