*** Filed ***
06:56 PM, 19 Jun, 2026
U.S.D.C., Eastern District of New York

**UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK**

---

Andrew Quijano, Plaintiff, -against- AMAZON.COM SERVICES LLC, Defendant

Case No.: 1:26-cv-00664

---

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF OBJECTIONS TO THE REPORT AND RECOMMENDATION AND IN FURTHER SUPPORT OF MOTION TO REMAND

## I. PRELIMINARY STATEMENT: THE VERTICAL ASCENT OF THE PRO SE AGAINST BIG LAW

The Plaintiff files these objections with a singular, unyielding focus: this Court lacks subject-matter jurisdiction, and the case must eventually be remanded.

While the procedural maze of federal removal was initially daunting, the Plaintiff has adapted with absolute precision. Since February 2026, the Plaintiff has undergone what is essentially the legal equivalent of the Meiji Restoration. In a mere 30 days, the Plaintiff progressed from learning the foundational mechanics of electronic filing to identifying and documenting concrete Rule 11(b)(4) violations committed by a global elite law firm via strategic exhibit planting (ECF No. 9, Exhibit C, D), and even threatened a default on the motion to strike (ECF No. 22). This rapid vertical leap, from novice e-filer to trading blows with an acclimated "Litigation Star," Mr. Jason David Burns, has instilled in the Plaintiff the necessary confidence to navigate any federal forum.

**However, confidence in one's ability to litigate cannot manufacture federal jurisdiction where none exists**. Defendant's counsel is currently attempting to escape their late-removal failures by pivoting toward a venue transfer to the Southern District of New York (SDNY). But a venue transfer cannot cure a fundamentally untimely removal notice under 28 U.S.C. § 1446(b). Bouncing this case between federal districts only delays the inevitable conclusion that federal subject-matter jurisdiction never attached in the first place. Conversely, a swift remand to the Queens County Supreme Court offers the only lawful resolution to this procedural quagmire. The current Report & Recommendation completely glosses over some important nuances not addressed in the question about State Rights. Because federal removal courts must strictly construe their jurisdiction, this Court should decline to anchor its docket to a removal notice built on such unstable procedural ground.

The Plaintiff continues to press for remand on unassailable grounds of comity, federalism, and judicial economy. There exists a significant probability that the Queens County Court will require the Plaintiff's involvement, particularly in light of the potential mistrial risks the Plaintiff has identified regarding *The People of the State of New York v. Orlando Valdez* (ECF No. 24, Section VI(c)). It is in the best interest of the unified court system for this case, and the inevitable judicial fallout concerning the integrity of New York's jury system, to be adjudicated by the New York State courts, where the underlying statutory protections of Judiciary Law § 519 originated.

## II. THE MAGISTRATE'S EXPLICIT REFUSAL TO RULE ON THE MOTION TO STRIKE RISKS A CIRCULAR JURISDICTIONAL NIGHTMARE IN THE SDNY

The procedural mechanism adopted by the R&R is a masterclass in judicial inefficiency. In Footnote 1 of the Report and Recommendation, the Magistrate explicitly notes that the Plaintiff's

2

Motion to Strike the Defendant's contractual "General Release" defense under Rule 12(f) was formally referred to him by Judge DeArcy Hall. (R&R at 1, n.1). However, the Magistrate chose to defer explicitly considering that motion, opting instead to recommend a venue transfer to the Southern District of New York.

This creates an absurd, circular game of jurisdictional hot potato that inevitably loops right back to where it started. By deferring the Motion to Strike, the Magistrate is recommending that this Court ship a procedurally toxic asset to Lower Manhattan. Should the Court adopt this recommendation, the SDNY will inherit a case burdened by a threshold motion to invalidate the core defense on New York public policy grounds.

If the SDNY judge sits down, reads the Plaintiff's motion (ECF No. 20, 22, 24), and rules that a boilerplate corporate release cannot extinguish statutory protections under New York Judiciary Law § 519, SEC 21F-17(a), USERRA, NY § 740, JSIA, etc., and that the release is non-severable, the contract falls apart**.** The moment that the contract dies, the sole purported federal defense vanishes. At that exact moment, **the venue provisions of NYLL § 740(4)(b) instantly take absolute precedence.**

Under NYLL § 740(4)(b), a whistleblower action **may be brought in the county where the plaintiff resides, where the alleged retaliation occurred, or where the employer maintains its principal place of business. For this dispute, the relevant New York loci are strictly confined to Queens County. The Southern District of New York encompasses neither Queens nor the Defendant's corporate headquarters, rendering Manhattan a completely foreign forum under the state framework.**

Consequently, if the **SDNY determines that the General Release fails on public policy grounds, the sole jurisdictional hook that anchors the case in SDNY evaporates**. The SDNY would find itself presiding over a litigation where it satisfies none of the permissible statutory venue criteria under New York law. Bound by the principles of comity, the strict limits of the state text, and the factors governing supplemental jurisdiction under 28 U.S.C. § 1367(c), the SDNY would have no choice but to either:

1. Deconstruct the case and remand the remaining state-law husk directly back to the Supreme Court of Queens County, or

2. Acknowledge that Manhattan is an improper statutory venue and transfer the case right back to the Eastern District of New York, landing this exact file straight back onto Judge DeArcy Hall's desk.

Passing the buck to the Southern District just to execute a circular loop that could force an inevitable remand or an embarrassing return-to-sender transfer is an egregious waste of federal judicial resources. Judicial economy dictates that this Court should reject the R&R, address the threshold issues here, and remand this matter immediately.

## III. THE MAGISTRATE ERRED BY IGNORING THE CLAUSTROPHOBIC REALITY OF JURY SERVICE AND ITS POTENTIAL SYSTEMIC CONTAMINATION

The Magistrate's R&R treats corporate retaliation against a sitting juror as a routine workplace dispute, failing to address the explicit public policy triggers of New York Judiciary Law § 519. This clinical assessment ignores the claustrophobic, high-stakes reality of state criminal court proceedings.

4

As outlined in the Plaintiff's Supplemental Declaration, the trial environment in *The People of the State of New York v. Orlando Valdez* was defined by intense pressure and strict judicial oversight. (Pl. Supp. Decl. ¶¶ 1 - 5). In an environment where jurors felt immense pressure to comply with instructions strictly, Amazon's economic coercion actively bled into the courthouse.

Because Amazon placed the Plaintiff on a punitive "Final Written Warning" (ECF No. 18 Exhibit B) shortly before his jury service began, **and it was still in effect**, the Plaintiff was forced to job hunt from the jury room on a laptop bearing a prominent "Amazon Security" sticker. (Pl. Supp. Decl. ¶ 3-4; see Exhibit A, ECF No. 24, Exhibit C). The chilling effect of this corporate coercion could not be contained to a single seat; the Plaintiff's employment anxiety became known to an active, deliberating juror during a mandatory court recess. (Pl. Supp. Decl. ¶ 6).

This interaction perfectly illustrates why New York's jury protection laws provide no statutory carve-out for alternate jurors. The state has an absolute, sovereign interest in ensuring that corporate intimidation does not infiltrate its criminal panels or distract its citizens during high-stakes deliberations, thereby risking a criminal defendant's right to an impartial jury. Whether an employer's economic pressure on a juror risks a structural defect in a state criminal trial is a profound, novel question of New York State public policy. Because the Magistrate **entirely skipped this analysis, the R&R failed to recognize that, under 28 U.S.C. § 1367(c)(1), comity requires that this unique dispute be remanded to the state courts where it originated.**

## IV. THE DEFENDANT'S MANUFACTURED AMBIGUITY: HOW AMAZON'S OWN MATHEMATICAL CERTAINTY EXCLUDES THE PROTECTIONS OF MOLTNER

The Second Circuit's holding in *Moltner v. Starbucks Coffee Co.*, 624 F.3d 34 (2d Cir. 2010) is a narrow, specialized doctrine designed to prevent jurisdictional guesswork. It was never intended to act as a safe harbor for a corporate defendant who possesses mathematically explicit data from Day One but elects to sit on the clock.

In adopting its bright-line rule, the *Moltner* court explicitly joined the Eighth Circuit's holding in *In re Willis*, 228 F.3d 896 (8th Cir. 2000). However, a forensic comparison of the facts in *Willis* reveals why Amazon's reliance on this doctrine is completely meritless.

In *Willis*, the plaintiff filed a personal injury action seeking unquantified, abstract damages for "*pain and suffering, permanent disability, and wage loss.*" The defendant there genuinely had no way to ascertain federal jurisdiction from the face of the complaint and was forced to conduct an initial round of civil discovery and issue an Offer of Judgment of $75,001 just to define the jurisdictional boundary. The *Willis* rule was created precisely for that scenario, to "*promote certainty*" and prevent courts from guessing what a defendant "*may or may not subjectively know*" when facing unquantified claims.

Amazon's record presents the exact polar opposite of *Willis*. Here, the Plaintiff did not hide or disguise a single economic metric. On the face of the initial state court pleadings, the Defendant used facts they knew about the Plaintiff: an explicit base salary of **$175,000** and an explicit **253 days of separation**.

6

The Defendant did not need to conduct discovery to uncover the value of this case. They did not need to issue an offer of judgment to clear a fuzzy threshold. They simply read the initial pleading, executed a basic multiplication formula based on uncontested facts they knew about the Plaintiff, and declared in their own Notice of Removal that back pay alone totaled "at least $120,000." (ECF No. 9-4 at "Exhibit A" ¶ 12). Furthermore, the Plaintiff didn't contest this point, as mathematics can't be spun, obviating any need for pre-removal discovery (ECF No. 16).

By confirming that a "fair reading" of the Plaintiff's initial figures immediately established federal jurisdiction, **Amazon proved that this case was never ambiguous. Unlike the defendants in *Moltner* and *Willis*, Amazon was never forced to guess**. The removal clock began running on Day One because the necessary jurisdictional facts were readily ascertainable from the face of the initial pleading. Because Amazon chose to treat the 30-day window as active and waited until the final hours of Day 30 to file, it assumed the risk of procedural failure. Failing to perfect the state court notice under 28 U.S.C. § 1446(d) before the stroke of midnight means the removal was untimely.

Furthermore, the Defendant's insistence that a late-night, post-midnight cross-filing into Day 31 satisfies the removal statute completely disregards the mandatory mechanics of 28 U.S.C. § 1446(d). Writing for the U.S. Court of Appeals for the Eighth Circuit, Circuit Judge Morris Sheppard Arnold made it clear that courts cannot hand-wave these steps away:

> "*Although we have never addressed this issue (perhaps we never had to do so because the statute was clear to litigants), we think that the removal statute leaves little room for creative interpretation. The only rule that logically follows from 28*

*U.S.C. § 1446(d) is that removal is effected when the notice of removal is filed with the state court and at no other time. Therefore, the amended complaint was properly before the district court, and we find that the district court erred in refusing to consider it." Anthony v. Runyon*, 76 F.3d 210, 214 (8th Cir. 1996).

While the outcome in *Runyon* ultimately turned on separate evidentiary failures, Judge Arnold's threshold jurisdictional holding remains unassailed: **removal is not effected until the state court notice is achieved under § 1446(d)**. The **Plaintiff is not inherently averse to the development of nuanced circuit splits on complex doctrines**, but **departing from Judge Arnold's strict temporal rule here would invite an unmitigated procedural crisis**. To argue that Judge Arnold's ruling is incorrect requires this Court to adopt a legal fiction where a case can simultaneously exist in two independent judicial systems at 12:30 AM on Day 31. If a defendant is permitted to ignore the strict sequencing of § 1446(d), it opens the door to severe jurisdictional chaos where state court judges could routinely issue binding orders, select juries, or enter defaults while a federal notice sits unperfected in an attorney's outbox. By choosing to sit on its mathematically clear data until the final hours of Day 30, Defendant accepted the risk of procedural failure. **Because Defendant failed to perfect that state court notice before the stroke of midnight, the case was not timely effected within the strict statutory window.**

To hold that a defendant can bleed an hour into Day 31 and still claim a timely removal invites a dangerous, standardless precedent that federal courts have systematically rejected. **Deadlines in removal practice are strictly construed for this exact reason: to prevent litigants from playing fast and loose with concurrent jurisdiction.** The statutory text provides a hard boundary, not a sliding scale. Allowing Defendant to use the federal court as a shield despite missing the midnight cutoff under § 1446(d) rewards procedural delinquency.

8

## V. PRINCIPLES OF FEDERALISM AND COMITY MANDATE REMAND TO PROTECT THE SOVEREIGN INTERESTS AND INTEGRITY OF THE STATE COURT DOCKET

**a. THE STATE OF NEW YORK HAS AN EXCLUSIVE, ACTIVE SOVEREIGN INTEREST IN ADJUDICATING THE INTEGRITY OF ITS OWN JURY MACHINERY**

The record demonstrates that the State of New York has already actively asserted its administrative and regulatory oversight over this specific dispute. On February 18, 2025, the Queens County Clerk, acting as an official arm of the New York State Unified Court System, explicitly instructed the Plaintiff to seek statutory relief through the New York Attorney General's Labor Bureau (ECF No. 9, Exhibit C). Plaintiff strictly adhered to this state-mandated directive and filed a formal enforcement complaint on February 20, 2025 (ECF No. 9, Exhibit D).

The underlying claims are inextricably bound to New York Judiciary Law § 519 and channeled through the protective remedial framework of New York Labor Law § 740. Had these facts implicated federal interests or federal police powers, the Queens County Clerk would have directed Plaintiff to the United States Attorney for the Eastern District of New York or the Department of Justice. **They did not.**

Under basic principles of federalism, **federal courts possess no authority to enforce, manage, or police state-level statutory protections designed to safeguard the integrity of state court jurors.** Allowing the Defendant to maintain removal under a highly questionable timeline effectively permits a private corporate entity to **use the federal judiciary as a safe haven to**

9

**evade state regulatory scrutiny.** Principles of comity mandate that the court whose institutional machinery was allegedly subverted, the New York State Supreme Court, retain primary jurisdiction over the action.

**b. THE DEFENDANT'S LACK OF CANDOR TO THE QUEENS COUNTY COURT AND THE REQUISITE FAILURE OF § 1446(d)**

The Queens County Supreme Court received Defendant's State Court Notice of Removal 31 days after service, clocked in at 1:00 AM (ECF No. 16, Exhibit B). Because Defendant failed to strictly comply with the immediate notice requirement of 28 U.S.C. § 1446(d), the State Court proceeded unaware of the removal. The Queens County Court actively issued a Request for Judicial Intervention (RJI) (ECF No. 16, Exhibit A, C); technically and legally, the case remained fully active in Queens.

Maintaining absolute candor with both forums, Plaintiff directly called the Queens County Court Clerk on March 2, 2026. Only after a 6-minute conversation did the Clerk finally notice and process the delayed federal removal (Pl. Supp. Decl. ¶ 8, Exhibit B).

**Because NYSCEF did not reflect any removal within the mandatory 30-day window, there was no automatic stay on the state docket.** This created an administrative overlap, with concurrent jurisdiction hanging in limbo until the Plaintiff alerted the clerk.

It demonstrates a profound lack of candor and diligence for a multi-trillion-dollar Defendant to not only deliver its state court notice an hour late, triggering a month-long dual-jurisdiction circus, but also to sit idly by while being actively served state court RJI documents via NYSCEF.

10

Ultimately, it fell upon the Plaintiff, a conscientious former Queens juror (ECF No. 18, Exhibit D), to clean up Defendant's procedural wreckage.

## VI. THE 28 U.S.C. § 1367(c)(1) QUESTION HAS NOT BEEN THOROUGHLY ADDRESSED

Plaintiff finds himself in a unique position, presenting a complex matrix of open questions of first impression concerning New York Judiciary Law § 519.

### a. THE LIST OF OPEN LEGAL QUESTIONS BROUGHT IN THIS CASE

This list of issues *prima facie* demonstrates that this action introduces a highly novel, unmapped terrain of New York State Law that federal courts should decline to pioneer under 28 U.S.C. § 1367(c)(1):

1. **A Historic First-Impression Contractual Challenge:** This is likely the first case in American history testing the validity of a private corporate severance contract against the sovereign machinery of state jury service. As noted in Plaintiff's Motion to Strike (ECF No. 24), Defendant has failed to produce a single case in which a standard corporate "General Release" was successfully enforced to immunize an employer from penalizing a sitting juror.

2. **Complete Absence of Binding Judicial Precedent:** A quick search of New York jurisprudence in Lexis Nexis reveals zero published, binding state court opinions interpreting the civil application, pleading standards, or core statutory elements of New York Judiciary Law § 519.

3. **The Attorney General's Settlement Confirms the Blank Slate:** The only modern public enforcement mechanism concerning § 519 is an administrative, out-of-court

11

settlement executed by the New York Attorney General's Labor Bureau in 2015 (*In re Wyndham Hotel Group LLC*). While this executive action underscores the State's profound public policy interest in shielding jurors from workplace disruption, an **administrative settlement provides absolutely zero judicial guidance on how a court must interpret the law.**

4. **The Civil Enforcement Gap in New York Jurisprudence:** While the First Department in *Matter of Arnold v. New York State Div. of Human Rights*, 70 A.D.3d 605 (1st Dept. 2010) noted that Judiciary Law § 519 does not independently contain a standalone, private civil right of action, pointing instead to criminal contempt under Judiciary Law § 750, this creates an incredibly complex, unresolved state law vacuum regarding alternate civil remedies.

5. **The Intersection of Common Law Defamation and Jury Protection:** This Court is faced with answering how a § 519 statutory violation intersects with distinct state common-law claims. Specifically, the Court must determine whether an employer issuing a disciplinary penalty that recklessly overrides a criminal juror protection statute constitutes defamation *per se* by falsely impugning a citizen's professional integrity. This is especially true here, where a punitive "Final Written Warning" was weaponized in a manner akin to a Computer Fraud and Abuse Act indictment (ECF No. 18, Exhibit B, ECF No. 24, Section VI) before being abruptly retracted (ECF No. 18, Exhibit A).

## b. THE STRUCTURAL THREAT MODEL: PUBLIC WELFARE, CORPORATE NEGLIGENCE/RECKLESSNESS, AND THE JURY BOX

Because the state judiciary has noted a historical lack of a standalone private civil action under Judiciary Law § 519, Plaintiff systematically bypassed this roadblock by anchoring these claims

within the protective machinery of New York Labor Law § 740(2)(a). Under NY LL § 740, Plaintiff is legally insulated so long as he "*reasonably believes an employer's conduct is in violation of law, rule, or regulation.*" Based on statutory and systemic analysis (ECF No. 22 Section VI, ECF No. 24 Section VI), including direct communications with the Queens County Clerk (ECF No. 9, Exhibit C), it **is undeniable that state jury law exists primarily to safeguard the absolute sanctity of trial deliberation.**

Therefore, the restrictive, corporate-favored "but-for" test, which demands proof of an explicit, malicious intent to fire someone solely because they sat in a jury chair, is completely flawed. This statutory refusal to graft an unwritten *mens rea* requirement into Judiciary Law § 519 is fundamentally reinforced by bedrock Supreme Court precedent governing public safety. In *United States v. Dotterweich*, 320 U.S. 277, 280–281 (1943), the Supreme Court established that public welfare legislation routinely "*dispenses with the conventional requirement for criminal conduct — awareness of some wrongdoing*" because the underlying statutory protections touch vital public interests that are "*largely beyond self-protection.*"

**There is no civic space more vulnerable, nor more central to the machinery of government, than an active jury box under structural pressure**. As Justice Frankfurter famously observed in *Dotterweich*, balancing relative hardships dictates that the risk of compliance must be thrown entirely on the corporate employer. We cannot throw that hazard back onto an innocent public or force a juror to choose between their constitutional oath and their livelihood.

When an employer issues a false "Final Written Warning" (ECF Nos. 18, Exhibit A, B, D) that overlaps with active trial service, they introduce objective, systemic pressure into the system. Given the stakes of the Sixth Amendment right to an impartial jury, **it is a dangerous legal**

13

**fiction to pretend a juror facing sudden workplace ruin will not be tempted to rush a deliberation just to save their career.** This risk is compounded by the structural rarity of modern jury trials, which allows corporate entities to treat the jury system as an administrative afterthought rather than a sacred constitutional mandate.

Paradoxically, the broader corporate apparatus frequently sings the praises of the jury box when it suits their legal stratagems; the Chamber of Commerce and Defendant have gone so far as to argue that administrative enforcement mechanisms like the NLRB are unconstitutional specifically because they bypass a corporation's right to a jury trial (ECF No. 24, Exhibit A). If the corporate class truly believes the jury trial is an indispensable safeguard, **one would expect a multi-trillion-dollar entity like the Defendant to demand the most expansive, ironclad, and unforgiving protections for citizens called to serve on juries.**

Ultimately, making jurors absolutely safe from workplace coercion is a profoundly pro-business position. When multinational corporations put billions of dollars on the line in lawsuits, they **require absolute, unshakeable confidence in the integrity of the panel deciding their fate. The entire capitalist legal ecosystem relies on predictable, untainted adjudication. It is an existential threat to commercial stability if a massive civil or criminal trial can be completely compromised or face a structural mistrial simply because a rogue middle-manager wanted to assert petty workplace dominance over a sitting juror.**

**Restricting corporate retaliation protects the market itself.** Yet large enterprises exploit narrow, technical intent standards, operating under the assumption that they can safely disrupt a panel through economic retaliation so long as they execute the penalty through automated means and/or create plausible deniability. **Only a robust interpretation of state jury law, one that**

14

**makes clear that the courts possess the statutory authority to hold even corporate executives (ECF No. 20 Section V) accountable under public welfare principles, can enforce systemic corporate respect for the judicial machinery.** Principles of federalism and comity under 28 U.S.C. § 1367(c)(1) dictate that New York State courts, not a federal forum, decide these landmark boundaries for Judiciary Law § 519.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate's Report and Recommendation should be rejected, and this matter should be remanded to the Supreme Court of the State of New York, Queens County.

The State of New York and its judiciary are indispensable stakeholders in this matter. To deny remand under these facts would signal that a multi-billion-dollar corporate defendant can bypass mandatory state removal deadlines with impunity, thereby stripping state courts of their sovereign power to protect their own criminal jury panels under New York Judiciary Law § 519.

Should this Court deny remand and proceed with a venue transfer, the Plaintiff remains entirely prepared to litigate this matter in any federal forum. The Southern District of New York is historically unyielding when enforcing the procedural integrity of its docket, and the Plaintiff is fully prepared to file a comprehensive motion addressing the multiple Rule 11(b)(4) violations inherent in the Defendant's Answer (ECF No. 14) the moment this file crosses the East River. However, orderly administration and the foundational principles of comity dictate that this unique state public policy dispute belongs in state custody. This Court should decline to anchor its docket to a removal notice built on such unstable procedural ground and return this matter to the New York State courts where it originated.

**WHEREFORE**, for the reasons set forth above, Plaintiff Andrew Quijano respectfully requests that this Court:

1. **PRIORITIZE AND GRANT** Plaintiff's Motion to Strike the Defendant's "General Release" defense under Rule 12(f), or, in the alternative, **ORDER** the Magistrate Judge to issue a formal Report and Recommendation on the merits of the Strike, because resolving this threshold issue simultaneously disposes of the sole instrument Defendant relies upon to justify a venue transfer, while fundamentally requiring the Judiciary to settle substantial questions of Federal Law (including SEC Rule 21F-17, the Jury System Integrity Act, and USERRA) to conclusively establish that boilerplate corporate releases cannot extinguish or "chill" vital public and statutory interests;

2. **REJECT** the Magistrate Judge's Report and Recommendation to the extent that it recommends a venue transfer to the Southern District of New York, thereby avoiding an inefficient, circular jurisdictional loop that would inevitably result in a return-to-sender transfer or a delayed remand if the non-severable contract defense fails on federal public policy grounds;

3. **ORDER A REMAND o**f this action back to the Supreme Court of the State of New York, County of Queens, pursuant to 28 U.S.C. § 1447(c) due to Defendant's failure to timely effect removal within the strict, mandatory window dictated by 28 U.S.C. § 1446(d); and

4. **GRANT** such other and further relief as this Court deems just, proper, and necessary to preserve judicial economy, protect federal public interests, and shield the sovereign machinery of the state court.

Dated: June 19, 2026

Respectfully submitted,

*Andrew Quijano*

Andrew Quijano, Plaintiff Pro Se

54-29 69th Lane Maspeth, NY 11378

+1 (917) 224-2122

16